**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **No. 03 C 5636** |
| | ) | |
| **CATERPILLAR INC.,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

On February 2, 2002, Karon Lambert filed a charge of discrimination against her employer, Caterpillar Inc. ("Defendant"), with the Equal Employment Opportunity Commission ("EEOC" or "Plaintiff"). At that time, Lambert was employed at Defendant's facility in Aurora, Illinois. This action arises out of the EEOC's subsequent investigation into sexual harassment allegedly occurring at that facility. The EEOC brings sexual harassment claims on behalf of five current Caterpillar employees—Virginia Early, Sandy Irvin, Lillie Johnson, Wendy Hollenback-Smithburg, and Roxanne Tucker—and sexual harassment and retaliation claims on behalf of two former Caterpillar employees—Karon Lambert and Diana Gomez.[1] Defendant now moves for partial summary judgment. Defendant seeks summary judgment on all claims brought on behalf of Early, Gomez, Irvin, Johnson, Hollenback-Smithburg, and Tucker. Defendant does not now seek summary judgment on the sexual harassment and retaliation claims that Plaintiff brings on Lambert's behalf, but it does seek summary judgment on any claim for punitive damages in favor of Lambert. As explained here, Defendant's motion for summary judgment is granted in part and denied in part.

---

[1] As Defendant observes, since the original filing of this lawsuit, the EEOC has abandoned its claim that Defendant subjected Lambert and a class of women to a pattern or practice of sexual harassment. (Defendant's Memorandum of Law in Support of its Second Motion for Partial Summary Judgment ("Def. Mem.") at 2.) The EEOC has also abandoned the claims of a number of other employees originally identified as class members. (Def. Mem. at 2.)

## 1.    Defendant's Aurora Facility & Workforce

All of the events giving rise to this action took place at Defendant's facility in Aurora, Illinois, which is devoted primarily to manufacturing and assembling large earth-moving equipment. (Def. LR 56.1 Stmt. ¶ 6.) The Aurora facility is composed of four main buildings and occupies almost 400 acres. (*Id.* ¶ 7.) Approximately one-third of the employees at the Aurora facility are salaried and work in clerical, technical, professional, and managerial positions. (*Id.* ¶ 8.) The remaining employees are hourly workers who are engaged in various aspects of the manufacturing process. (*Id.*) These hourly employees are represented by the United Auto Workers, Local 145 (the "union" or the "UAW") and, under the terms of the collective bargaining agreement between Caterpillar and the union, these workers fall into two classes—full-time and supplemental. (*Id.* ¶ 10.) Full-time workers are regular, non-temporary employees who are subject to all of the benefits and obligations of the labor agreement; they are covered by a progressive discipline policy and can only be fired for just cause. (*Id.* ¶ 11.) Supplemental employees are hired to work on a temporary, though sometimes indefinite, basis. (*Id.* ¶ 12.) Unlike full-time employees, supplemental employees can be fired at any time for any reason, have limited grievance rights under the labor agreement, and are not protected by provisions of the labor agreement that require Caterpillar to engage in progressive discipline. (*Id.* ¶ 13.)

## 2.    Defendant's Sexual Harassment Policies & Training

Because it is relevant to Caterpillar's affirmative defense, and to Plaintiff's claim for punitive damages, the parties have devoted considerable attention to Caterpillar's practices and policies

---

[2]    The court derives the background facts from the following: Defendant's Rule 56.1 Statement of Material Facts as to Which There is no Genuine Issue Supporting Defendant's Second Motion for Partial Summary Judgment ("Def. LR 56.1 Stmt."); EEOC's Response to Defendant's Rule 56.1 Statement of Material Facts Supporting Defendant's Second Motion for Partial Summary Judgment ("Pl. LR 56.1 Resp."); Plaintiff EEOC's Local Rule 56.1(b)(3)(B) Statement of Additional Facts ("Pl. LR 56.1 Stmt."); Defendant's Response to Plaintiff's EEOC's Local Rule 56.1(b)(3)(B) Statement of Additional Facts ("Def. LR 56.1 Resp.").

concerning workplace harassment. From at least 1996 to 2000, Caterpillar maintained and published a policy that prohibited sexual harassment. (*Id.* ¶ 14.) The policy in place between 1998 and 2000 provide that an employee who believes that he or she has been sexually harassed should report the conduct to one of four people: (1) his or her supervisor, (2) his or her manager, (3) the labor relations and personnel service manager, or (4) the corporate EEO coordinator. (*Id.* ¶ 15; Aurora Facility's Sexual Harassment Policies from 1998-2000, Ex. C. to Def. LR 56.1 Stmt.)[3] Since 2000, Caterpillar has maintained and published a "prohibited harassment" policy that expanded upon its earlier policy to prohibit all forms of harassment, including sexual harassment. (Def. LR 56.1 Stmt. ¶ 16; Aurora Facility's Prohibited Harassment Policies from 2000 to present, Ex. D to Def. LR 56.1 Stmt.) Similarly to the earlier policy, the policy issued in 2004 instructs workers who believe they have been harassed to notify either the area supervisor, the department manager, the human resources manager, or the corporate EEO manager. (Def. LR 56.1 Stmt. ¶ 18.) In addition to those individuals, the 2005 and 2006 policies provide that employees can report harassment to local human resources staff, as well. (*Id.* ¶ 19.) Caterpillar's sexual harassment and prohibited harassment policies state that Caterpillar will not tolerate retaliation against an employee who reports or participates in an investigation of sexual harassment. (*Id.* ¶ 21.) The policies also explain that an employee who believes he or she has been harassed may file a charge with the Illinois Department of Human Rights or the Illinois Human Rights Commission; the 2005 and 2006 policies tell employees of their right to file a charge with the EEOC. (*Id.* ¶ 20.)

---

[3] Citing the testimony of John Futterer, Caterpillar's labor relations manager, Plaintiff asserts that supervisors are required to report allegations of sexual harassment to their own supervisors, who are then required to report those allegations to the labor relations department. (Pl. LR 56.1 Stmt. ¶ 21.) Futterer's testimony does not establish that Caterpillar actually *requires* communication in this manner. (Deposition of John Futterer at 92-93, Ex. 2 to Pl. LR 56.1 Stmt.) In any case, Bill Miller, the labor relations representative, testified that Caterpillar managers or supervisors do have a reporting obligation, and must report allegations of harassment directly to the labor relations department or "up through their line organization." (Deposition of Bill Miller at 50-53, Ex. W to Def. LR 56.1 Stmt.)

Since at least 1996, Caterpillar had established procedures for processing employee complaints regarding equal employment matters. (*Id.* ¶ 22; Complaint Procedure, Ex. E to Def. LR 56.1 Stmt.) Also since 1996, Caterpillar has maintained an equal employment opportunity ("EEO") policy announcing that the Aurora facility is to be a harassment-free work environment. (Def. LR 56.1 Stmt. ¶ 23; Aurora Facility EEO Policy Statement, Ex. F to Def. LR 56.1 Stmt.) These harassment policies, as well as government-required anti-discrimination posters, have been posted in at least one spot of high visibility in every major building at the Aurora facility since 1996; they have also been posted in locked glass display cases at major facility entrances, at least one of which all employees pass when they walk into work. (Def. LR 56.1 Stmt. ¶¶ 25-27.)

In addition to the posters, Caterpillar communicated with its employees by way of printed publications. In 1996, Caterpillar published a booklet for employees called *What You Should Know About Sexual Harassment in the Workplace*, which reprints Caterpillar's sexual harassment policy and provides guidance to employees on how to recognize and handle sexual harassment and the consequences of such harassment. (*Id.* ¶ 28; *What You Should Know About Sexual Harassment in the Workplace*, Ex. G to LR 56.1 Stmt.) From 1996 to 2000, this booklet was distributed to each new employee during his or her orientation. (Def. LR 56.1 Stmt. ¶ 40.) It provides that when an employee discloses information concerning an incident of harassment, supervisors are to immediately report the incident to their facility EEO coordinator or local human resources manager. (Pl. LR 56.1 Stmt. ¶ 23.) That same year, Caterpillar published another booklet for employees, *Working at Caterpillar*, which contains its EEO policy and warns employees that failure to comply with the company's policies and procedures, including the sexual harassment policy, may lead to disciplinary action. (Def. LR 56.1 Stmt. ¶ 29; *Working at Caterpillar*, Ex. H. to Def. LR 56.1 Stmt.) A revised booklet, *What You Should Know About Caterpillar's Prohibited Harassment Policy,* was distributed to employees in 2001; this booklet discusses Caterpillar's policies against sexual harassment and retaliation in depth. (Def. LR 56.1 Stmt. ¶¶ 30-31; *What You Should Know About*

*Caterpillar's Prohibited Harassment Policy*, Ex. I to Def. LR 56.1 Stmt.) From 2001 to the present, this booklet was also distributed to each new employee during orientation. (Def. LR 56.1 Stmt. ¶ 40.) Caterpillar also distributes its Code of Worldwide Business Conduct, which affirms that the company obeys laws prohibiting discrimination, that Caterpillar promotes an environment free of intimidation and harassment, and that its employees have a responsibility to report harassment and will not be subject to retaliation for doing so. (*Id.* ¶¶ 32-38; 2000 Code of Worldwide Business Conduct, Ex. J to Def. LR 56.1 Stmt.; 2005 Caterpillar Worldwide Code of Conduct, Ex. K to Def. LR 56.1 Stmt.)

Caterpillar has conducted a number of training sessions for its employees that included training on sexual harassment. Among the training sessions that Caterpillar has conducted at its Aurora facility are the following:

- Since 1996, all new employees at the Aurora facility attend an orientation program on their first day. (Def. LR 56.1 Stmt. ¶ 39.) At this orientation, Caterpillar's harassment policies are reviewed with the attendees and the new employees are informed that these policies are posted throughout the facility. (*Id.* ¶ 41.)

- Since 1996, employees have been required to attend another week-long training program three months into their employment. A portion of that training program is devoted to harassment training. (*Id.* ¶¶ 43-44.)

- The facility has conducted a new supervisor orientation since 1996 for newly-hired or promoted supervisors; at this orientation, Caterpillar reviews its harassment policies and explains to the supervisors their role with respect to complaints of harassment. (*Id.* ¶¶ 45-47.)

- In March 1996, all salaried and management employees at the Aurora facility were required to attend a diversity training called "Synergy From Others," which included a discussion on behaviors that can give rise to complaints of sexual harassment. (*Id.* ¶ 48.) This training was repeated for hourly employees in March of 1997. (*Id.* ¶ 52.)

- In November 1996, all of the supervisory and management employees at the Aurora facility were required to attend a two-hour sexual harassment training course titled "Maintaining A Harassment-Free Work Environment." (*Id.* ¶¶ 49-50.) Attendees were given the *What You Should Know About Sexual Harassment in the Workplace* booklet. (*Id.* ¶ 50.)

- In January 1998, all salaried and management employees at the Aurora facility were required to attend an eight-hour diversity training, which included sexual harassment training. (*Id.* ¶ 53.)

- Bill Miller, the labor relations representative, conducted an updated sexual harassment training for managers in certain buildings at the Aurora facility in October 1999. (*Id.* ¶ 54.)

- In early 2000, hourly employees at the Aurora facility were required to attend a training course called the "Diversity Diner," which covered the need to be sensitive to diversity, including gender differences, in the workplace. (*Id.* ¶ 55.)

- Supervisors at the Aurora facility were required to attend a training course titled "What the Supervisor Needs to Know About Sexual Harassment" in March 2000, which covered Caterpillar's policies and procedures, what behaviors constitute sexual harassment, and how supervisors should respond to complaints of harassment. (*Id.* ¶ 56.)

- In 2001, management employees at the Aurora facility took part in a training program called "Valuing People" that covered diversity issues, including gender differences, in the workplace. (*Id.* ¶ 57.)

- An all-employee meeting was held at the Aurora facility in 2002 at which time the employees saw a video on prohibited harassment in the workplace and discussed Caterpillar's prohibited harassment policy. (*Id.* ¶ 58.)[4]

- In 2003-2004, Caterpillar held a facility-wide prohibited harassment training, which covered its prohibited harassment policy and policy of non-retaliation. (*Id.* ¶ 59.) During the course, Caterpillar reissued its *What You Should Know About Sexual Harassment in the Workplace* booklet. (*Id.*)[5]

- In 2005, another all-employee training was held at the Aurora facility on the Caterpillar Code of Conduct, which includes a commitment to a harassment-free environment. (*Id.* ¶ 60.)[6]

In addition to conducting training sessions, the Aurora facility's security department conducts "sweeps" to identify and remove any inappropriate materials. (*Id.* ¶ 61.) These sweeps

---

[4] Plaintiff disputes Defendant's statement of fact to the extent it implies that all employees attended this 2002 meeting. (Pl. LR 56.1 Resp. ¶ 58.) Plaintiff is correct that the Declaration of William Arbogast, the only source cited to support Defendant's statement, does not establish that all employees actually attended these meetings; Arbogast states that only that he was responsible for coordinating the meeting. (Declaration of William C. Arbogast, Ex. MM to Def. LR 56.1 Stmt.)

[5] Again, Plaintiff correctly notes that the Declaration of Alan Wolff, the only source cited to support Defendant's statement, states only that Wolff was responsible for conducting this training, not that all employees actually did attend it. (Declaration of Alan Wolff, Ex. NN to Def. LR 56.1 Stmt.)

[6] Plaintiff contends that Defendant's cited evidence, Bill Miller's Declaration, does not establish foundation for his knowledge that all employees attended this training in 2005. (Pl. LR 56.1 Resp. ¶ 60.) The court agrees; while it is undisputed that the 2005 training was held for all employees, the basis for Miller's assertion that all employees actually attended the training is not evident from his declaration. (Declaration of Bill Miller ¶ 35, Ex. GG to Def. LR 56.1 Stmt.)

occur not less than every eight weeks and more often if requested by the labor relations or operations departments.  (*Id.*)[7]

3.    **Alleged Sexual Harassment of Current and Former Caterpillar Employees**

The parties have set forth extensive facts related to the alleged harassment of Virginia Early, Diana Gomez, Sandy Irvin, Lilly Johnson, Wendy Hollenback-Smithburg, and Roxanne Tucker.  The court presents the relevant facts concerning each of these individuals within the text of the opinion that follows.

## DISCUSSION

A.    **Summary Judgment Standard**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c); *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1125 (7th Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).  In determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor.  *Gillis v. Litscher*, 468 F.3d 488, 492 (7th Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  The moving party has the initial burden to show that the evidence is insufficient to establish a material element of the non-moving party's case.  *Celotex Corp.*, 477 U.S. at 322-23.  If the moving party meets this burden, the non-moving party must then "come forward with specific facts showing there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If the evidence supporting the non-moving party's claim is insufficient for a reasonable jury

---

[7]    Plaintiff disputes that sweeps occurred every eight weeks, but cites testimony from Lillie Johnson stating only that she saw inappropriate materials at various work stations from 1988 until she left Caterpillar in November 2001.  (Pl. LR 56.1 Resp. ¶ 61.)  Johnson's experience casts doubt on the effectiveness of Defendant's practice of conducting sweeps, but her testimony does not contradict Defendant's assertion that sweeps were in fact conducted regularly.

to return a verdict in its favor, the court will grant summary judgment. *Id.*

**B.  Title VII Claims for Hostile Work Environment Sexual Harassment**

Title VII prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). It is implicit in this provision that an employer may be liable "if an employee's work environment is discriminatorily hostile or abusive." *Phelan v. Cook County*, 463 F.3d 773, 782-83 (7th Cir. 2006) (citing *Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006)). To establish a *prima facie* case of hostile work environment sexual harassment, an employee must establish that:

> (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on her sex; (3) the sexual harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and (4) a basis for employer liability exists.

*Phelan*, 463 F.3d at 783 (citation omitted). Sexual harassment is actionable under Title VII if it is "'both subjectively and objectively so severe or pervasive'" that it alters the conditions of the plaintiff's employment and creates an abusive work environment. *Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005) (quoting *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 975 (7th Cir.2004)). Both the victim and a reasonable person must perceive the environment as "hostile or abusive." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993)). In determining whether a workplace is objectively hostile, the court considers the totality of the circumstances, including: the frequency and severity of the discriminatory conduct; "'whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *See Faragher*, 524 U.S. at 787-88 (quoting *Harris*, 510 U.S. at 23).

Employers are strictly liable for harassment by a supervisor. *Rhodes v. Ill. Dep't of Transp.*,

359 F.3d 498, 505 (7th Cir. 2004) (citation omitted). A supervisor is "someone with the power to *directly* affect the terms and conditions" of the allegedly harassed individual's employment; the court does not consider an employee who merely has the "authority to oversee aspects of another employee's job performance" to be a supervisor for Title VII purposes. *Id.* at 506 (citation omitted). If the harassed employee did not suffer a "tangible employment action," such as a discharge, demotion, or undesirable reassignment, the employer may assert the *Ellerth/Faragher* affirmative defense to avoid liability. *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. at 807; *Phelan*, 463 F.3d at 783 (citing *Faragher*, 524 U.S. at 807). To succeed on this affirmative defense, the employer must establish that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and that the "employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Phelan*, 463 F.3d at 783 (citing *Faragher*, 524 U.S. at 807). No affirmative defense is available, however, if the employee suffered a "tangible employment action" as a part of the alleged harassment. *Faragher*, 524 U.S. at 808 (citing *Ellerth*, 524 U.S. at 762-63); *Phelan*, 463 F.3d at 784-85.

If the individual responsible for the harassment is another employee but not a supervisor, the employer is liable if it was negligent in discovering or remedying the harassment. *Rhodes*, 359 F.3d at 506. In other words, an employer is liable for harassment by a coworker if the employer "'knew or should have known' about the harassment and failed to take reasonable steps to remedy the harassment once it was on notice." *Wyninger*, 361 F.3d at 976 (quoting *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 811 (7th Cir. 2001)).

In its motion for summary judgment, Defendant argues that the record does not establish that the terms and conditions under which Early, Irvin, Johnson, Hollenback-Smithburg, Tucker, or Gomez worked were substantially altered by severe or pervasive sex-based harassment, or that Gomez's 2004 dismissal was in retaliation for any protected conduct. (Def. Mem. at 2.) Moreover,

Defendant argues, there is no dispute that it acted "reasonably and promptly to correct inappropriate conduct that violated its widely publicized prohibited harassment policies when complaints were raised." (*Id.* at 2-3.) Plaintiff contends that questions of fact exist as to whether these six employees were subject to a sexually hostile work environment and whether Defendant terminated Gomez in retaliation for complaining about harassment. (Plaintiff's Memorandum of Law in Opposition to Defendant's Second Motion for Partial Summary Judgment ("Pl. Response") at 1.) The court considers Plaintiff's claims on behalf of Early, Irvin, Johnson, Hollenback-Smithburg, Tucker, and Gomez in turn.

### 1. Virginia Early

#### a. Factual Background

Virginia Early began working for Caterpillar in January 1994 as a "fabrication specialist"; she was initially assigned to work the second shift. (Def. LR 56.1 Stmt. ¶ 62.)[8] During her employment with Caterpillar, Early has always worked in Building G, with the exception of a few occasions on which she was assigned to work elsewhere. (*Id.*) In July 2001, Early was transferred to the third shift. (*Id.* ¶ 64.) She remained on the third shift for eighteen to twenty-four months and then transferred to the first shift because she wanted to work during the day. (*Id.* ¶ 65.) Today, Early remains employed as a fabrication specialist on the first shift. (*Id.* ¶ 66.) At the time of the alleged incidents of sexual harassment, Early was working on the second shift in Building G. (*Id.* ¶ 71.)

It is undisputed that Early understood, prior to 2000, that Caterpillar had a policy prohibiting harassment in the workplace. Early recalls having received a document discussing Caterpillar's sexual harassment policy at some point, has viewed copies of the prohibited harassment policy on bulletin boards at the Aurora facility, and recalls attending training on the harassment policy and

---

[8] The Aurora facility operates twenty-four hours a day, five days a week and employees work in three shifts. (Miller Decl. ¶ 8.) The first shift runs from 7:18 am to 3:18 pm, the second shift from 3:18 pm to 11:18 pm, and the third shift from 11:18 pm to 7:18 am. (*Id.*)

receiving a list of names and telephone numbers of persons in the labor relations department whom she could call to complain of harassment.  (*Id.* ¶¶ 67-70; Pl. LR 56.1 Stmt. ¶ 1.)

Early claims to have been harassed by a security guard in July 2001; she does not know the name of the security guard, though she remembers that he spoke with an accent.  (Def. LR 56.1 Stmt. ¶ 72.)  Early recalls that the guard moved in various parts of the plant and was not permanently located in the area where she worked.  (*Id.*)  According to Early, the guard made comments to her of a sexual nature on multiple dates between July 19, 2001 and July 25, 2001:

- On July 19, 2001, the guard asked Early to sleep with him.  (*Id.* ¶ 74.)  Early felt fearful as a result of this encounter and left her station to tell "Bruce," a co-worker, though not a supervisor, that the guard was bothering her.  (Pl. LR 56.1 Stmt. ¶ 3.)

- On July 21, 2001, the guard asked Early for sex three times.  (Def. LR 56.1 Stmt. ¶ 75.)  While the guard was at her work station, her supervisor, George Dutton, also came to her work station for an unrelated reason.  (*Id.*)  Early did not inform Dutton of the guard's conduct.  (*Id.* ¶ 76.)

- On July 23, 2001, the security guard again asked Early for sex and came to her work area three times before lunch.  (*Id.* ¶ 77.)  During one of her conversations with the guard, he told her that in Romania, where he is from, he could rape her and nothing would be done about it.  (*Id.* ¶ 78.)

- On July 25, 2001, Early told the guard not to talk to her and warned him that he might get in trouble for sexual harassment.  (*Id.* ¶ 79.)

In total, according to Early, the guard asked her to have sex with him seven times and he also told her "what his wife did not do for him."  (Pl. LR 56.1 Stmt. ¶ 2; Deposition of Virginia Early at 23, Ex. U to Def. LR 56.1 Stmt.)  Early had no conversations with the guard after July 25, 2001.  (Def. LR 56.1 Stmt. ¶ 73.)  Other than the conversations with this particular guard, Early admits that no one at Caterpillar has ever harassed her.  (*Id.* ¶ 80.)

Early testified that she told two of her co-workers, Bruce and Jimmy Ray, that the security guard was "bothering" her.  She also called the labor relations department and reported the guard's comments to someone who identified himself as "Doug"; Early cannot recall when, exactly, she

made this phone call. (*Id.* ¶ 81; Pl. LR 56.1 Stmt. ¶¶ 4-5; Early Dep. at 27.) Doug Howell, who worked as a labor relations assistant at the time, recalls having once received a complaint from Early, though he did not recall its substance. (Pl. LR 56.1 Stmt. ¶¶ 9-10; Def. LR 56.1 Resp. ¶ 10; Declaration of Doug Howell ¶ 1, Ex. HH to Def. LR 56.1 Stmt.; Deposition of Doug Howell at 142-43, Ex. X to Def. LR 56.1 Stmt.) Early testified that she told Doug that she did not feel safe on her shift, that the security guard was soliciting sex from her, and that he told her if he was in Romania he could rape her and nothing would be done about it. (Pl. LR 56.1 Stmt. ¶ 6.)[9] Doug asked Early whether she was intimate with the security guard and told her that someone would come out to talk to her about the incident. (*Id.* ¶ 7.)[10] Howell recalls taking notes of Early's complaint but does not remembering doing anything else in response to her complaint. (*Id.* ¶ 11.)[11] It is undisputed that after Early reported the comments by the security guard, she was never approached by him or harassed again. (Def. LR 56.1 Stmt. ¶ 83.) Although Early could not remember when she reported the security guard's comments by calling the labor relations department, (Early Dep. at 27), the

---

[9] Defendant is correct that some of Plaintiff's assertions regarding Early's conversation with Doug are not supported by the portions of Early's deposition that Plaintiff has cited, but Plaintiff's account of Early's conversation with Doug is supported by other portions of Early's deposition that Plaintiff did not cite. (Def. LR 56.1 Resp. ¶ 6; *see* Early Dep. at 28, 80-81.)

[10] Defendant disputes this assertion on the basis that it is not supported by the deposition testimony Plaintiff cites. The court disagrees; Early testified that Doug asked her if she was seeing the security guard and if she was intimate with him, and then told her that someone "would come out and talk to [her] about it." (Early Dep. at 28.) Plaintiff also claims, citing only Plaintiff's responses to Defendant's second interrogatories, that Early never heard anything from Doug after their initial conversation and that, as far as Early was aware, Defendant took no action against the security guard. (Pl. LR 56.1 Stmt. ¶ 8.) Defendant objects that Plaintiff's interrogatory responses are inadmissible hearsay because, although Early assisted in the preparation of the interrogatory answers, (Pl. EEOC's Fifth Supp. Resp. to Def.'s Second Set of Interrogatories to Pl. at 1, Ex.2 to Pl. LR 56.1 Stmt.), she did not sign them or swear to their truth. Howell himself admitted that he did not recall doing anything in response to Early's complaint, however, so the information for which Plaintiff cites the interrogatory responses is already in the record. (Pl. LR 56.1 Stmt. ¶ 11.)

[11] Defendant disputes this assertion on the basis that it is not supported by the cited evidence. (Def. LR 56.1 Resp. ¶ 11.) The court disagrees; Howell testified that he believes he made notes of his conversations with Early and that he does not believe that he did anything else in response to her allegation. (Howell Dep. at 143-44.)

court concludes that she must have called on or after July 25, 2001, the last day Early spoke to the guard, given the parties' agreement that Early was never approached by the guard after she reported his conduct.

On July 25, 2001, Early received a visit from Doug Holman, a department superintendent, who asked her about the previous request she had made to be moved to the third shift.  (*Id.* ¶ 82.) Early told Holman that she wanted to transfer to the third shift due to issues with her children and gave no other reason; her request was granted shortly thereafter.  (*Id.*; Pl. LR 56.1 Stmt. ¶ 13.) After her transfer to the third shift, Early saw the troublesome security guard on one occasion but they did not speak.  (Pl. LR 56.1 Stmt. ¶ 14; Early Dep. at 31-32.)  In any event, Early testified, she did not feel safe even after her transfer to the third shift, and, based on her experience, she did not believe that Caterpillar took its prohibited harassment policy seriously.  (Pl. LR 56.1 Stmt. ¶¶ 15-16.)

In December 2001, Early filed a charge of discrimination with the EEOC, alleging race and disability discrimination.  (Def. LR 56.1 Stmt. ¶ 84.)  In this charge, Early claimed that she was discriminated against on the basis of her race and an unspecified disability when she was given a below average performance evaluation, her work was scrutinized by management, and her "White Foreman" subjected her to "teasing and harassment on the basis of [her] disability."  (12/20/01 Virginia Early EEOC Charge, Ex. U to Def. LR 56.1 Stmt.)  Early did not mention sexual harassment or anything related to her July 2001 conversations with the security guard in that charge.  (Def. LR 56.1 Stmt. ¶ 84.)

### b.        Sexual Harassment Claim

Defendant argues that it is entitled to summary judgment on Plaintiff's sexual harassment claim on Early's behalf because there is no evidence that Early was subject to a severe or pervasive hostile work environment or that Defendant was negligent in failing to prevent or remedy any alleged harassment.  (Def. Mem. at 9-10.)  Plaintiff disagrees and contends that the undisputed evidence raises triable issues as to the existence of a sexually hostile work environment and the

appropriateness of Defendant's response. (Pl. Response at 5-8.) The court agrees with Plaintiff.

To establish this claim, Plaintiff must show that the alleged harassment was subjectively and objectively severe or pervasive. *See Whittaker*, 424 F.3d at 645. Defendant argues that Plaintiff cannot establish the subjective component of Early's claim. (Defendant's Reply in Support of Its Second Motion for Partial Summary Judgment ("Def. Reply") at 8.) Defendant notes that Early did not mention any sexual harassment in her December 2001 EEOC charge of race and disability discrimination, filed less than five months after the security guard's comments to her. (Def. LR 56.1 Stmt. ¶ 84.) Because Defendant raises this argument for the first time in its reply brief, the court need not consider it here. *See United States v. Adamson*, 441 F.3d 513, 521 (7th Cir. 2006) (citing *United States v. Blaylock*, 413 F.3d 616, 619 (7th Cir. 2005)) (arguments raised for first time in reply brief are waived). In any case, Early testified that she was scared by the security guard's comments, that she did not feel safe, and that she was bothered enough by the guard's comments that she alerted two co-workers and the labor relations department. (Def. LR 56.1 Stmt. ¶ 81; Pl. LR 56.1 Stmt. ¶¶ 3-5.) Viewing this evidence in the light most favorable to Plaintiff, the court is satisfied that Early found her work environment to be hostile.

In assessing whether Early's work environment was objectively hostile, the court considers the totality of the circumstances, including the frequency and severity of the discriminatory conduct; whether it was physically threatening or humiliating, or merely consisted of offensive utterances; and whether it unreasonably interfered with Early's work performance. *See Faragher*, 524 U.S. at 787-88 (citing *Harris*, 510 U.S. at 23). The offensive conduct at issue here was arguably infrequent: Early's career at Caterpillar began in 1994 and she only claims to have suffered from sexual harassment between July 19, 2001 and July 25, 2001. The severity of the harassment presents a closer issue, however. In evaluating severity, the Seventh Circuit has explained that on one side are sexual assaults, other physical contact for which there is no consent, uninvited sexual solicitations, intimidating words or acts, obscene language or gestures, and pornographic pictures;

on the other side lies conduct that generally does not create a hostile work environment, such as "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Patton v. Keystone RV Co.*, 455 F.3d 812, 816 (7th Cir. 2006) (citing *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995)). It is undisputed that the security guard asked Early to have sex with him seven times within a six-day time period, told her on one occasion "what his wife did not do for him," and told her on another occasion that in his homeland of Romania, he could rape her without any consequences. (Pl. LR 56.1 Stmt. ¶ 2; Def. LR 56.1 Stmt. ¶ 78.)

That the guard repeatedly and directly solicited Early for sex is troubling. In *Quantock v. Shared Marketing Services, Inc.*, the Seventh Circuit viewed an employee's outright solicitation for numerous sex acts, which were made directly to the plaintiff, as more severe than "occasional vulgar banter tinged with sexual innuendo." 312 F.3d 899, 904 (7th Cir. 2002). The court held that a reasonable jury could find these sexual propositions sufficiently severe as to have created a hostile work environment. *Id.* The circumstances here are not identical: the harassing employee in *Quantock* worked in close quarters with plaintiff and held a significant position of authority over her; but the harassing employee in this case, the security guard, threatened Early in addition to propositioning her for sex. Construing all facts in Plaintiff's favor, as this court must, the court views the guard's statement to Early that, in Romania, he could rape her without any repercussions as a threatening and intimidating statement. Viewing this verbal harassment and the guard's numerous solicitations of Early for sex in the light most favorable to Plaintiff, the court concludes a jury could find the guard's conduct sufficiently severe so as to have created a hostile work environment.

Because Early did not suffer a tangible employment action, Defendant asserts the *Ellerth/Faragher* affirmative defense, arguing that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and that Early "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm

otherwise." *Faragher*, 524 U.S. at 807; *Phelan*, 463 F.3d at 783 (citing *Faragher*, 524 U.S. at 807). Defendant urges that Plaintiff cannot establish that it acted negligently because Early did not tell her supervisor about the security guard's conduct and had no compelling reason for failing to report the conduct. (Def. Mem at 9-10.) It is undisputed, however, that Early did reported the security guard's conduct to Defendant's labor relations department. Plaintiff argues that Defendant was negligent in failing to investigate that complaint or to take any corrective action, and urges that Defendant cannot escape liability simply because the security guard's harassment of Early ceased fortuitously. (Pl. Response at 7-9.)

The court first concludes that Defendant knew or should have known about the security guard's conduct towards Early. *See Wyninger*, 361 F.3d at 976 (quoting *Berry*, 260 F.3d at 811) (employer is liable for harassment by a coworker if the employer "'knew or should have known' about the harassment and failed to take reasonable steps to remedy the harassment once it was on notice"). As noted, it is undisputed that Early reported the security guard's conduct to Doug Howell, a labor relations assistant. (Def. LR 56.1 Stmt. ¶ 81; Pl. LR 56.1 Stmt. ¶¶ 4-5, 9-10.) In this complaint, Early specifically told Doug that she did not feel safe, that the guard was soliciting sex from her, and that the guard had told Early that if he was in Romania he could rape her without consequence. (Pl. LR 56.1 Stmt. ¶ 6.) Early's failure to report the alleged harassment to her supervisor therefore does not defeat her claim; Defendant does not dispute Early's testimony that at a training session on Defendant's sexual harassment policy, she was given a list of names and telephone numbers she could call to report harassment, which included employees in the labor relations department. (*Id.* ¶ 1.) Defendant itself thus conveyed to Early that calling the labor relations department was an appropriate means of reporting sexual harassment.

The only question that remains, then, is whether Defendant took reasonable steps once it was on notice of Early's complaint. *See Wyninger*, 361 F.3d at 976 (quoting *Berry*, 260 F.3d at 811). In making this assessment, the court considers whether Defendant's response was

reasonably calculated to prevent further harassment based on the facts and circumstances at the time Early complained of the guard's conduct. *See Longstreet v. Ill. Dep't of Corr.*, 276 F.3d 379, 382 (7th Cir. 2002) (citations omitted); *see also Smith v. Sheahan*, 189 F.3d 529, 535 (7th Cir. 1999) (court must determine if employer's response "was a reasonable one, designed to remedy the illegal harassment, or a negligent one that did not adequately respond to the situation in its midst.") What is a reasonable response depends, in large part, on the gravity of the harassment. *Longstreet*, 276 F.3d at 382 (citing *Baskerville*, 50 F.3d 428).

Howell recalls taking notes of Early's complaint but does not recall doing anything else in response to her complaint. (Pl. LR 56.1 Stmt. ¶ 11.) It is true that on July 25, 2001, the last day the security guard spoke to Early, she talked with her supervisor, Doug Holman, about transferring shifts and she was in fact transferred to a different shift shortly thereafter. (Def. LR 56.1 Stmt. ¶ 82; Pl. LR 56.1 Stmt. ¶ 13.) Defendant does not, however, contend that this transfer had anything to do with Early's complaint about the security guard's conduct. Indeed, it is undisputed that Early did not tell Holman about the security guard's conduct and that Early had previously put in a request to transfer shifts for family-related reasons. (Def. LR 56.1 Stmt. ¶ 82; Pl. LR 56.1 Stmt. ¶ 13.) The parties do not address whether, when Howell received Early's complaint, he was aware that Early would be transferred to another shift so that her contact with the security guard would be limited. This question bears heavily on whether Defendant responded appropriately to Early's complaint as, if Howell did not have any knowledge that Early might be transferred, Defendant effectively did nothing in response to Early's complaint. Under these circumstances, the fact that the harassing conduct did not recur does not require the conclusion that the employer's response was adequate. *Loughman v. Malnati Org. Inc.*, 395 F.3d 404, 407 (7th Cir. 2005) (citing *Smith*, 189 F.3d at 535). If "a jury deems [the employer's] response to have fallen below the level of due care," an employer may still be liable even if the alleged harassment fortuitously ceased. *Smith*, 189 F.3d at 535. Defendant's motion for summary judgment on Early's sexual harassment claim is denied.

### 2. Diana Gomez

#### a. Factual Background

Caterpillar hired Diana Gomez as a "supplemental materials handler" in June 2001, and later transferred her to the position of an "assembler"; as an assembler, she worked in Building H. (Def. LR 56.1 Stmt. ¶ 85.) Gomez was assigned to work on the "990/992" assembly line. (*Id.* ¶ 86.) In this position, Gomez reported to supervisor Austin Bullington, Bullington reported to Roger Meyer, and Meyer reported to Dan Mikelson, the Production Manager; General Foreman Dave Hinton also provided management support for supervisors such as Bullington. (*Id.* ¶ 87.)

Gomez admits that she received sexual harassment training, (*id.* ¶ 89), but she does not remember whether she received a copy of Caterpillar's prohibited harassment policy. (Pl. LR 56.1 Resp. ¶ 89; Pl. LR 56.1 Stmt. ¶ 66; Deposition of Diana Gomez at 45-46, Ex. V to Def. LR 56.1 Stmt.)[12] Though she recalls that various policies were displayed on bulletin boards at the Aurora facility, she also does not recall specifically whether the prohibited harassment policy was displayed there. (Pl. LR 56.1 Stmt. ¶ 67.) In any case, Gomez understood that sexual harassment was a violation of Caterpillar's rules and she was aware of Caterpillar's prohibited harassment policy. (Def. LR 56.1 Stmt. ¶ 91.)

Gomez claims to have been sexually harassed from December 2003 to February 2004 by Roberto Flores, who has worked at Caterpillar since 1973, and was working as an assembler on the same line as Gomez as of 2003. (Deposition of Roberto Flores at 9-10, Ex. TT in Def. Supp. Exhibits to LR 56.1 Stmt.)[13] As a result of Flores's conduct, described below, Gomez claims that

---

[12]    The court sustains Plaintiff's objection to the assertion that Gomez recalls that the prohibited harassment policy was posted on bulletin boards that she passed within the facility. (Def. LR 56.1 Stmt. ¶ 90.) In fact, Gomez testified that she recalls that policies were posted on certain bulletin boards at the facility, but she did not identify the prohibited harassment policy as one of the posted policies. (*See* Gomez Dep. at 31-37.)

[13]    Plaintiff objects to Defendant's statement that Flores worked as an assembler on the
(continued...)

she was uncomfortable at work and unable to do her job. (Def. LR 56.1 Stmt. ¶ 93; Pl. LR 56.1 Stmt. ¶¶ 68, 78.) Flores himself was aware of Caterpillar's prohibited harassment policy from the time he started working at Caterpillar, has seen the policy posted in various places at the plant, and has received updated copies of the policy. (Def. LR 56.1 Stmt. ¶ 95.)[14] Flores also testified that he attended a meeting for employees about sexual harassment approximately every two years. (*Id.* ¶ 96.)

"In roughly 2003, Flores was tasked with training Gomez in a particular work area or 'zone' on the 990/992 line." (*Id.* ¶ 97.) According to Gomez, during the time Flores worked with her, he made "kissing faces" at her approximately four times and touched her buttocks on two occasions. (Def. LR 56.1 Stmt. ¶ 98; Pl. LR 56.1 Stmt. ¶ 72.) The first time that Flores slapped Gomez's buttocks, she told him to stop and he just laughed. (Pl. LR 56.1 Stmt. ¶ 70.) Flores also told Gomez to "suck [his] dick" two or three times while grabbing himself, and once asked her to "hold it" when he went to the restroom. (Def. LR 56.1 Stmt. ¶ 98; Pl. LR 56.1 Stmt. ¶ 69.)[15] When Flores

_____

[13](...continued)
990/992 line with Gomez. (Pl. LR 56.1 Resp. ¶ 94.) While the testimony to which Defendant cites is not explicit that Gomez and Flores worked on the same line, the court can reasonably infer that fact; both Gomez and Flores testified that they worked on the 992 line in time periods that would include 2003, which is when Flores is alleged to have sexually harassed Gomez. (Flores Dep. at 9-10; Gomez Dep. at 38-39.)

[14]     Plaintiff disputes these facts on the basis that Defendant has not provided record support and did not include Flores's deposition transcript in its appendix of materials. (Pl. LR 56.1 Resp. ¶ 95.) Defendant inadvertently omitted Flores's deposition transcript and certain other materials from its appendix; the court will consider the exhibits, including Flores's deposition, which Defendant submitted to the court and Plaintiff on September 15, 2006 upon realizing its omission. Plaintiff does not otherwise support its disagreement with record evidence; where a fact is controverted and the dispute is not supported by record evidence, the court deems the fact admitted. *See* N.D. ILL. LOCAL RULE 56.1(b)(3)(B) (stating that a response to movant's statement of facts shall contain "specific references to affidavits, parts of the record, and other supporting materials relied upon," in the case of a disagreement).

[15]     Defendant asserts that, when Flores said "suck my dick" to Gomez, she did not take it as a sexual overture. (Def. LR 56.1 Stmt. ¶ 98.) The court concludes this is disputed. Gomez did testify that she took Flores's statement as an insult, not as a request, but this does not preclude Gomez's understanding of Flores's statement as a sexual overture. (Gomez Dep. at 99.) In any (continued...)

asked Gomez to "hold it," she believed he was telling her to go with him to the bathroom and help him hold his penis; Gomez was not sure whether or not Flores was joking when he said this. (Pl. LR 56.1 Stmt. ¶ 71.)

Gomez had complained to her supervisor, Bullington, from time to time about non-sexual issues she had with Flores. (Def. LR 56.1 Stmt. ¶ 99.) And Flores had complained to Bullington about Gomez's work performance, reporting to Bullington that Gomez asked too many questions to which she should already know the answer; Bullington told Gomez and Flores that they needed to learn to work together. (*Id.* ¶ 105; Declaration of Austin Bullington ¶ 7, Ex. II to Def. LR 56.1 Stmt.)

Gomez did report some of Flores's sexual conduct to her union steward, Brian DeHotel; at some point before January 24, 2004, Gomez told DeHotel that Flores had smacked her on the buttocks, that he blew kisses at her, that he made remarks about her sucking his penis, and that he asked her to "hold it." (Pl. LR 56.1 Stmt. ¶ 79.) Gomez admits she did not report the alleged sexual harassment to Caterpillar management until January 24, 2004. She explained that she was afraid that her coworkers would not support her story and that she might lose her job because she was a temporary worker. (Def. LR 56.1 Stmt. ¶ 99; Pl. LR 56.1 Stmt. ¶ 80.) She acknowledged, however, that she had not heard of anyone losing his or her job for reporting harassment and that she knew that she could have reported Flores's conduct to someone in Caterpillar's human resources or labor relations departments. (Def. LR 56.1 Stmt. ¶¶ 102, 104.)

In any case, she reported the alleged harassment to Caterpillar management on January 24, 2004 because she "had enough." (*Id.* ¶¶ 102-03; Gomez Dep. at 80.) On that day, while Flores and Gomez were eating lunch with others, Flores told Gomez that she was crazy, called her a

---

[15](...continued)
event, whether or not Gomez viewed Flores's comment as a sexual overture, it remains an offensive comment of a sexual nature.

"puto," (a Spanish word for "bitch" or "faggot"), and said she had a penis. (Def. LR 56.1 Stmt. ¶ 106.) Gomez took these comments as angry insults rather than sexual propositions. (*Id.* ¶ 107.) She claims, further, that at one point during the conversation Flores grabbed himself, pretended to unzip his pants, and told her to "suck my dick," a comment Flores admits he made. (*Id.* ¶¶ 108-09; Pl. LR 56.1 Stmt. ¶¶ 76-77.) Gomez told Flores she believed he made comments like these because she was a female and that he would not be saying them if she were male. (Pl. LR 56.1 Stmt. ¶ 76.) Gomez responded by mockingly repeated everything that Flores said to her during the conversation.[16] Gomez also told Flores that she "know[s] where [he] live[s]" and that she planned to go to his house and tell his wife everything he was saying, (Def. LR 56.1 Stmt; ¶ 111; Pl. LR 56.1 Stmt. ¶ 75), a threat that Flores testified worried him because he believed that Gomez's husband was a gang member. (Def. LR 56.1 Stmt. ¶ 112; Flores Dep. at 44-45.) Gomez also admits that she called Flores a "mother fucker" during this altercation. (Def. LR 56.1 Stmt. ¶ 111; Flores Dep. at 93.)

Ultimately, Flores told Gomez that she was "really pissing [him] off" and that he was going to report the incident to "the boss," Bullington. (Def. LR 56.1 Stmt. ¶ 113.) Gomez herself then headed to the office to talk to Bullington, followed by Flores. Gomez claims that as she turned around to put down a can of soda, Flores grabbed her wrist; she admits that Flores did so because he thought she was going to "do something" to him. (*Id.* ¶¶ 114-15; Gomez Dep. at 70-71.) A coworker separated the two, and Gomez proceeded to Bullington's office where she complained to Bullington about her altercation with Flores. (Def. LR 56.1 Stmt. ¶ 116.) Gomez also reported other incidents that had occurred between her and Flores; though Gomez does not recall exactly what she told Bullington, she does recall that she told him about the bathroom incident when Flores asked her to "hold it." (*Id.* ¶ 117; Pl. LR 56.1 Resp. ¶ 117; Gomez Dep. at 123-24.) Gomez also

---

[16] Defendant notes that Gomez testified that mocking Flores was probably not the "right way" to handle the conversation, (Def. LR 56.1 Stmt. ¶ 110), but has not explained the relevance of this testimony, nor suggested what the "right way" to handle such an incident might be.

told Bullington that she wanted Flores arrested. (Pl. LR 56.1 Stmt. ¶ 81.)

Bullington reported the January 24, 2004 altercation to the General Foreman, Dave Hinton, and Caterpillar's Labor Relations representative, Bill Miller. (Def. LR 56.1 Stmt. ¶ 118.) Miller conducted an investigation; first, he removed Flores from Gomez's work area, and then he interviewed Gomez and Flores. (*Id.* ¶ 120; Pl. LR 56.1 Resp. ¶ 120.)[17] In addition to telling Miller about the January 24, 2004 incident, during one of her multiple meetings with Miller, Gomez also told Miller about "everything else" that Flores had said to her. (Pl. LR 56.1 Stmt. ¶ 82; Gomez Dep. at 116.)[18] Flores admitted to Miller that he told Gomez to suck his dick, that he called her a faggot, and that he told her that she has a penis. (Pl. LR 56.1 Stmt. ¶ 83.) Gomez and Flores both admitted that they used profane language during the altercation on January 24, 2004. (Def. LR 56.1 Stmt. ¶ 123.)

Together with Hinton and Doug Howell, Miller also interviewed other employees from Gomez's work area, including George King and Rocky Olson. (Def. LR 56.1 Stmt. ¶ 120; Pl. LR 56.1 Resp. ¶ 120.) King confirmed that Gomez and Flores had an argument but indicated that he could not understand most of it because they spoke in Spanish; King believed that profanity was involved. He did not see Flores grab himself or pretend to unzip his pants. (Def. LR 56.1 Stmt. ¶ 121.) Although King saw Gomez and Flores shouting and gesturing while standing close to each other, he did not see any physical contact between the two. (*Id.*) Olson informed Miller that he did not see the incident at all. (*Id.* ¶ 122.)

During Miller's investigation of the January 24, 2004 incident, he learned of an incident

---

[17] Plaintiff is correct that the cited evidence does not support that Miller, Hinton, and Howell interviewed Flores and Gomez; rather, Miller's declaration only indicates that he interviewed Flores and Gomez. (Pl. LR 56.1 Resp. ¶ 120; Miller Decl. ¶ 38.)

[18] Defendant disputes that Gomez told Miller about other incidents between her and Flores based on Gomez's testimony that she cannot remember specifically what she said to whom. (Def. LR 56.1 Resp. ¶ 82.) Gomez did, however, recall that she told Miller about other issues she had been having with Flores during one of their multiple meetings. (Gomez Dep. at 116.)

between Flores and Gomez that occurred on January 22, 2004. (*Id.* ¶ 124.) What occurred on that date is disputed. According to Gomez, Flores tried to kiss her and she pushed him away. (*Id.* ¶ 125; Pl. LR 56.1 Stmt. ¶ 74; Gomez Dep. at 94.) Gomez did not tell Bullington about this attempted kiss when she met with him on January 24, 2004, (Def. LR 56.1 Stmt. ¶ 126), nor did she tell the EEOC investigator who examined her case (the record does not say when) about the attempted kiss. (*Id.* ¶ 127.) Gomez did raise the incident during Caterpillar's investigation of the January 24, 2004 altercation and claims that she did not raise it initially because she "just knew" nobody would believe her. (*Id.* ¶ 128.)[19] For his part, Flores denies that he tried to kiss Gomez and claims instead that on January 22, 2004, Gomez struck him without provocation. (*Id.* ¶ 129; Miller Decl. ¶ 41.) Randy Lavender, another employee, told Miller, Hinton, and Howell that he had witnessed the January 22, 2004 incident. Lavender confirmed Flores's version, reporting that Gomez had struck Flores without provocation. (Def. LR 56.1 Stmt. ¶ 130.)

Miller and Howell determined that the January 24, 2004 altercation between Flores and Gomez was inappropriate and a violation of Caterpillar's policies but concluded that it did not constitute sexual harassment. (*Id.* ¶ 132.) They informed Dan Mikelson, the Production Manager, of their investigation and recommended that both Flores and Gomez receive a 30-day suspension for their conduct in late January 2004. (*Id.* ¶ 133.) Mikelson was concerned about the allegation that Gomez had struck Flores without provocation, which was corroborated by an independent witness, Randy Lavender. (*Id.* ¶ 135.) Mikelson issued Flores, a full-time employee, a 30-day unpaid suspension. (*Id.* ¶ 139.) Mikelson understood, however, that the agreement between the union and Caterpillar "did not provide for suspensions" of supplemental employees like Gomez.

---

[19]   Though Defendant states that Plaintiff never reported to anyone that Flores had tried to kiss her, Plaintiff testified that she reported that to Bill Miller during his investigation of the January 24, 2004 incident. (Pl. LR 56.1 Resp. ¶ 126; Gomez Dep. at 94.)

(*Id.* ¶ 134.)[20] Mikelson decided to terminate Gomez[21] based on his reading of the labor contract and his understanding of the January 2004 events. (*Id.* ¶ 136; Declaration of Daniel Mikelson ¶ 10, Ex. JJ. to Def. LR 56.1 Stmt.)[22] According to Mikelson, he was not aware that Gomez had complained about sexual harassment when he decided to terminate her. (Def. LR 56.1 Stmt. ¶ 137; Mikelson Decl. ¶ 11.)[23] It remains undisputed, however, that Gomez does not know the reason why she was terminated. (Def. LR 56.1 Stmt. ¶ 138.)

---

[20] The court understands this statement to mean that progressive disciplinary action was not *required* before a supplemental employee could be terminated; not that a suspension for such a worker was not *permitted.*

[21] The parties do not specify when Gomez was terminated nor do they make any arguments based on the timing of Gomez's termination.

[22] Plaintiff attempts to dispute Mikelson's reasons for terminating Gomez. According to Plaintiff, an internal Caterpillar document states that Gomez was discharged because of "false allegations" about Flores trying to kiss her. (Pl. LR 56.1 Stmt. ¶ 87.) The court will not consider this document, which is unauthenticated and for which Plaintiff has provided no foundation, on summary judgment. Though Plaintiff claims—based on Plaintiff's own non-expert handwriting analysis—that this document "appears to be in the handwriting of Jack Futterer," the labor relations manager, Futterer did not testify about this document and the face of the document does not identify its author. (CAT009404, Ex. 7 to Pl. LR 56.1 Stmt.) Even if the court were willing to consider the document on summary judgment, it would not be sufficient to create a dispute of fact as to why Gomez was terminated. Though the document indicates Gomez was discharged because of "false allegations" regarding the January 22, 2004 incident, it also said that her story and Flores' story were different; that a third employee, Lavender, saw the incident and corroborated Flores' account; and that "overall Ms. Gomez had to [sic] many holes in story." (*Id.*) Moreover, this document, if written by Futterer as Plaintiff claims, would not contradict Defendant's assertion that Mikelson fired Gomez based on his reading of the labor contract and his understanding of the 2004 events. (Mikelson Decl. ¶ 10.)

[23] Plaintiff also disputes that Mikelson was unaware that Gomez had complained of sexual harassment when he decided to terminate her. (Pl. LR 56.1 Resp. ¶ 137.) To support this dispute, Plaintiff cites only the Caterpillar internal document that, according to Plaintiff, shows that Gomez was discharged because of false allegations regarding Flores trying to kiss her. (*Id.*; Pl. LR 56.1 Stmt. ¶ 87.) The court has already declined to consider this document on summary judgment, *see supra* n.22, and the document is not sufficient to create a dispute of fact as it indicates nothing about Mikelson's knowledge at the time he decided to terminate Gomez.

24

### b. Sexual Harassment Claim

Diana Gomez alleges that Flores's conduct, described above, constituted sexual harassment. (Pl. LR 56.1 Stmt. ¶ 68.) Defendant acknowledges that Flores's conduct was insulting, but argues that it was not based on Gomez's sex and does not rise to the level of actionable sexual harassment. (Def. Mem. at 12.)

The court concludes there are disputes of fact concerning this claim. Although Defendant urges that Flores's conduct was not based on Gomez's sex, the evidence shows that much of Flores's conduct was of an overtly sexual nature; prior to January 24, 2004, he made kissing faces at Gomez, touched her buttocks, told her to "suck [his] dick" while grabbing himself, and asked her to "hold it" when he went to the restroom. Defendant has not argued that these particular incidents were not based on Gomez's sex, and the court cannot reasonably make such an inference. (Def. LR 56.1 Stmt. ¶ 98; Pl. LR 56.1 Stmt. ¶¶ 70-72.)

Defendant does argue that Flores's conduct on January 24, 2004 was not sexual in nature, despite evidence that Flores called Gomez a "bitch" or "faggot, " told her to "suck [his] dick" while grabbing himself, and pretended to unzip his pants. (Def. LR 56.1 Stmt. ¶¶ 106-09; Pl. LR 56.1 Stmt. ¶¶ 76-77.) Defendant insists that Gomez did not understand Flores's conduct to be sexual and observes that Gomez herself used inappropriate language towards Flores during their altercation. (Def. Mem. at 12.) This evidence, according to Defendant, establishes only "rude banter" between co-workers, not actionable harassment. Defendant cites *Johnson v. Hondo* for the proposition that the use of phrases such as "suck my dick" are common in certain circles and often are not sexual harassment but "simply expressions of animosity or juvenile protection." 125 F.3d 408, 412 (7th Cir. 1997). In the court's view, *Johnson* is distinguishable. In *Johnson*, a male alleged that his male co-worker harassed him by repeated comments that he was going to "make [Johnson] suck [his] dick" and taunts about Johnson's girlfriend; the co-worker never physically touched or threatened Johnson. *Id.* at 410-11. Johnson responded to the harassment by calling

his co-worker various names, such as "fag" or "S.O.B." and the two men eventually engaged in a physical fight. *Id.* at 411. The Seventh Circuit acknowledged that the case presented a "close call," but concluded that the co-worker's use of such expressions was nothing more than an expression of animosity. *Id.* at 412-13. The court observed that expressions such as "fuck me" and "suck my dick" are common in certain circles, particularly when made by men to other men, and can have no connection to the sexual acts that they reference. *Id.* at 412. In this case, in contrast, the facts do provide a basis to conclude that Flores's comments were more than an expression of animosity; Flores had, on multiple occasions in the two months preceding the January 24, 2004 incident, made other comments and gestures to Gomez that were arguably based on her sex, and there is no indication that any of these earlier comments and gestures occurred during the course of an altercation. Based on the current record, the court is not satisfied that Flores's conduct towards Gomez was not because of her sex.

The court therefore must look to the totality of the circumstances to determine if, as Defendant argues, a reasonable person would not find Flores's conduct towards Gomez so severe and pervasive to have created a hostile work environment. As noted earlier, the court must consider the frequency and severity of the conduct, whether it was physically threatening or humiliating, and whether it interfered with the employee's work performance. *See Faragher*, 524 U.S. at 787-88 (citing *Harris*, 510 U.S. at 23). In brief, the relevant conduct occurred between December 2003 and January 2004 and consisted of Flores's making kissing faces at Gomez approximately four times, touching her buttocks twice, telling her to "suck [his] dick" two or three times while grabbing himself, and once asking Gomez to "hold it" when he went to the restroom. (Def. LR 56.1 Stmt. ¶ 98; Pl. LR 56.1 Stmt. ¶¶ 70-72.) Such conduct is in addition to the January 24, 2004 altercation during which Flores called Gomez a Spanish word that can mean "bitch" or "faggot," said that she had a penis, and told her to "suck [his] dick" while grabbing himself and pretending to unzip his pants. (Def. LR 56.1 Stmt. ¶¶ 106-09; Pl. LR 56.1 Stmt. ¶¶ 76-77.)

"In the typical case, it is a combination of severity and frequency that reaches the level of actionable harassment." *Patton*, 455 F.3d at 816-17. This case provides such a combination. Some of Flores's actions towards Gomez—the kissing faces he made at Gomez and asking her to "hold it"—might be characterized as merely offensive utterances and vulgar banter. *Id.* at 816 (citing *Baskerville*, 50 F.3d at 430) ("[In evaluating the severity of harassment, on] one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers . . .") But, on more than one occasion, Flores's offensive comments were accompanied by the obscene gesture of Flores grabbing himself, which amounts to more than mere banter. *See Patton*, 455 F.3d at 816 (obscene gestures more severe than occasional vulgar banter). And all of Flores's offensive comments and gestures, including the words "suck my dick" were made directly to Gomez. *Cf. Whittaker*, 424 F.3d at 646 (rejecting a hostile work environment claim, in part, because there was no evidence that plaintiff was aware of the explicit, derogatory, and sexist remarks of her supervisors). Flores also engaged in unwanted physical contact with Gomez on at least two occasions when he slapped her on the buttocks. Importantly, the various obscene gestures, offensive comments, and two confirmed incidents of unwanted touching all took place over a relatively short two-month time period. The court is unwilling to characterize this evidence simply as isolated instances of misconduct. *See id.* at 646 (citing *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993)). Further, it remains undisputed that, because of Flores's conduct, Gomez was not comfortable at work and could not do her job. (Pl. LR 56.1 Stmt. ¶ 78.).[24] Based on the totality of the circumstances, a reasonable juror could conclude that the harassment of Gomez was so severe or pervasive so as to create a

---

[24] Though Defendant argues that Gomez's work environment was not objectively hostile, Defendant does not address the subjective hostility prong. (Def. Mem. at 12.) The court therefore assumes this prong to be satisfied for the purpose of this motion.

hostile work environment.

Defendant argues it is nevertheless entitled to summary judgment on this claim because as soon as Gomez alleged that she had been harassed after the January 24, 2004 incident, Defendant responded appropriately. (Def. Mem. at 13.) Indeed, Plaintiff has not suggested that Defendant should have been aware of Flores's conduct towards Gomez or taken any corrective action prior to Gomez's voicing of her complaints about Flores on January 24, 2004. Defendant points out that immediately after learning of Gomez's allegations, Bullington reported her claims to his supervisor and to the labor relations department and removed Flores from Gomez's work area. (Def. LR 56.1 Stmt. ¶¶ 118, 120.) The facts presented by the parties do not, however, address the details of this removal and, without knowing the degree to which this removal limited contact between Flores and Gomez, the court cannot determine whether Flores's removal was reasonably calculated to prevent further harassment of Gomez based on the facts and circumstances as of January 24, 2004. *See Longstreet*, 276 F.3d at 38. Defendant also notes that it conducted a prompt and thorough investigation of Gomez's claims by interviewing Gomez, Flores, and three other employees in Gomez's work area, (Def. LR 56.1 Stmt. ¶¶ 20, 30), but it is not clear from this record whether the investigation addressed anything other than the January 22, 2004 and January 24, 2004 incidents, despite Gomez's undisputed testimony that she told Miller about "everything else" that Flores had said to her. (Pl. LR 56.1 Stmt. ¶ 82; Gomez Dep. at 116.) Because it is not clear that Defendant investigated all of her allegations, the court cannot conclude, at this juncture, whether Defendant acted negligently in discovering or remedying any harassment of Gomez. Defendant's motion for summary judgment is denied as to Gomez's sexual harassment claim.

### c.    Retaliation Claim

Plaintiff also claims that Gomez was terminated in retaliation for her sexual harassment complaint. A plaintiff bringing a Title VII retaliation claim can proceed under either the direct or indirect method. *See Phelan*, 463 F.3d at 787 (citing *Stone v. City of Indianapolis Pub. Utils. Div.*,

281 F.3d 640 (7th Cir. 2002)).  Under the direct method, a plaintiff must present direct evidence that she engaged in a protected activity and as a result suffered the adverse employment action of which she complains.  *Phelan*, 463 F.3d at 787 (citing *Stone*, 281 F.3d at 644).  "In the absence of an admission of retaliatory motive by the defendant, a plaintiff can succeed under [the direct method] by presenting sufficient circumstantial evidence such that a jury could infer retaliation." *Phelan*, 463 F.3d at 788 (citing *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)).  If the evidence of retaliation is contradicted, the defendant must establish that it would have taken the adverse employment action even if it had no retaliatory motive.  *Phelan*, 463 F.3d at 787-88 (citing *Stone*, 281 F.3d at 644).  The indirect method requires the plaintiff to show that after engaging in protected activity, she, and not any similarly situated employee who did not engage in such activity, was subject to an adverse employment action.  *Phelan*, 463 F.3d at 788 (citing *Stone*, 281 F.3d at 644).

On its motion for summary judgment, Defendant claims that Plaintiff has no direct evidence that Gomez was retaliated against and that Plaintiff cannot establish retaliation under the direct or indirect methods.  (Def. Mem. at 14-16.)  Plaintiff proceeds only under the direct method and contends that circumstantial evidence establishes that Plaintiff was discharged in retaliation for her allegations of sexual harassment.  (Pl. Response at 16.)  In making this case, Plaintiff points only to an internal Caterpillar document that, in Plaintiff's view, shows that Gomez was discharged due to false allegations regarding the January 22, 2004 incident during which Gomez claims that Flores tried to kiss her, and creates an issue of fact as to whether Gomez was retaliated against for complaining of harassment.  (Pl. Response at 16-17.)  For reasons explained earlier, the court is not inclined to consider this unauthenticated document, the author of which is not known.

In any case, Defendant can prevail if it can show that Plaintiff has insufficient evidence to establish its case under the direct method.  *Celotex Corp.*, 477 U.S. at 322-23.  The court is satisfied that Defendant has done so.  Defendant argues that because Mikelson, the decision-

maker with respect to Gomez's termination, had no knowledge that Gomez had complained of sexual harassment, his decision to terminate Plaintiff could not have been retaliatory. (Def. Mem. at 14.) Defendant is correct that, without such knowledge, Mikelson's decision to fire Gomez could not have been retaliatory. S*ee Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) (decision-maker must have had actual knowledge of the complaints of discrimination in order to retaliate for such complaints); *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000) ("[A]n employer cannot retaliate when it is unaware of any complaints."). According to Mikelson, he was not aware that Gomez had complained about sexual harassment when he decided to terminate her. (Def. LR 56.1 Stmt. ¶ 137; Mikelson Decl. ¶ 11.) And, while the court finds it somewhat confusing that Mikelson made the decision to fire Gomez based on his understanding of the events that occurred on January 22, 2004 and January 24, 2004 without understanding that at some point Gomez had complained of sexual harassment, (Mikelson Decl. ¶¶ 5-6, 10), Plaintiff has not set forth any credible evidence to dispute Mikelson's declaration. *See supra* n.23. In fact, Plaintiff casts this fact—that Mikelson did not know of Gomez's allegations of sexual harassment—as evidence that Mikelson's act of disciplining Flores could not have been calculated to correct or prevent harassment. (Pl. Response at 16.) Other undisputed portions of Mikelson's declaration establish that he fired Gomez based on his understanding of the January 2004 incidents—that both Flores and Gomez had used crude language, during the January 24, 2004 altercation, and that Gomez had struck Flores without provocation on January 22, 2004—and because, as a supplemental employee, Gomez was not protected by the union agreement against immediate termination for such misconduct. (Mikelson Decl. ¶¶ 5-6, 8.) The court grants summary judgment for Defendant on Gomez's retaliation claim.

### 3. Sandy Irvin

#### a. Factual Background

Sandy Irvin began working for Caterpillar in April 2000 as an "assembly operator" at its Pontiac, Illinois facility. (Def. LR 56.1 Stmt. ¶ 140.) As a part of her orientation, Irvin learned about Caterpillar's harassment policy and received a copy of Caterpillar's booklet entitled *What You Should Know About Sexual Harassment in the Workplace*. (*Id.*) Caterpillar promoted Irvin to the position of supervisor on the assembly floor in January 2001 and Irvin then attended a series of classes, one of which covered her responsibilities as a supervisor with respect to Caterpillar's prohibited harassment policy. (*Id.* ¶ 141.) Irvin understood that if she received a report of harassment, she was required to report it immediately to human resources staff and to her immediate supervisor. (*Id.* ¶¶ 141, 143.) In March 2003, Irvin transferred to the Aurora facility and, within approximately six months of her transfer, she attended an orientation that covered Caterpillar's harassment policy and received a copy of the harassment policy. (*Id.* ¶ 142.) Irvin is aware that Caterpillar's harassment policies are posted on bulletin boards in the Aurora facility and on Caterpillar's website. (*Id.* ¶ 144.)

In March 2003, Irvin's position at the Aurora facility was as "second shift supervisor" in Building G; she reported to Mike Brown, the "second shift superintendent." (*Id.* ¶ 145.) Mike Brown felt that Irvin was fully competent in her job; Tim Tunt, the operations manager, who reviewed Irvin's performance when she worked under Brown, also felt that Irvin did a very competent job. (Pl. LR 56.1 Stmt. ¶ 20.) Jon Fay and Paul Oropeza were the lead foremen in Irvin's areas while she was second-shift supervisor. (Def. LR 56.1 Stmt. ¶ 147.) According to Irvin, she would communicate with the lead foremen daily; before the end of their shift, they were responsible for "getting with [her] and either sending [her] lineups or getting with [her] and giving [her] instructions on what they wanted done on the off shift." (*Id.*; Deposition of Sandra Irvin at 37, Ex. Y to Def. LR 56.1 Stmt.) Each day, Fay and Irvin went over the night's game plan; though Irvin coordinated activities across

the shift with Fay, she did not have any reporting relationship with Fay, and Fay was not her supervisor. (Def. LR 56.1 Stmt. ¶¶ 149-51.) Fay had no ability to fire or discipline Irvin, did not review Irvin's performance, and did not affect her compensation or assign her work. (*Id.*)

According to Irvin, in the summer of 2003, Fay began to harass her in person and over the telephone both at work and at home. (*Id.* ¶ 152; Irvin Dep. at 57, 65.) Irvin claims that Fay would look down her shirt, tell her that he liked the color of her bra, tell her that she "needed a spanking" and that he was the one to do it, ask if she "wanted fries with that shake," and ask her what kind of underwear she was wearing, including whether she was wearing a thong. (Def. LR 56.1 Stmt. ¶ 153; Pl. LR 56.1 Stmt. ¶ 26.)[25] Irvin testified that such comments "were an everyday occurrence," though Fay might make particular comments only one or two days a week. (Def. LR 56.1 Stmt. ¶ 153; Pl. LR 56.1 Resp. ¶ 153; Pl. LR 56.1 Stmt. ¶ 27; Irvin Dep. at 61-62.) Fay asked Irvin if she "wanted fries with that shake" approximately ten times; Irvin believes this comment was a reference to how she walks, and when she firmly told Fay to stop, he laughed. (Pl. LR 56.1 Stmt. ¶ 28.) When Fay asked Irvin what kind of underwear she was wearing, Irvin told Fay in a serious tone that it was none of his business. (*Id.* ¶ 29.)

Fay began calling Irvin at home in approximately August 2003 and called her at home a few times a week. (*Id.* ¶ 30.) Irvin claims that the phone calls Fay made to her home were rarely work related. Sometimes he would call just to talk and ask her what she was doing, sometimes he would tell her he called just to hear her voice, on one occasion he asked her what she was wearing, and at other times he talked about his wife or asked Irvin if she found him attractive. (Def. LR 56.1 Stmt. ¶ 154; Pl. LR 56.1 Stmt. ¶ 30.) During four or five phone calls, Fay told Irvin that he was in love with her and asked if there was any chance for him; Irvin responded that they were just friends and

---

[25] Defendant is correct that Plaintiff's assertion is not supported by the cited testimony, but in a portion of Irvin's deposition not cited by Plaintiff, Irvin did testify that Fay asked her about wearing a thong. (Irvin Dep. at 64-65.)

would never be anything more than that.  (Pl. LR 56.1 Stmt. ¶ 30.)  Irvin testified that Fay made phone calls to her from late summer 2003 until December or January of 2004, though they stopped for a few weeks in the interim.  (*Id.*; Irvin Dep. at 93-94.)  The phone calls during which Fay told Irvin that he was in love with her occurred for only one week.  (Def. LR 56.1 Stmt. ¶ 155; Irvin Dep. at 89-90.)

Irvin further testified that, in the summer of 2003, she informed Fay that she had gotten a tattoo and, when she refused to let him see it, he yanked at the waistline of her pants.  (Def. LR 56.1 Stmt. ¶¶ 156-57.)  Irvin did not report this incident to anyone at Caterpillar.  (*Id.* ¶ 158.)  In the fall of 2003, Fay told Irvin that his wife had (falsely) accused him of having an affair with her, and that his wife threatened to come to their workplace and shoot them both.  (*Id.* ¶ 166; Pl. LR 56.1 Stmt. ¶ 31; Irvin Dep. at 76.)

Beginning in late summer or early fall 2003, Irvin told Bob Dively, a maintenance supervisor for Caterpillar, about Fay's offensive conduct on at least three separate occasions; Irvin testified that she did not expect Dively to act upon the information but she was confiding in him as "a friend." (Def. LR 56.1 Stmt. ¶¶ 171-72; Pl. LR 56.1 Stmt. ¶ 33.)[26]  Dively was not Irvin's supervisor and urged Irvin to report Fay's conduct.  (Def. LR 56.1 Stmt. ¶ 171.)  According to Tim Tunt, the operations manager, however, Dively nevertheless had a responsibility to report Irvin's allegations of Fay's harassment because he was a supervisor.  (Pl. LR 56.1 Stmt. ¶ 24.)  In any case, after Irvin first came to Dively and told him about Fay's conduct, Dively did speak to Mike Brown, Irvin's supervisor, about Fay and Brown told Dively that he "would take care of it." (*Id.* ¶ 38.)[27]

---

[26]     Plaintiff characterizes Irvin's conversations with Dively as "complaints," (Pl. LR 56.1 Stmt. ¶ 33), but Irvin testified that she was not "really complaining" to Dively but "was more confiding in him."  (Irvin Dep. at 94-95.)

[27]     Defendant objects to a lack of foundation with regard to the conversation between Dively and Brown; the court is satisfied that Dively has sufficient personal knowledge to testify that this conversation, of which he was a part, took place.  (Def. LR 56.1 Stmt. ¶ 38.)  Plaintiff is clearly not offering Brown's promise to "take care of it" for its truth.

Irvin complained to Mike Brown directly in late summer or early fall 2003. (Def. LR 56.1 Stmt. ¶ 159; Pl. LR 56.1 Stmt. ¶ 41.) According to Irvin, she told Brown "exactly what was going on, that Jon Fay was making repeated phone calls to [her] and that he was telling [her] that he was in love with [her] and asking [her] if there was ever a chance between" the two of them, and that she was offended by these calls. (Def. LR 56.1 Stmt. ¶ 159; Pl. LR 56.1 Stmt. ¶ 41; Irvin Dep. at 71.) Brown told Irvin that he was going to look into the matter and talk to Doug Holman, John Fay's supervisor; though Irvin believes that Brown took her complaint seriously, she does not know what happened after her conversation with Brown. (Def. LR 56.1 Stmt. ¶¶ 160, 162; Pl. LR 56.1 Stmt. ¶ 41.) Irvin testified that when she reported Fay's conduct to Brown it was because she "wanted it to stop so [she] could come in and do [her] job harassment free." (Def. LR 56.1 Stmt. ¶ 161; Irvin Dep. at 129.)[28]

Shortly after Irvin's complaint to Brown, Irvin testified, Fay's behavior changed for about three weeks; he apologized for the things he said and stopped making such comments. (Def. LR 56.1 Stmt. ¶ 163; Pl. LR 56.1 Stmt. ¶ 42; Irvin Dep. at 79-80.) But after three weeks, Fay resumed making inappropriate comments and phone calls to Irvin. (Def. LR 56.1 Stmt. ¶ 164; Pl. LR 56.1 Stmt. ¶ 42.)

A couple of months later, Irvin again complained to Brown. (Def. LR 56.1 Stmt. ¶¶ 165, 168.) Specifically, she reported that Fay had warned her that his wife had threatened to come in and shoot Irvin and Fay. (Pl. LR 56.1 Stmt. ¶ 43.) Brown again promised to talk to Doug Holman. (*Id.*) After this second complaint to Brown, Fay stopped speaking to Irvin about non-business matters and tried not to talk to her unless it was necessary. (Def. LR 56.1 Stmt. ¶ 169.) But though his conduct was not as offensive as it had been earlier, Irvin testified that even after her second

---

[28]     Defendant also asserts that Irvin did not want Brown to fire Fay at the time she reported Fay's conduct to Brown. (Def. LR 56.1 Stmt. ¶ 161.) Plaintiff is correct that Defendant somewhat mischaracterizes Irvin's testimony; the thrust of Irvin's testimony is that she could not have wanted Fay to be fired because she never thought about that one way or another. (Pl. LR 56.1 Stmt. ¶ 161; Irvin Dep. at 128.)

complaint to Brown, Fay continued to make comments about the way she looked. (Def. LR 56.1 Stmt. ¶ 170; Pl. LR 56.1 Resp. ¶ 169; Pl. LR 56.1 Stmt. ¶ 44; Irvin Dep. at 83-84.) Irvin does not recall that Brown checked in with her after either her first or second complaint to ensure that everything was okay. (Pl. LR 56.1 Stmt. ¶ 46.)

On one occasion in January 2004, Irvin was not feeling well and put her head down on her desk. Fay came up behind her and began rubbing her shoulders; Irvin told Fay to stop, warning him that somebody might see him, but Fay continued, rubbing her back harder. (Def. LR 56.1 Stmt. ¶¶ 174-75; Pl. LR 56.1 Stmt. ¶ 32.) Irvin again told Fay to stop, and, when he did not stop, she pushed her rolling chair back as hard as she could to get away from him. (Def. LR 56.1 Stmt. ¶¶ 175-76; Pl. LR 56.1 Stmt. ¶ 32.) According to Irvin, Fay then walked over to his desk, looked down, and said "now look what you did to me." (Def. LR 56.1 Stmt. ¶ 177; Pl. LR 56.1 Stmt. ¶ 32.) Irvin could see out of the corner of her eye that Fay had an erection; Fay then said to Irvin, "we can go out and finish this, nobody will know." (Def. LR 56.1 Stmt. ¶ 178; Pl. LR 56.1 Stmt. ¶ 32.) Irvin told him "no" and Fay repeated that they could go "take care of this now," at which point Irvin said "no," left the office, and then left the Caterpillar facility without speaking to anyone. (Def. LR 56.1 Stmt. ¶¶ 178-79.)

Irvin told Dively about the January 2004 incident, and Dively again spoke to Brown, who said "he would take care of it." (Pl. LR 56.1 Stmt. ¶ 39.) Also on the day of the January 2004 incident, or the following day, Irvin confided in Tim Anderson, "as a friend," about the comments Fay had made to her, Fay's phone calls to her, and the January 2004 incident. (Def. LR 56.1 Stmt. ¶ 173; Irvin Dep. at 100.) Anderson also reported Fay's conduct to Brown. (Def. LR 56.1 Stmt. ¶¶ 180-81; Pl. LR 56.1 Stmt. ¶ 37; Irvin Dep. at 100-01.)[29]

---

[29] Plaintiff asserts that Anderson was a supervisor at the time Irvin informed Anderson about the January 2004 incident. (Pl. LR 56.1 Stmt. ¶ 36.) The court agrees with Defendant that Anderson's testimony does not support this conclusion. (Def. LR 56.1 Resp. ¶ 36.) Anderson testified that he was rehired to work as a robotics programmer support person at the Aurora facility
(continued...)

On the day following the January 2004 incident, Brown pulled Irvin into his office, told her that Anderson had reported the incident to her, and asked her what had happened. (Def. LR 56.1 Stmt. ¶¶ 180-81; Pl. LR 56.1 Stmt. ¶ 47.) After Irvin explained what had occurred, Brown discussed her allegation with Doug Holman, and Holman and Brown decided to take the issue to their supervisor Tim Tunt, the operations manager. (Def. LR 56.1 Stmt. ¶ 182; Pl. LR 56.1 Stmt. ¶ 48.)[30] Tunt testified that this was the first occasion on which Brown had told him of Irvin's allegations against Fay, and that Brown did not report previous complaints from Irvin. (Pl. LR 56.1 Stmt. ¶¶ 49-50.) Tunt was familiar with Caterpillar's sexual harassment policy and his obligation to investigate incidents related to the policy. (Def. LR 56.1 Stmt. ¶ 182.) Tunt met with Irvin and Holman that same day, heard her account of what had occurred, and asked her to write a statement about the incident. (*Id.* ¶ 183; Pl. LR 56.1 Stmt. ¶ 51.) A few days later, Irvin did write a statement detailing her allegations against Fay, and later reviewed it with Tunt. (Def. LR 56.1 Stmt. ¶ 183; Pl. LR 56.1 Stmt. ¶ 51; Tunt Dep. at 27.)[31]

Irvin testified that, during her meeting with Holman and Tunt, Holman accused Irvin of

---

[29](...continued)
in February 2003 as a "retiree," which was a position similar to a supplemental or temporary employee. (Deposition of Tim Anderson at 10-13, Ex. 4 to Pl. LR 56.1 Stmt.)

[30]     Plaintiff asserts that Brown had never reported Irvin's complaints of harassment to anyone else prior to his discussion with Holman in January 2004. (Pl. LR 56.1 Stmt. ¶ 49.) Defendant contends that the cited deposition testimony does not support such an assertion and the court agrees. (Def. LR 56.1 Resp. ¶ 49; Deposition of Michael J. Brown at 12, Ex. Z to Def. LR 56.1 Stmt.)

[31]     In Plaintiff's statement of facts, Plaintiff states, in detail, the content of Irvin's statement. (*See* Pl. LR 56.1 Stmt. ¶¶ 52-56.) Defendant objects to these assertions of fact on the ground that they are based only on an "unauthenticated, unverified, hearsay document." (Def. LR 56.1 Stmt. ¶ 52.) In her deposition, Irvin identified a statement she had written after her meeting with Tunt and Holman, but Defendant is correct that there is no indication that the statement Plaintiff relies on in its statement of facts is the same document Irvin identified during her deposition. (*See* Ex. 5 to Pl. LR 56.1 Stmt.) Though the court will not consider this unauthenticated handwritten document, the court acknowledges that the parties do not dispute that a few days after the January 2004 incident, Irvin wrote a statement, at Tunt's request, detailing her allegations about Fay's conduct towards her. (Pl. LR 56.1 Stmt. ¶ 51; Def. LR 56.1 Stmt. ¶ 183.)

"leading Fay on," and asked Irvin if she had asked Fay out for drinks, to which Irvin responded that she had not. (Pl. LR 56.1 Stmt. ¶ 57.) In response to this exchange, Tunt clarified that no matter what, Fay did not have the right to conduct himself as he had. (*Id.* ¶ 59.) Tunt nevertheless observed that Irvin was a good-looking woman, that "things like this were going to happen," and that Irvin needed to "have thick skin in the shop." (*Id.* ¶ 58.)

Prior to Irvin's report of the January 2004 incident, Tunt was not aware of any allegations of inappropriate conduct on Fay's part. (Def. LR 56.1 Stmt. ¶ 184.) After learning about the incident, Tunt interviewed both Irvin and Fay. Tunt recalls that when he confronted Fay with "the issue in general and with some of the specifics that Irvin had alleged," Fay responded by presenting a number of things that Irvin herself did, including his belief that Irvin "was setting him up," "that she showed him her tattoos on various places on her body," and that "she talked about being horny all of the time and giving her old man just enough to keep him happy." (*Id.* ¶¶ 185-86.) Tunt testified that he listened and documented his conversation with Fay. (*Id.* ¶ 186.) Tunt then talked to various other employees, including Dively, but did not find any firsthand witnesses to the January 2004 incident; Tunt concluded he was left with a "he said, she said" situation and had no reason to believe Irvin any more than Fay. (*Id.* ¶¶ 187-88; Pl. LR 56.1 Stmt. ¶ 60.) Dively did, however, tell Tunt that Irvin had also talked to him and reiterated some of the allegations in her statement. (Pl. LR 56.1 Stmt. ¶ 60.)[32] Ultimately, Tunt gave Fay a verbal reprimand, instructed him that there would be no tolerance for a violation of the prohibited harassment policy, warned him that Irvin's allegations were very serious, sent him home for a couple of days to impress on him the importance of abiding by the policy, and instructed Fay that any further interaction with Irvin had to be limited

---

[32]     Defendant objects to Plaintiff's statement of fact to the extent it is based on Tunt's testimony regarding what Dively said to Tunt, which Defendant characterizes as inadmissible hearsay. (Def. LR 56.1 Resp. ¶ 60.) As the court understands this evidence, Plaintiff is not presenting Dively's statement to Tunt for its truth, but rather to suggest that Dively's confirmation that Irvin had made a similar complaint to him bolstered Irvin's credibility; the court finds Tunt's testimony on his conversation with Dively admissible for that limited purpose. (Pl. LR 56.1 Stmt. ¶ 60.)

to what was necessary for them to do their jobs.  (Def. LR 56.1 Stmt. ¶¶ 188-89; Pl. LR 56.1 Stmt. ¶ 61; Tunt Dep. at 30-33.)  Tunt also referred Fay to Caterpillar's Employee Assistance Program because, in Tunt's estimation, Fay appeared emotionally unstable.  (Pl. LR 56.1 Stmt. ¶ 61.)  The parties agree that Fay was not suspended and suffered no loss of pay.  (*Id.* ¶ 62; Tunt Dep. at 32.)  After meeting with Fay for the second time, Tunt forwarded the documentation from his investigation to Bill Miller in the labor relations department; Miller and Tunt reviewed Irvin's statement and Tunt's summary and agreed that Caterpillar had taken the appropriate action.  (Def. LR 56.1 Stmt. ¶ 190.)

In January 2004, Irvin was promoted to lead foreman on the day shift in Building K.  (*Id.* ¶ 193.)  It is undisputed that at the time of the January 2004 incident, the plans to move Irvin to Building K were already in process.  (*Id.*; Irvin Dep. at 129.)  In this position, Irvin reported to Mark Koenig and Bill Chapman.  (Def. LR 56.1 Stmt. ¶ 193.)  After Irvin had been transferred to Building K, she heard rumors that Fay was telling people that Irvin had "set him up."  (*Id.* ¶ 196)  Irvin reported these rumors to Tunt, who told her that he would talk to Fay about it, and urged her to report to him if the rumors did not stop.  (*Id.* ¶¶ 196-97.)  After she complained to Tunt, Irvin did not hear the rumor again.  (*Id.* ¶ 197.)

In March 2004, Irvin took a "developmental" assignment in the planning department as a "manufacturing project specialist," which required her to once again work in Building G.  (*Id.* ¶ 194.)  In that position, Irvin reported to Greg Sabo and then to Craig Decker.  (*Id.*)  According to Irvin, when she moved back to Building G, Fay also worked in Building G, on the same shift, although Irvin's job did not require her to interact with Fay.  (*Id.* ¶ 199; Irvin Dep. at 118.) Irvin claims that she and Fay nevertheless would "run into each other" and Fay would smirk at her or glare at her when he saw her; Irvin did not report this behavior to anyone.  (Def. LR 56.1 Stmt. ¶ 199.)  In July 2005, Irvin's desk in the planning department was "ransacked"; papers were "strewn all over" and some paperwork was stolen from Irvin's desk.  (Irvin Dep. at 121.)  Irvin admits that she did not see Fay "ransack" her desk, nor did anyone tell Irvin that he had done so; Irvin nevertheless assumed that

Fay was involved because she has never had problems with anyone else. (Def. LR 56.1 Stmt. ¶ 201; Irvin Dep. at 125-26.) By 2005, Tunt was Irvin's mentor; when Irvin mentioned to Tunt the previous situation between her and Fay in 2005, Tunt commented on the difficulties it created for him with the words, "I could have shot you both." (Pl. LR 56.1 Stmt. ¶ 63.)

### b.    Sexual Harassment Claim

Plaintiff brings a sexual harassment claim on Sandy Irvin's behalf as a result of John Fay's conduct. In moving for summary judgment, Defendant does not contend that Fay's conduct was not objectively and subjectively so severe or pervasive that it created a hostile work environment for Irvin. Rather, Defendant argues only that it is not liable for Fay's conduct because it was not negligent in discovering or correcting the alleged harassment. (Def. Mem. at 17.) Plaintiff disagrees and contends that Defendant failed to respond in a timely or appropriate manner to Irvin's complaints. (Pl. Response at 8-9.)

As stated above, an employer is liable for harassment by a coworker if the employer "'knew or should have known' about the harassment and failed to take reasonable steps to remedy the harassment once it was on notice." *Wyninger*, 361 F.3d at 976 (quoting *Berry*, 260 F.3d at 811). There is ample evidence that Defendant knew or should have known about Fay's conduct towards Irvin: Irvin testified that she made multiple complaints about Fay's harassment to Bob Dively, Tim Anderson, and Mike Brown beginning in the summer 2003 and continuing through December 2003. (Pl. Response at 10.) Defendant disputes that Irvin's complaints to Dively and Anderson were sufficient to put Defendant on notice of Fay's conduct; Defendant notes that Irvin confided in Dively and Anderson as "friends" and did not expect them to take corrective action. (Def. Mem. at 15-16.) Plaintiff observes, however, that because Dively and Anderson were supervisors,[33] they were required to bring any complaints of harassment to the attention of their supervisors and the labor

---

[33]    The court previously concluded that a dispute exists as to whether Dively was a supervisor. *See supra* Discussion Section A.3.a.

relations department. (Pl. Response at 10.) It is undisputed that Defendant's supervisors and managers do have a responsibility to report allegations of harassment per Caterpillar policy, *see supra* n.3, and the court is uncertain whether Irvin's perception that she was confiding in Anderson and Dively as "friends" excuses that obligation. In any event, it is undisputed that, after Irvin first confided in Dively in late summer or early fall 2003, he did inform Mike Brown, Irvin's supervisor, about Fay's conduct and again informed Brown about Fay's conduct after the January 2004 incident. (Pl. LR 56.1 Stmt. ¶¶ 38-39.) Anderson likewise told Brown about the January 2004 incident. (Def. LR 56.1 Stmt. ¶ 181.) Further, Irvin testified that she complained to Brown himself about Fay's treatment of her in late summer or early fall 2003 and again a couple of months later, after Fay repeated his alleged threat to shoot both Irvin and Fay. (Def. LR 56.1 Stmt. ¶¶ 159, 165, 168; Pl. LR 56.1 Stmt. ¶¶ 41, 43.) Brown thus certainly knew or had reason to know of the alleged harassment by the early fall of 2003.

Defendant nevertheless urges that it is entitled to summary judgment on the claim because it acted reasonably. According to Defendant, after Irvin's first complaint in fall 2003, Fay apologized to Irvin and his offensive conduct stopped and, when it began again, Irvin did not immediately report it. (Def. Mem. at 18.) In January 2004, Defendant argues, it took prompt action by conducting an investigation and then reprimanding Fay, at which point all harassment of Irvin came to an end. (*Id.* at 19.) Plaintiff, on the other hand, notes that Brown neglected to follow Defendant's policy by failing to take Irvin's complaints to anyone higher in Defendant's management or labor relations department until January 2004, and, as a result, is liable for Fay's continued harassment in 2003. (Pl. Response at 10.) Finally, Plaintiff contends that the action Defendant did take in 2004—sending Fay home from work with pay to impress upon him the importance of the harassment policy—was insufficient to prevent further harassment and that Fay's misconduct ceased only because Irvin fortuitously received a promotion and reassignment to another building. (*Id.* at 12-13.)

Defendant has not satisfied the court that there are no disputes of fact concerning the adequacy of its response to Irvin's complaints. *Celotex Corp.*, 477 U.S. at 322-23 (on summary judgment, it is the moving party's initial burden to show that the evidence is insufficient to establish a material element of the non-moving party's case); *Longstreet*, 276 F.3d at 382 (employer's response to harassment by co-worker must be reasonably calculated to prevent further harassment based on the facts and circumstances at the time). After Dively first told Brown about Fay's conduct, Brown told Dively that "he would take care of it," (Pl. LR 56.1 Stmt. ¶ 38), and when Irvin first complained to Brown, Brown told her that he was going to look into the matter and talk to Fay's supervisor. (Def. LR 56.1 Stmt. ¶¶ 160, 162; Pl. LR 56.1 Stmt. ¶ 41.) There is no evidence, however, of what action, if any, Brown actually took in response. It is true that Fay apologized to Irvin after her initial complaint and that his behavior changed for about three weeks, but it is also undisputed that Fay then resumed making inappropriate comments and phone calls to Irvin. (Def. LR 56.1 Stmt. ¶¶ 163-64; Pl. LR 56.1 Stmt. ¶ 42; Irvin Dep. at 79-80.) That Fay's conduct ceased for a period of time is not determinative of the court's outcome; after all, an employer can "be liable if harassment fortuitously stops, but a jury deems its response to have fallen below the level of due care." *Smith*, 189 F.3d at 535.

The court also cannot determine if Defendant acted negligently after Irvin complained to Brown a second time when Fay informed her that his wife had threatened to come in and shoot Irvin and Fay.[34] At that point, Brown again told Irvin he would talk to Doug Holman. (Pl. LR 56.1 Stmt.

---

[34]     In Defendant's brief, Defendant assumes that Irvin made two complaints to Brown: one in late summer or early fall 2003 and a second related to the January 2004 incident. (Def. Mem. at 18.) Defendant further asserts that when Fay engaged in additional conduct, after Irvin's complaint, she failed to report it. (*Id.* at 19.) This does not comport with the court's view of the facts. Irvin testified that she complained to Brown first in late summer 2003 or early fall 2003 and again a few months later when Fay informed her that his wife had threatened to come in and shoot Fay, (Pl. LR 56.1 Stmt. ¶¶ 41, 43), and Defendant has not set forth any evidence to contradict Irvin's testimony. (Def. LR 56.1 Resp. ¶¶ 41, 43.) It is true that, in January 2004, Brown asked Irvin about Fay's conduct, but Brown explained that he learned of Fay's conduct in January 2004 from Anderson, not Irvin. (Pl. LR 56.1 Stmt. ¶ 47.)

¶ 43.) And it is undisputed that after that complaint Fay tried to speak to Irvin only when necessary. (Def. LR 56.1 Stmt. ¶ 169.) Still, because Defendant has presented no evidence of what action Brown actually took, the court cannot evaluate whether Defendant's response was reasonably calculated to prevent further harassment.

The record does include evidence of Defendant's response in the aftermath of the January 2004 incident: Defendant initiated an investigation of the January 2004 incident, administered a verbal reprimand of Fay, ordered counseling for Fay on the harassment policy, instructed him to interact with Irvin only when necessary for business, and imposed a two-day paid leave of absence. (Def. LR 56.1 Stmt. ¶¶ 188-89; Pl. LR 56.1 Stmt. ¶ 61; Tunt Dep. at 30-33.) Although these steps appear to be appropriate ones, the court is unable to determine, as a matter of law, whether Defendant was negligent in failing to discover or adequately remedy the harassment of Irvin. *See Brooms v. Regal Tube Co.*, 881 F.2d 412, 421 (7th Cir. 1989)*, overruled on other grounds by Saxton*, 10 F.3d at 533 n.12 (court must determine whether "employer's total response was reasonable under the circumstances as then existed"). The court therefore denies Defendant's motion for summary judgment with respect to Irvin's sexual harassment claim.

### 4. Lillie Johnson

#### a. Factual Background

Lillie Johnson began working for Caterpillar at its Aurora facility in 1974. (Def. LR 56.1 Stmt. ¶ 202.) Since 1974, Johnson has held several different positions at the Aurora facility. (*Id.*) At all times during Johnson's employment, she was a member of the UAW and was protected by the collective bargaining agreement between the UAW and Caterpillar; she has filed (unspecified) grievances pursuant to that agreement. (*Id.* ¶ 203.)

Johnson had at least some training on Caterpillar's prohibited harassment policy. According to Defendant, beginning as early as December 1996, Johnson attended a number of training

sessions that covered the prohibited harassment policy, and received Caterpillar's booklet, *What You Should Know About Sexual Harassment in the Workplace*, at those training sessions. (Def. LR 56.1 Stmt. ¶¶ 258-60.)[35] Plaintiff does not dispute that, in December 2003, Johnson attended a training on the prohibited harassment policy, (Pl. LR 56.1 Resp. ¶ 261), but Johnson testified that she does not recall receiving any documents relating to the prohibited harassment policy and was not aware of any of Caterpillar's policies with regard to investigating complaints of sexual harassment. (Def. LR 56.1 Stmt. ¶ 262.)[36]

According to Johnson, Dave Ridenour, her supervisor from 1988 to 1990, harassed her in Building B at some point when he was her supervisor. (*Id.* ¶ 229; 12/1/05 Deposition of Lillie Johnson at 47-48, Tab BB to Def. LR 56.1 Stmt.) Johnson alleges that, after she complained to Ridenour that she was offended by the another employee's use of the term "nigger-rigging," Ridenour began following her to the bathroom, and limiting her breaks and personal time. (Def. LR 56.1 Stmt. ¶ 229; 12/1/05 Johnson Dep. at 46-47.) Johnson testified that after she filed a complaint with the EEOC about this conduct sometime between 1988 and 1990, the harassment stopped. (Def. LR 56.1 Stmt. ¶ 230.)

Johnson also testified that Dean Potter, who was her superintendent for several years, asked her "personal questions" at some point during the 1990's; specifically, Johnson testified that

---

[35]     Defendant cites to the declaration of Bill Miller to establish that Johnson attended particular training sessions on Caterpillar's prohibited harassment policy and that she was provided documents on the policy. (Def. LR 56.1 Stmt. ¶¶ 258-60.) Plaintiff objects that Miller's statements are not supported by adequate foundation. (Pl. LR 56.1 Resp. ¶¶ 258-60.) Miller's declaration sets forth his responsibilities as the labor relations representative, which includes implementing training programs on Caterpillar's harassment policies, and that he has access to employee personnel files. (Miller Decl. ¶¶ 2-5.) The court is satisfied that Miller has sufficient knowledge to attest to what training sessions Plaintiff attended and what occurred at those training sessions.

[36]     Johnson also testified that she did not see Caterpillar's prohibited harassment policy posted until after this lawsuit, but this testimony deserves little weight; Johnson did not recall exactly when the lawsuit was filed, and acknowledged that she never checked the display cases and bulletin boards where the prohibited harassment policy is posted. (Def. LR 56.1 Stmt. ¶ 263.)

43

Potter harassed her by asking her on one occasion whether she was still married and whether she had a boyfriend or children. (*Id.* ¶ 231.) Johnson admits that Potter never asked her out, asked her for sex, commented on her appearance, or threatened her in any way. (*Id.* ¶ 232.)

Johnson also felt harassed by a co-worker, Art Whipple, after she had crossed the picket line and continued to work during a UAW strike in 1996. (12/1/05 Johnson Dep. at 35-36.) According to Johnson, Whipple called her a "bitch" on one occasion and repeatedly wore a t-shirt that read "roses are red, violets are blue, I pay my union dues, why don't ewe." (Def. LR 56.1 Stmt. ¶ 233.) Johnson claims that Whipple also harassed her in February 1999 by "stalking" and "staring" at her, and by whistling at her on three different days. (*Id.* ¶ 234.)[37] After Johnson executed a statement detailing Whipple's treatment of her and gave it "to security," various supervisors met with her and Whipple, (12/1/05 Johnson Dep. at 37-38), and Bill Miller conducted an investigation, which included interviews with Johnson and Whipple among others. (Def. LR 56.1 Stmt. ¶ 236.) Whipple admitted to Miller that he often whistled, but he denied ever whistling at Johnson or stalking or staring at Johnson. (*Id.* ¶ 237.) During the interview, Miller cited Caterpillar's prohibited harassment policy and warned Whipple that harassment is cause for discipline up to and including termination. (*Id.*) Miller subsequently explained to Johnson that he had instructed Whipple to control his whistling, that Whipple had a business reason for being in her work area and that he (Miller) could not confirm that Whipple was "stalking" her or "staring" at her. (*Id.*) Miller also encouraged Johnson to immediately report any further incidents and explained that certain supervisors would monitor her situation with Whipple. (*Id.* ¶ 239.) Johnson told Miller that she was satisfied with his investigation. (*Id.* ¶ 240.) She never again complained to him about Whipple's conduct. (*Id.* ¶ 241.)

---

[37] Oddly, Plaintiff contends that Defendant has not provided support for its statement that Johnson alleged that Whipple harassed her in 1999. (Pl. LR 56.1 Resp. ¶ 234.) While Defendant initially neglected to attach its supporting exhibit to its statement of facts, Defendant subsequently submitted an affidavit executed by Johnson in 1999 detailing Johnson's allegations of Whipple's harassment. (February,1999 Johnson Affidavit, Ex. 44 to 12/1/05 Johnson Dep.)

Johnson testified that she learned in 1998 from another Caterpillar employee, Sam Rory, who retired in 1995, that other Caterpillar employees—specifically, Diane Brown, Syl Taylor, and Reatta Williams—were promoted because they slept with management employees. (Def. LR 56.1 Stmt. ¶¶ 252-54.) Johnson admits that she does not know what promotions any of these women received or the identities of the managers they allegedly slept with. (Id. ¶¶ 255-57.)

Johnson also claims that she was harassed in 1998 or 1999 by Bob Smith, who was also her supervisor at the time. (Id. ¶ 242; Pl. LR 56.1 Stmt. ¶ 121.) According to Johnson, when she asked Smith what steps she needed to take to get promoted, Smith asked her whether she "wanted to sleep [her] way up," a comment Johnson interpreted as a suggestion that she should sleep with Smith. Smith further asked her how badly she wanted it and told her she could "get in the office" (presumably, a reference to obtaining a promotion) in six months if she slept her way up. (Def. LR 56.1 Stmt. ¶ 242; Pl. LR 56.1 Stmt. ¶¶ 118, 120; 12/1/05 Johnson Dep. at 53.) When Smith told her she was not interested in getting into the office that way, Smith asked her, "[w]hat's the matter, am I not black enough?" (Pl. LR 56.1 Stmt. ¶ 118.) Johnson admits that she did not file a grievance over this comment, nor did she report it to any manager, supervisor, the EEOC, or Caterpillar's human resources department. (Def. LR 56.1 Stmt. ¶ 243.)[38] Johnson also alleges that Smith hit her "on [her] behind" on one occasion in 1998 and tried to rub his arm against her breasts on two occasions in 1999; after Johnson told Smith that she "would cut his arm off" if he did it again, his conduct stopped. (Id. ¶ 245; 12/1/05 Johnson Dep. at 55-56.) According to Johnson, she had seen Smith rub his arm against the breasts of another employee, Esther Wilson, in 1998 or 1999.

_____

[38] Plaintiff disputes this fact and contends that Johnson did report Smith's comment to the EEOC. (Pl. LR 56.1 Resp. ¶ 243.) Plaintiff cites to the EEOC's Response to Defendant's Second Set of Interrogatories, which noted Johnson's allegation that Smith told her she could "sleep [her] way up" at Caterpillar. (EEOC's Response to Defendant's Second Set of Interrogatories at 4, Ex. T to Def. LR 56.1 Stmt.) But, Johnson admitted in her testimony that she did not report Smith's comment to anyone at the EEOC, (12/1/05 Johnson Dep. at 55), and there is nothing in the EEOC's interrogatory responses indicating that the EEOC would have learned of Smith's comment but for this lawsuit.

(Pl. LR 56.1 Stmt. ¶ 119.) Finally, Johnson claims that around the year 2000, Smith warned Johnson that he would "hit [her] across [her] fat ass if [she broke] another one of those wheels." (Def. LR 56.1 Stmt. ¶ 246; 12/1/05 Johnson Dep. at 72-73.) Johnson never reported this comment to anyone in Caterpillar's labor relations or human resources departments, (Def. LR 56.1 Stmt. ¶ 247), but she asserts that another employee, Bill Brown, witnessed Smith threaten to hit Johnson's buttocks. (Pl. LR 56.1 Stmt. ¶ 122.) Johnson testified that Brown, whom she believes to be part of Caterpillar's management, asked her not to make a complaint about Smith because he believed Smith "didn't mean it." (Id.; 12/1/05 Johnson Dep. at 72-75.)

Johnson also observed offensive pictures of naked women posted throughout Building B starting in 1988 and until November 2001. (Def. LR 56.1 Stmt. ¶ 248; Pl. LR 56.1 Resp. ¶ 248; Pl. LR 56.1 Stmt. ¶ 123.)[39] These pictures, which Johnson observed at various work stations depicted, for example, women with bare breasts, naked women sitting with their legs spread open, women sitting on motorcycles and other pictures from Playboy magazine. (Pl. LR 56. 1 Stmt. ¶ 123.) Johnson found the pictures and the comments that men made about them distracting; for example, in 2000, she heard a co-worker comment that he wondered how many other woman "in here" look like these women. (Id. ¶ 124.) She admits, however, that she never complained to managers or Caterpillar's labor relations or human resources departments about these pictures. (Def. LR 56.1 Stmt. ¶ 250; Pl. LR 56.1 Stmt. ¶ 123.) Johnson also felt harassed in 1999 or 2000 when someone left a rubber penis at her work station. (Def. LR 56.1 Stmt. ¶ 251.) She complained to her

---

[39] Based on Johnson's testimony that she did not experience sexual harassment from October 2000 to November 2001, Defendant contests Plaintiff's assertion that Johnson saw such pictures after October 2000. (Def. LR 56.1 Resp. ¶ 123; 12/1/05 Johnson Dep. at 93.) While Defendant accurately stated Johnson's testimony, Johnson also testified that she believed employees acted inappropriately towards her based on her sex because there were magazines with pictures of naked women throughout the plant during that same time period. (12/1/05 Johnson Dep. at 86.) She also stated specifically in her declaration that she was exposed to such pictures until November 2001. (Declaration of Lillie Johnson ¶ 6, Ex. 11 to Pl. LR 56.1 Stmt.) The court views these facts in the light most favorable to Plaintiff and concludes that Johnson was exposed to pictures of naked women from 1988 to November 2001.

supervisor at the time, Jim Foster, about the rubber penis; she is not aware whether Foster took any action in response and did not explain what happened to this item.  (Pl. LR 56.1 Stmt. ¶ 125.)

From October 2000 to November 2001, Johnson reported to George Tolliver in Building B, with the exception of two months in 2001 when she reported to U.B. Jenkins in Building K.  (Def. LR 56.1 Stmt. ¶ 204.)  During the time Johnson worked in Building B, she worked on the first, second, and third shifts, and had no reason to go into any other buildings.  (*Id.* ¶¶ 206-07.) Beginning in December 2001, Johnson again worked in Building K.  (*Id.* ¶ 204.)

According to Johnson, Bob Garcia harassed her during the time she worked in Building B and reported to George Tolliver.  (*Id.* ¶ 214.)  Specifically, Johnson claims that Garcia winked at her when she made eye contact with him on several occasions.  (*Id.*)  On one occasion, Johnson asked Garcia what was in his eye and he replied, "you."  (*Id.*)  Garcia said nothing else during that conversation and, during the numerous times he walked through Johnson's work area over a period of approximately six months, he never stopped to talk to her.  (*Id.* ¶¶ 214-16.)  After that six-month period, Johnson never again saw Garcia in her work area.  (*Id.* ¶ 216.)  Garcia never supervised Johnson, nor did he control Johnson's work assignments.  (*Id.* ¶ 217.)  Johnson did not report Garcia's conduct to her supervisor or anyone in Caterpillar's labor relations or human resources departments.  (*Id.* ¶ 218.)

Johnson also claims that she was harassed by U.B Jenkins when she worked in Building K in 2002.  According to Johnson, after receiving her degree from Aurora University in 2002 she asked Jenkins, a long-time management employee, if there was anything he could do in order to help her get a job in the office.  (12/1/05 Johnson Dep. at 97.)  Jenkins told her "the degree won't do any good without a couple of lap dances."  (Def. LR 56.1 Stmt. ¶ 220; Pl. LR 56.1 Stmt. ¶ 126.) Johnson never reported this comment to her supervisor or anyone in Caterpillar's labor relations or human resources departments, assertedly because she feared retaliation.  ( (Def. LR 56.1 Stmt.

¶ 222.)[40]  The parties dispute whether Jenkins made any further harassing comments to Johnson. Defendant is correct that Johnson testified that Jenkins did not say anything else that she thought was harassing.  (*Id.* ¶ 223; 12/1/05 Johnson Dep. at 99.)  But Johnson also testified that Jenkins made further "inappropriate" comments to her as he "would come by [her] work station and ask [her] was [she] ready to do the lap dance."  (Pl. LR 56.1 Resp. ¶ 223; Pl. LR 56.1 Stmt. ¶ 127; 12/1/05 Johnson Dep. at 99.)  In any case, though Johnson approached Jenkins because he had been in management for a long time, (12/1/05 Johnson Dep. at 97), she acknowledged that she knew that Jenkins "had no pull in promoting [her]" and "wasn't talking about doing a lap dance for him." (7/24/06 Deposition of Lillie Johnson at 156-58, Tab UU to Def. LR 56.1 Stmt.)

Though Jenkins had previously supervised Johnson, he was not her direct supervisor in 2002.  (Def. LR 56.1 Stmt. ¶ 204.)  The parties disagree, however, whether Jenkins was in Johnson's line of reporting and whether he had authority to hire, fire, or evaluate Johnson.  Citing only the declaration of Bill Miller, Defendant claims that Jenkins was not in Johnson's line of report and that he did not have such authority.  (*Id.* ¶ 221; Miller Decl. ¶ 48.)  Plaintiff disputes this, citing her performance review in March 2002, which is signed by Jenkins in his capacity as "superintendent," and Johnson's declaration that Jenkins was her superintendent in 2002.  (Pl. LR 56.1 Resp. ¶ 221; Pl. LR 56.1 Stmt. ¶ 129; March 20, 2002 Johnson Performance Evaluation, Tab BB to Def. LR 56.1 Stmt.; Declaration of Lillie Johnson ¶ 5, Ex. 11 to Pl. LR 56.1 Resp.)

The parties also dispute whether Johnson felt harassed at any point after 2002.  Defendant claims that Johnson did not feel harassed after 2002 based on her testimony that during the time period Angela Isaacs was her supervisor—from November 4, 2002 to February 1, 2004—she did not feel that she was harassed by any other employees.  (Def. LR 56.1 Stmt. ¶¶ 204, 224, 12/1/05 Johnson Dep. at 104-05.)  Plaintiff, on the other hand, notes Johnson's testimony that she saw

---

[40]      According to Johnson, she feared retaliation because of the way she was treated years earlier by Dave Ridenour after she complained to Ridenour that she was offended by another employee's use of the term "nigger-rigging."  (Def. LR 56.1 Stmt. ¶¶ 222, 229.)

pictures of naked women on the desk of a co-worker, Ray Conley, in Building K at some point in 2003 and, in 2006, saw a picture of a scantily-clad woman with bare breasts in an area where employees eat in Building H. (Pl. LR 56.1 Resp. ¶ 224; Def. LR 56.1 Stmt. ¶ 26; Pl. LR 56.1 Stmt. ¶ 130.) Johnson admits she did not report this photo display to her union steward, supervisor, or anyone in Caterpillar's labor relations or human resources departments. (Def. LR 56.1 Stmt. ¶ 226.) According to Johnson, she made no such report because she feared that her supervisor would retaliate against her. (*Id.* ¶ 227.)[41] Johnson also claims to have feared that Mike Groff in human resources would retaliate because he once failed to follow up on conversations they had concerning Johnson's promotion. (*Id.* ¶ 228; 12/1/05 Johnson Dep. at 138.) Finally, Johnson testified that she feared retaliation from Bob Bend in human resources "[b]ecause he is a part of human resources," and Bill Miller in labor relations because she believed "he [did] not like people of color." (Def. LR 56.1 Stmt. ¶ 228; 12/1/05 Johnson Dep. at 141.)

On March 28, 2004, Johnson filed an EEOC charge alleging that Caterpillar discriminated against her on the basis of age and race by failing to promote her. (Def. LR 56.1 Stmt. ¶ 211.) She made no mention of sexual harassment or sex discrimination in this charge, and did not file any other EEOC charge making such claims. (*Id.* ¶¶ 212-13.)

### b.    Sexual Harassment

In this action, Plaintiff brings a sexual harassment claim on Johnson's behalf. Defendant contends that Johnson's allegations of harassment are not sufficiently severe or pervasive to establish an actionable work environment and that, in any case, there is no basis for imputing liability to Defendant. (Def. Mem. at 19.) Defendant also argues that the majority of Johnson's

---

[41]    Defendant asserts that Johnson's supervisor in 2003 when she saw pictures of a naked woman on Conley's desk was Sandy Irvin. (Def. LR 56.1 Stmt. ¶ 227.) While Plaintiff does not dispute this fact and Johnson so testified, (Pl. LR 56.1 Resp. ¶ 227; 12/1/05 Johnson Dep. at 136), the court notes that Plaintiff and Defendant have also agreed that Angela Isaacs, not Sandy Irvin, was Johnson's direct supervisor in 2003. (Def. LR 56.1 Stmt. ¶ 204.)

allegations are untimely, and that Johnson never reported her timely allegations of harassment. (*Id.*) Plaintiff contends that Johnson was subject to severe or pervasive harassment, and that the court should consider all of the incidents of harassment Johnson now alleges. (Pl. Response at 24-27.) Moreover, Plaintiff argues, Defendant cannot succeed in raising the *Ellerth/Faragher* affirmative defense because Johnson did not receive a copy of Defendant's prohibited harassment policy and Defendant's efforts to prevent co-worker and supervisor harassment were inadequate. (*Id.* at 27.)

The court first turns to the timeliness of Johnson's allegations of harassment. The EEOC charge underlying this action was filed by Karon Lambert on February 5, 2002. According to Defendant, any allegations relating to harassment before April 11, 2001 cannot support Plaintiff's claim on behalf of Johnson because such harassment would have occurred more than 300 days before Lambert filed her EEOC charge. (Def. Mem. at 20.) Plaintiff concedes that the timeliness of Johnson's claims should be measured from the date of Lambert's EEOC charge, but contends that the court should consider all of the acts of harassment alleged because they are of the same nature and part of the same pattern. (*See* Pl. Response at 26 ("The harassing conduct Johnson alleges occurred more than 300 days prior to the filing of the underlying charge on February 5, 2002, is part of the same pattern of harassment . . . .")

Defendant is correct that a charge underlying a Title VII action must be filed within a certain number of days—in this case, 300 days—after the unlawful employment practice occurred. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002). Because a "hostile work environment claim is composed of a series of separate acts that collectively constitute 'one unlawful employment practice,'" the Supreme Court has held that as long as one act contributing to the claim occurred within the statutory period, the court may consider acts outside of the statutory period. *Id.*; *Lucas v. Chicago Transit Auth.*, 367 F.3d 714, 723-24 (7th Cir. 2004) (citing *Morgan*, 536 U.S. at 117). Of course, the district court must determine "whether the acts about which an employee complains are

part of the same actionable hostile work environment practice. . . ." *Morgan*, 536 U.S. at 120. If the act within the statutory time period has no relation to the earlier acts, "or for some other reason, such as certain intervening action by the employer, was no longer part of the same hostile environment claim, then the employee cannot recover for the previous acts. . . ." *Id.* at 118. In *Morgan*, the Court approved of the lower court's approach to determining whether acts outside of the statutory time period were part of the same hostile environment claim as acts within the statutory period; the lower court had considered whether "the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers." *Id.* at 120 (quoting *Morgan v. Nat. R.R. Passenger Corp.*, 232 F.3d 1008, 1017 (9th Cir. 2000)). This court will use the same approach here.

As set forth in its response brief, Plaintiff considers the following to be harassing acts that contributed to Johnson's hostile work environment:

- Bob Smith, Johnson's supervisor, whom Johnson had seen rub his arm against a co-worker's breast, touched Johnson on the buttocks and twice tried to rub his arm against her breast (1998);

- When Johnson asked about a promotion, Smith asked her if she wanted to sleep her way up; and when Johnson told Smith she was not interested, Smith responded by asking if he was not black enough (1998 or 1999);

- Someone left a rubber penis at Johnson's work station (1999 or 2000);

- Smith threatened to hit Johnson across her "fat ass" if she broke another wheel (2000);

- When Johnson asked about getting a job in the office, Jenkins (whose supervisory status is disputed), told Johnson that her degree would not do her any good without a couple of lap dances and later came to her work area a couple of times to ask if she was ready to lap dance (2002); and

- Johnson saw pictures of naked women on a daily basis (1988-November 2001), saw a picture of a naked woman on a co-worker's desk in 2003, and saw a picture of a scantily-clad woman in an area where employees eat in 2006. (Pl. Response at 24-25.)

Defendant does not dispute that Jenkins' comments about a lap dance and Ray Conley's photo display both occurred during the statutory period. (Def. Mem. at 20-21.) The court therefore

reasonably infers that Defendant would not object to including the incident in which Johnson saw a picture of a scantily-clad woman displayed in 2006 as part of this same claim. Based on the factors approved of in *Morgan*—whether the "pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers"—the court also considers Johnson's daily exposure to pictures of naked women from 1988 to November 2001 to be part of the same hostile work environment claim. *See Morgan*, 536 U.S. at 120 (citation omitted). While it is not clear who was responsible for displaying these pictures, this exposure occurred frequently, on a daily basis, and was similar to conduct that occurred within the statutory period—specifically, Johnson's exposure to pictures of naked women from April 11, 2001 to November 2001. *See id.* at 120.

The remaining conduct that occurred outside the statutory period includes the incident in which a rubber penis was left at Johnson's work station. Assuming in Plaintiff's favor that this act was in fact based on Johnson's sex, the court nevertheless will not consider the incident as part of Johnson's hostile work environment claim. The perpetrator of this one-time incident is unknown, and it is not similar in type to any of the conduct committed during the statutory period. *Cf. Avdyli v. Barnhart*, No. 05-C-2132, 2007 WL 57601, *10 (N.D. Ill. Jan. 3, 2007) (to the extent pre-limitations acts that were of the same type as the post-limitations act and occurred frequently, they were properly part of same hostile work environment claim).

Plaintiff also claims that Bob Smith's conduct forms part of the same claim, as those acts that occurred within the statutory period. As a preliminary matter, the court is not convinced that Smith's threat that he would hit Johnson across her "fat ass" if she broke another wheel was based on Johnson's sex. It is undisputed that Smith made this comment at a time when he was disturbed that Johnson had broken several grinder wheels. (Def. LR 56.1 Stmt. ¶ 246.) In any case, the court does not conclude that this comment or Smith's other conduct—in 1998 or 1999 he made offensive comments to Johnson and, in 1998, he touched her on the buttocks and twice tried to rub his arm

against her breast—form part of the same hostile environment claim with acts that occurred within the statutory period. While it is true that Smith's 1998 comment to Johnson regarding whether she wanted to "sleep her way up" bears some similarity to Jenkins' offensive "lap dance" comments in 2002, Smith was not the perpetrator of any of the harassing acts that occurred within the statutory time period. *See Avdyli*, 2007 WL 57601, *9 (conduct of different perpetrator not part of same hostile environment claim). To the extent that Smith's allegedly harassing conduct consisted of physical contact or attempted physical contact, the conduct is entirely different in type than conduct that occurred within the statutory period. Moreover, none of Smith's conduct before the statutory period occurred with any frequency. In the three years before the statutory period, Smith subjected Johnson to, at most, five harassing acts; he once touched Johnson's buttocks, twice tried to rub his arm against her breast, and made offensive remarks to Johnson on one or possibly two occasions. The court therefore views Johnson's hostile environment claim as consisting only of Jenkins' comments to Johnson in 2002 and Johnson's exposure to pictures of naked or scantily-clad women from 1988 to 2001, on a co-worker's desk in 2003, and in an area where employees eat on one day in 2006.

Defendant does not raise the argument that Johnson herself did not find her work environment to be hostile until its reply brief, (Def. Reply at 19); thus, the court need not consider it. *See Adamson*, 441 F.3d at 521 (citing *Blaylock*, 413 F.3d at 619) (arguments raised for first time in reply brief are waived). In any case, the court finds that Defendant is entitled to summary judgment on Johnson's claim on other grounds described below; the court therefore assumes, for analytical purposes, that Johnson did find her work environment to be hostile.

Again, in assessing Plaintiff's claim that Johnson's work environment was objectively hostile, the court must consider the totality of the circumstances, including the frequency and severity of the conduct; whether it is threatening or humiliating, and whether it "unreasonably interferes" with work performance. *See Faragher*, 524 U.S. at 787-88 (quoting *Harris*, 510 U.S. at 23). The

offensive comments made by U.B. Jenkins about Johnson giving him a lap dance, which Johnson never reported, were made on only two occasions.  *See Baskerville*, 50 F.3d at 430-31 (citation omitted) ("The infrequency of the offensive comments is relevant to an assessment of their impact. A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage.")  A question of fact exists as to whether Jenkins was Johnson's supervisor, and his comments were certainly inappropriate for the workplace, but they constitute offensive utterances, not severe misconduct.

A comparison to *Baskerville*, a case in which the plaintiff alleged hostile work environment sexual harassment based on nine different comments made to her by her supervisor over a seven-month period, is useful.  *Id.* at 430.  Some of the comments at issue in *Baskerville*, for example, that the plaintiff's supervisor called her a "pretty girl" and made other comments about women that did not address the plaintiff specifically, are not as troubling as Jenkins' comments which were addressed directly to Johnson.  But, on one occasion, the supervisor in *Baskerville* stopped at the plaintiff's desk while an announcement was being broadcast over the public-address system and told her that "all pretty girls" were supposed to "run around naked."  *Id.* at 430.  Even considering this comment in combination with the eight other comments that the plaintiff found to be harassing, the *Baskerville* court did not find that the supervisor's offensive utterances amounted to actionable harassment.  *Id.* at 430-31.  Jenkins' comment might be considered more offensive than those made by the supervisor in *Baskerville* if the lap dance could reasonably be construed as the "quid pro quo" for a promotion, but Johnson herself testified that Jenkins did not have influence over whether she would be promoted and was not actually asking her to do a lap dance for him. (7/24/06 Johnson Dep. at 156-58.)

The court, of course, must view Jenkins' comments together with the other conduct that forms Johnson's hostile work environment claim—that she saw pictures of naked women on a daily basis from 1988 through November 2001, saw another picture of a naked woman displayed on a

co-worker's desk in 2003, and saw a picture of a scantily-clad woman in an area where employees eat on one day in 2006. (Pl. Response at 24-25.) Johnson admits that she never complained about these pictures, though she found them distracting. (Pl. LR 56.1 Stmt. ¶¶ 123-24; Def. LR 56.1 Stmt. ¶ 250.) The Seventh Circuit has noted that "pornographic pictures" differ from "occasional vulgar banter" in severity. *Patton*, 455 F.3d at 816 (citing *Baskerville*, 50 F.3d at 430). Here, there is evidence that at least some of the images to which Johnson was exposed were pornographic, and Johnson's exposure to the pornography was an everyday occurrence for over a decade. Still, there is no evidence in the record that Johnson's observance of these images was anything more than indirect: although they were displayed in places where Johnson could see them, the images were not specifically displayed or shown to her, nor were they displayed anywhere but in other employees' personal work space. *See Baskerville*, 50 F.3d at 431 (finding that supervisor's offensive comments did not amount to actionable harassment and noting, among other things supervisor did not do, that he "did not show [plaintiff] dirty pictures."). The one exception is a picture that Johnson specified as being in a public area—an area where employees eat—but Johnson saw this picture on only one day, September 10, 2006. (Pl. LR 56.1 Stmt. ¶ 130.) In fact, Plaintiff states only vaguely that the pictures Johnson saw from 1998 to 2001 were located at "various work stations." (*Id.* ¶ 123.) Plaintiff does not specify the work station of any particular employee or credit the display of such pictures to any particular employee or group of employees and elaborates in its brief only by stating that such pictures were displayed "at employees' work stations, such as on their desks or tool boxes." (Pl. Response at 25.) *See Yuknis v. First Student, Inc.*, 481 F.3d 552, 555 (7th Cir. 2007) (noting the difference between a manager watching pornography on his computer at work and pornographic pictures being displayed on the walls of the workplace or being e-mailed to the plaintiff); *cf. Scott-Riley v. Mullins Food Prods., Inc.*, 391 F. Supp. 2d 707, 718 (N.D. Ill. 2005) (citations omitted) ("Though pornographic pictures not directed

at a plaintiff . . . may not constitute a hostile environment . . ., pictures of naked women repeatedly placed on a plaintiff's desk are different.")

It is well-accepted that harassment not directed at an individual has a lesser impact on that individual. *See Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997) ("The impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff.") (quoting *Rennie v. Dalton*, 3 F.3d 1100, 1107 (7th Cir. 1993)). Considering together the indirect, though prolonged, nature of Johnson's exposure to explicit materials that were kept at other employee's work stations and Jenkins' infrequent offensive comments to Johnson, the court cannot conclude that a reasonable person would find this work environment to be hostile. Defendant is entitled to summary judgment on Johnson's sexual harassment claim.

### 5. Wendy Hollenback-Smithburg

#### a. Factual Background

Wendy Hollenback-Smithburg ("Smithburg") was hired by Caterpillar to work as an hourly employee at its Aurora facility in March 1989. (Def. LR 56.1 Stmt. ¶ 264.) Smithburg recalls reviewing the sexual harassment policy when she began working at Caterpillar, and that the policy was one of "zero tolerance." (*Id.* ¶ 265.) She also admits that she has seen copies of the prohibited harassment policy posted where she enters work, and believes the policy has been posted in that same spot for a long time. (*Id.* ¶ 271.) Smithburg further recalls attending a "diversity training course" in the early to mid-1990's at which Caterpillar's sexual harassment policy was discussed; Smithburg understood that she could report harassment to her supervisor. (*Id.* ¶ 272.) She also attended a four-hour training course on Caterpillar's prohibited harassment policy on January 16, 2002. (*Id.* ¶ 303.)

In May 1990, Smithburg was accepted into a tool maker apprentice program, which she completed in June 1996. (*Id.* ¶ 266.) Approximately fifteen other employees were in her

apprenticeship group, including Dean Morrissette.  (*Id.*)  According to Smithburg, in or about 1990, Morrissette followed her home in his car after they attended a class together at Waubonsee College, told her he wanted to talk to her, and asked if he could kiss her hand, to which Smithburg responded "no."  (*Id.* ¶ 267.)  Smithburg did not report the incident and Morrissette later apologized to her.  (*Id.*)[42]

By the late 1990's, Smithburg was working as a tool maker on the second shift and, as an hourly employee in the tool room, she was a member of the UAW.  (*Id.* ¶ 269.)  This tool room, located in Building B, was about as large as a football field.  (*Id.* ¶ 270.)  Smithburg claims that while she was working in there in 1994 or 1995, Doug Holman, then a tool room supervisor, grabbed her buttocks, put his arm around her neck, and told her that her "ass looked good in

jeans."  (*Id.* ¶ 273.)  Smithburg complained to Dick Roberts, the head supervisor in the tool room, and to Roberts' and Holman's boss, Jerry Leonard.  (*Id.*)  Smithburg later learned that Roberts and Leonard spoke to Holman, and Smithburg does not recall Holman ever behaving inappropriately towards her again.  (*Id.*)

At some point in or about 1999, Smithburg reported to Morrissette (who was by then her supervisor) that a co-worker, Glen Thomas, would sometimes sit and stare at her.  (*Id.* ¶ 274.)  After Smithburg reported Thomas' behavior, it stopped.  (*Id.*)  At some point in 1999, a condom was left on Smithburg's desk and she reported the incident to Doug Holman, who still served as a supervisor.  (*Id.* ¶ 275.)  Holman told Smithburg that he would deal with it and, although she testified that she was not aware of any investigation, Holman did meet with employees on Smithburg's shift after the incident and distributed a document entitled *You Make a Difference – Sexual Harassment in the Workplace.*  (*Id.*; Deposition of Wendy S. Hollenback-Smithburg at 71-72, 84-85, Ex. CC to

---

[42]     Defendant notes, and Plaintiff does not dispute, that in the early 1990's Smithburg had gone on one date with and had sex with Morrissette, after which they did not date but continued to have a friendly relationship.  (Def. LR 56.1 Stmt. ¶ 268.)

Def. LR 56.1 Stmt.)  Smithburg also reviewed this document in June 1999 and was aware that it instructed employees to report any conduct that they thought subjected them to sexual harassment. (Def. LR 56.1 Stmt. ¶ 275.)

As of late 1999 or early 2000, Smithburg was working as a "make" tool maker and reported to a supervisor, Don McNeill.  (*Id.* ¶ 276.)  In 2001, Smithburg reported to McNeill that an outside contractor—not a Caterpillar employee—had repeatedly asked her to go out with him.  (*Id.* ¶ 277.) After she reported the conduct to McNeill, the conduct stopped.  (*Id.*)  In 2001, Smithburg found the word "Bitch" scratched on one of her filing cabinets.  (*Id.* ¶ 278.)  Smithburg reported this to McNeill and the filing cabinet was removed and repainted.  (*Id.*)  As a result of this incident and the incident in which a condom was left on Smithburg's desk, Caterpillar placed a surveillance camera in Smithburg's work area, which Caterpillar maintained for approximately a year.  (*Id.* ¶ 279.)  Plaintiff also claims that Dean Martin, the superintendent from the tool room from October 2000 to the present, made a comment to Smithburg about how nice her breasts looked.  (Pl. LR 56.1 Stmt. ¶ 97.) According to Plaintiff, Morrissette was present at the time but did not report Martin's comments to anyone.  (*Id.* ¶ 97; Morrissette Dep. at 63-65.)[43]

In the summer of 2001, Smithburg, who was at that time assigned to work the second shift, complained to McNeill that she was receiving calls at home from Morrissette, who was at that time a first-shift supervisor.  (Def. LR 56.1 Stmt. ¶ 280.)  Smithburg testified that Morrissette would call to question her about her work, and would then make comments about dating or having sex, including asking her to "fuck."  (*Id.*; Pl. LR 56.1 Stmt. ¶ 92; Hollenback-Smithburg Dep. at 95.)  After Smithburg reported the calls to McNeill, McNeill instructed Morrissette not to contact Smithburg outside of the workplace and the phone calls ceased for approximately three months.  (Def. LR 56.1 Stmt. ¶ 280; Pl. LR 56.1 Stmt. ¶ 93; Hollenback-Smithburg Dep. at 96.)  Prior to this incident,

---

[43]    Martin denies ever making a comment to Smithburg about her breasts, (Def. LR 56.1 Resp. ¶ 97; Deposition of Dean Martin at 73, Ex. DD to Def. LR 56.1 Stmt.), but for purposes of this motion the court assumes that he did so.

Smithburg had not complained to a supervisor or manager about any inappropriate conduct by Morrissette. (Def. LR 56.1 Stmt. ¶ 280.)

Plaintiff contends that other conduct by Morrissette also constituted harassment. Smithburg testified that Morrissette frequently made comments to her about her breasts and her body, and often told her that he wanted to "fuck her." (Pl. LR 56.1 Stmt. ¶¶ 94, 96.) Morrissette denied making any such comments. (Def. LR 56.1 Resp. ¶¶ 94, 96; Morrissette Dep. at 115.) It is not disputed, however, that at some point or points between 1998 to 2000, Morrissette put his hands on Smithburg's thighs. (Pl. LR 56.1 Stmt. ¶ 95.)[44]

On March 7, 2002, Smithburg reported to McNeill that a full-page newspaper advertisement for breast enlargement was left at her workstation. (Def LR 56.1 Stmt. ¶ 282.) She also complained that Morrissette had been calling her at home again. (*Id.*; Hollenback-Smithburg Dep. at 92-95.) In response to the complaint about the newspaper advertisement, McNeill contacted Dean Martin, the tool room superintendent, and the two men convened a meeting of all the workers on Smithburg's shift, telling them that what had occurred was "unacceptable behavior." (Def. LR 56.1 Stmt. ¶ 285; Hollenback-Smithburg Dep. at 93-94.)

Also on March 7, 2002, Smithburg met with Martin and with Paul Walker, her union steward, and amplified her concerns about Morrissette's conduct. (Def. LR 56.1 Stmt. ¶ 282.) She reported that Morrissette had once asked in a safety meeting whether anybody had "any bitches they want to get out," that he had repeatedly asked her out in the past, that he made derogatory comments

---

[44]     Defendant challenges Plaintiff's statement that Morrissette put his hands on Smithburg's thighs, but has not cited evidence to the contrary. (Def. LR 56.1 Resp. ¶ 95.) Morrissette denied many of Smithburg's allegations, but Morrissette was not asked, and therefore did not deny, putting his hands on Smithburg's thighs, nor was he asked more generally whether he ever touched Smithburg. (Morrissette Dep. at 115-17.) Nor does the fact that Smithburg did not mention this inappropriate touching when she complained to Caterpillar about Morrissette in March 2002 directly contradict her testimony that Morrissette touched her thighs. (Def. LR 56.1 Stmt. ¶ 95.) Likewise, Morrissette's denial that he had acted inappropriately towards Smithburg after her 2000 complaint about him, does not contradict Smithburg's assertion that Morrissette put his hands on Smithburg's thighs between 1998 and 2000. (*Id.*)

about her children and her husband, and that he repeatedly made comments about her body. (*Id.* ¶ 283.) Smithburg recalls that Martin responded by saying that "he should have put two and two together," and assured her that she had the right to work in an harassment-free environment, and promised that her allegations would be further investigated. (*Id.* ¶ 284.) Martin instructed Morrissette to stay away from Smithburg during the investigation. (*Id.* ¶ 285.)

Martin proceeded to report Smithburg's allegations to Bill Miller, who conducted an investigation in which he spoke to a number of witnesses, as well as Smithburg and Morrissette. (*Id.* ¶ 286; Deposition of Bill Miller at 134, 140, Ex. W to Def. LR 56.1 Stmt.; Miller Dep. Ex. 9, Ex. W to Def. LR 56.1 Stmt.) Dean Martin also interviewed certain individuals about Smithburg's allegations and provided that information to Miller. (Def. LR 56.1 Stmt. ¶ 287.)[45] Several of the persons Miller interviewed told him that the relationship between Morrissette and Smithburg appeared to be a friendly one and that they had seen Smithburg approach Morrissette's desk and speak to him for extended periods of time. (*Id.* ¶ 288.) For his part, Morrissette denied that he had engaged in the inappropriate actions alleged by Smithburg; he admitted that he had telephoned her at home in response to pages he received from her to talk about "general matters," but he denied ever asking her for sex. (*Id.* ¶ 289.) Morrissette also told Miller that he had obtained statements from employees to defend himself against Smithburg's allegations. (Pl. LR 56.1 Stmt. ¶ 100.)[46]

On March 13, 2002, Miller interviewed Smithburg in the presence of her union representatives, Tom Crossen and Paul Walker. (Def. LR 56.1 Stmt. ¶ 290.) Smithburg reported during this interview that Morrissette had harassed her for thirteen years since the time they were

---

[45] Plaintiff asserts that the record citations do not establish that Dean Martin interviewed certain individuals and gave such information to Miller, (Pl. LR 56.1 Resp. ¶ 287), but Miller stated exactly that in his declaration. (Miller Decl. ¶ 62.) Miller also testified that he interviewed a number of individuals regarding Smithburg's allegations. (Miller Dep. at 134, 140.)

[46] The court is uncertain of the nature of these statements, the circumstances in which they were obtained, or the extent, if any, to which they may have influenced or interfered with Miller's investigation.

apprentices together and that he had often asked her for sex. (*Id.*) Smithburg told Miller that she would be satisfied if Morrissette's inappropriate conduct were to end, and that she did not want to have any further contact with him. (*Id.* ¶ 291.) Miller counseled Smithburg to bring any problems or concerns she might have in the future directly to him. (*Id.* ¶ 292.) He also pointed out that McNeill, not Morrissette, was the second-shift supervisor and that Morrissette would have no impact on Smithburg's performance evaluation. (*Id.* ¶ 293.) In fact, Morrissette had no authority to transfer, demote, suspect, discharge Smithburg. (*Id.* ¶ 294.)

Based on his investigation, Miller was unable to conclude whether Smithburg's allegations were true, but Morrissette was given a five-day suspension for unbecoming conduct that was not specifically related to Smithburg's allegations. (*Id.* ¶ 295.) The parties agree that Morrissette's suspension was not imposed as punishment for engaging in sexual harassment. (Pl. LR 56.1 Stmt. ¶ 98.) Rather, at some point Miller learned that Morrissette had told Smithburg about the security camera installed in her work area (information that had been disclosed to Morrissette in confidence), and had warned her that he "could get anybody fired." (*Id.* ¶ 99.) Morrissette was punished for having shared confidential information, for spending excessive amounts of time with Smithburg, and for making intimidating comments to other employees. (*Id.* ¶ 98; Miller Dep. at 141-42.)

The Union also filed a grievance on Smithburg's behalf for "harassment" arising from her March 2002 allegations against Morrissette. (Def. LR 56.1 Stmt. ¶ 296; Pl. LR 56.1 Stmt. ¶ 98.) Caterpillar and the union agreed that Morrissette would not supervise Smithburg or have any influence over her job. (Def. LR 56.1 Stmt. ¶ 295.) This agreement was honored; Morrissette did not supervise Smithburg between the spring of 2002 and October 2004, nor did Smithburg have any contact with Morrissette during this period of time. (*Id.* ¶ 297.) On August 27, 2002, Smithburg signed a document confirming that her union grievance was resolved to her satisfaction. (*Id.* ¶ 296; Pl. LR 56.1 Stmt. ¶ 98.)

In October 2002, Smithburg moved voluntarily to the third shift as an "auto-call" tool maker reporting to Ron Mueller, a position in which she remained through October 2004; in this position, Smithburg spent most of her time fixing tooling within the Aurora facility and outside of the Building B tool room.  (Def. LR 56.1 Stmt. ¶ 298.)  While working in this position, Smithburg discovered explicit pictures of women on more than one occasion; in each instance, after Smithburg complained, the pictures were removed within about a week.  (*Id.* ¶ 300; Pl. LR 56.1 Stmt. ¶ 101.) In one instance, Smithburg saw a sex novelties catalog that had nudity on the cover in a trash can in the auto-call area; she complained to a supervisor about it and the catalogue was removed. (Def. LR 56.1 Stmt. ¶ 301.)  Smithburg also complained about a sticker on a co-worker's cabinet that read "I know why women live longer. They don't have wives." (*Id.*)  The sticker was taped over within a few days of Smithburg's complaint.  (*Id.*)

In October 2004, Smithburg chose to downgrade to a lower paying position as a "layout developer" so that she could work the first shift and be home with her family at night.  (*Id.* ¶ 304; Pl. LR 56.1 Stmt. ¶ 102; Hollenback-Smithburg Dep. at 48-49.)  When Smithburg bid to switch to this position, she was aware that it could bring her under the supervision of either Dean Morrissette or Mike Martens.  (Def. LR 56.1 Stmt. ¶ 305.)  After she was awarded the bid, Dean Martin, then the superintendent of the tool room, informed her that Morrissette would be her supervisor and gave her the opportunity to withdraw the bid.  (*Id.*)  Smithburg chose to accept the position, though she understood that Martin would not make changes that would enable her to report to someone other than Morrissette.  (Pl. LR 56.1 Stmt. ¶¶ 105-06.)  Plaintiff notes that there were no other first-shift positions available in the tool room at the time Smithburg bid on the layout developer position, but it is undisputed that there were other positions available on the first shift that would not have resulted in a change of pay for Smithburg and did not report to Morrissette.  (Def. LR 56.1 Stmt. ¶ 306; Pl. LR 56.1 Resp. ¶ 306; Pl. LR 56.1 Stmt. ¶ 104; Hollenback-Smithburg Dep. at 182-83.)

As a layout developer on the first shift, Smithburg worked in the tool room.  (Pl. LR 56.1

Stmt. ¶ 107.)  The parties agree that there are two supervisors in the tool room during the first shift. (*Id.* ¶ 108.)  When Morrissette became a supervisor in 1998, he supervised the tool makers while the other supervisor was responsible for the machinists and welders and the layout developer.  (*Id.*)  Nevertheless, although she was working as a layout developer, she reported to Morrissette, instead of the other supervisor on the first shift.  (*Id.* ¶ 109.)  According to Plaintiff, Martin refused to allow Smithburg to report to the other supervisor.  (*Id.*)  Defendant purports to dispute this fact, but the evidence cited by Defendant establishes only that Smithburg reported to Morrissette because her work was similar to the work of the tool makers whom Morrissette supervised.  (Def. LR 56.1 Resp. ¶ 109.)  Morrissette himself testified that Smithburg could have been assigned to report to the other supervisor.  (Pl. LR 56.1 Stmt. ¶ 111.)[47]  Morrissette explained that at the same time Smithburg was bidding to switch to the first shift, his brother was also bidding on that particular job and that if Morrissette's brother received the job, Martin said he would have no choice but to swap Morrissette with the other first-shift supervisor so as to ensure that Morrissette was not supervising his brother. (*Id.* ¶ 110.)  Defendant notes that a policy existed that would have precluded Morrissette from directly supervising a direct relative, (Def. LR 56.1 Resp. ¶ 110), but does not explain why a swap could not have been made for other reasons.[48]

While Smithburg worked on the first shift, she learned from male co-workers that offensive graffiti was posted in the men's bathroom about her.  (Def. LR 56.1 Stmt. ¶ 308.)  After her co-workers reported the graffiti to Morrissette, Smithburg was informed that the bathroom door

---

[47]     Defendant disputes this fact, but the evidence Defendant cites does not establish that Caterpillar could not assign Smithburg to another supervisor—it shows only that Caterpillar did not make such an arrangement, that Smithburg was given an opportunity to withdraw her bid, and that she did not request to report to someone else.  (Def. LR 56.1 Resp. ¶ 111.)

[48]     Defendant contends that Morrissette's testimony that his brother bid on the layout developer position is based on hearsay.  (Def. LR 56.1 Resp. ¶ 110.)  Although the foundation for this testimony is not clear, Morrissette made no reference to an out-of-court statement; the court presumes he could have observed his brother bidding on the job or have seen the completed bid form.  Moreover, Defendant did not raise a hearsay objection to this testimony during Morrissette's deposition.  (Morrissette Dep. at 225-28.)

containing the graffiti had been removed. (*Id.*; Hollenback-Smithburg Dep. at 249-59.) According to Smithburg, Morrissette again began to make inappropriate comments to her in January or February of 2005, including telling her, after he found out she had separated from her husband, that he wanted to "fuck [her]," that she "was a slut and he liked that," and that she "was going to be his third wife." (Def. LR 56.1 Stmt. ¶ 307; Pl. LR 56.1 Stmt. ¶¶ 112, 114; Hollenback-Smithburg Dep. at 178-79.) Although Defendant itself submitted evidence of the "third wife" comment, Defendant disputes that Morrissette ever told Smithburg that he wanted to "fuck her" or that he ever called Smithburg a slut. (Def. LR 56.1 Resp. ¶¶ 112, 114.) Smithburg testified that her work relationship with Morrissette was "okay" as of July 2005; though Morrissette was "saying things and doing things" at that point—for example, telling Smithburg that he loved her—Smithburg characterized such conduct as a "nuisance." (Def. LR 56.1 Stmt. ¶ 309.)

Morrissette engaged in more troublesome conduct in 2005. Smithburg testified that, in 2005, Morrissette told her that she had gotten him in trouble in the past and warned her not to try it again; specifically, Morrissette said to her, "I'll fucking kill you if you turn me in again." (Pl. LR 56.1 Stmt. ¶ 113.) In August of 2005, Morrissette accused Smithburg of having sex with a male co-worker. (*Id.* ¶ 115.) Also in 2005, according to Plaintiff, Morrissette showed up at her house uninvited between 10:00 and 11:00 pm and grabbed her around the waist when she opened the door. (*Id.* ¶ 117.) Although Defendant disputes that this incident occurred in 2005, Morrissette acknowledged that he had been to Smithburg's home (though he did not say when). (Def. LR 56.1 Resp. ¶ 117; Morrissette Dep. at 191-92.)

Around August 7, 2005, Morrissette spoke to Smithburg about his desire for a date with Collette Truckinbord, Smithburg's co-worker and close friend. (Def. LR 56.1 Stmt. ¶ 310.) Morrissette told Smithburg that he thought Truckinbord had a "hot" little body and that he wanted

to "do" her.  (Pl. LR 56.1 Stmt. ¶ 116.)  Smithburg's notes[49] about the conversation indicate that she

did not think the situation between Morrissette and Truckinbord was any of her business.  (Def. LR

56.1 Stmt. ¶ 310.)[50]  Smithburg then had a discussion with her union steward, Jim Habben, about

Morrissette's intention to ask Truckinbord out.  (*Id.* ¶ 311.)  Smithburg did not characterize her

conversation with Habben as a complaint about harassment, and testified that she and Habben

were friends and he was somebody to talk to about something that was bothering her "a little bit"

because Truckinbord "didn't seem receptive."  (Smithburg Dep. at 265-66.)  On or about August 8,

2005, Habben contacted Doug Howell, a labor relations representative, on Smithburg's behalf

concerning issues related to Morrissette.  (Def. LR 56.1 Stmt. ¶ 312.)  After Howell interviewed a

number of individuals regarding allegations of Morrissette's inappropriate conduct, including

Smithburg and Truckinbord, Morrissette was removed from his supervisory responsibilities in the

tool room and shortly thereafter terminated for violating Caterpillar's harassment policy.  (*Id.* ¶¶ 312-

13.)  Smithburg has not been subject to inappropriate conduct since Morrissette was removed as

her supervisor.  (*Id.* ¶ 314.)

### b.    Sexual Harassment Claim

Plaintiff now brings a sexual harassment claim on Smithburg's behalf.  Defendant contends

that Smithburg's allegations, viewed objectively or subjectively, are insufficient to establish an

actionable hostile environment, that Smithburg unreasonably failed to bring forward complaints of

harassment, and that Defendant exercised reasonable care to prevent and remedy any alleged

---

[49]    Smithburg did not testify in any detail as to why she was keeping notes of various incidents that occurred in her workplace between August 4, 2005 and August 7, 2005.  Smithburg recalls that "she was asked to sit down and write this" and that she believes she wrote the notes all at the same time, though she did not say when she wrote the notes or who asked her to write them.  (Hollenback-Smithburg Dep. at 220-21.)

[50]    Plaintiff disputes this fact because Defendant failed to attach its supporting exhibit, Smithburg's notes, to its statement of material facts.  (Pl. LR 56.1 Resp. ¶ 310.)  Defendant submitted this exhibit to the court and counsel after realizing its omission and the court will consider it.

harassment.  (Def. Mem. at 26-27.)  Plaintiff argues that Smithburg was subject to severe or pervasive harassment, that Defendant did not take corrective action calculated to prevent the harassment, and that Smithburg did not unreasonably fail to take advantage of preventative or corrective opportunities.  (Pl. Response at 17.)

Of the many events described above, Plaintiff characterizes the following as severe or pervasive harassment:[51]

- Morrissette's conduct in 2001 when he would call Smithburg at home, make sexual advances, tell her how "hot" her body was, and ask her to "fuck;"

- Morrissette's other sexual comments about Smithburg's breasts and body and asking her, in person, to "fuck";

- Morrissette putting his hands on Smithburg's thighs between 1998 and 2000;

- Dean Martin, Johnson's supervisor, commenting on how nice Smithburg's breasts looked;

- The condom left in Smithburg's work area at some point in 1999;

- Smithburg's exposure to a variety of pornographic materials, including Playboy magazines in her work area, a sex novelties catalog with some nudity on the cover in a trash can, an offensive sticker on a cabinet, and an explicit picture of a woman in the tool room; and

- Morrissette's comments to Smithburg after her transfer in 2004, when Morrissette was her supervisor, that he wanted to "fuck" her, and various other offensive comments by Morrissette about Smithburg's body.  (Pl. Response at 18-19.)

Defendant first argues that Smithburg herself did not find her work environment to be hostile. (Def. Mem. at 28-30; Def. Reply at 28-30.)  Plaintiff does not specifically address this argument, which is supported by evidence that co-workers characterized Smithburg's relationship with

---

[51]     As nearly all of the events of which Smithburg complains involve Morrissette, Defendant wisely has not raised a timeliness objection to this claim.

Morrissette as friendly; Smithburg's admission to having had consensual sex with Morrissette on one occasion in the 1990's; her willingness to accept a job assignment knowing that Morrissette would be her supervisor; and, her references to Morrissette's conduct as a "nuisance" and to their "okay" working relationship in mid-2005. (Def. LR 56.1 Stmt. ¶¶ 268, 288, 305, 309.) Viewing the evidence in the light most favorable to the Plaintiff, however, the court declines to enter summary judgment in favor of Defendant on this basis. Although Plaintiff has presented no evidence specifically addressing the effect on Smithburg of the alleged harassment, it is undisputed that she complained on more than one occasion about what she perceived as sexual harassment. Smithburg complained to a supervisor about the presence of materials that she viewed as pornographic in the workplace and reported the 1999 incident during which she found a condom at her work station. (Def. LR 56.1 Stmt. ¶¶ 275, 300-02.) Smithburg did not lodge a complaint about Morrissette's conduct towards her at the time the allegedly harassing conduct commenced, but she did report Morrissette's conduct in the summer of 2001 and complained again in March 2002. (*Id.* ¶¶ 280, 282; Pl. LR 56.1 Stmt. ¶ 92.) Smithburg's initial delay in reporting Morrissette's conduct does not defeat her claim; a fair conclusion is that Smithburg delayed in reporting Morrissette's conduct until it began to alter the terms and conditions of her employment. These multiple complaints create a question of fact as to whether Smithburg found her work environment to be hostile. *See Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 896-07 (7th Cir. 2000) (evident that employee found work environment hostile when she promptly left work after harassing encounter, promptly reported harassing conduct, and reiterated that behavior was unacceptable when matter was not pursued by her employer in a timely manner); *Wyninger v. New Venture Gear, Inc.*, 245 F. Supp. 2d 976, 985 (S.D. Ind. 2003) ("Since she complained to management, we will assume that [the plaintiff] subjectively perceived these incidents to be abusive and hostile."); *cf. Gleason*, 118 F.3d at 1145-46 (employee did not subjectively experience a hostile work environment when she did not bother to report the harassment to any of her superiors despite

ample opportunities to do so).

There are disputes concerning whether Smithburg's work environment was objectively hostile, as well. Morrissette testified that he never made comments of a sexual nature to Smithburg, never made statements about Smithburg's breasts and body, and never stated that he wanted to "fuck" Smithburg, (Def. LR 56.1 Resp. ¶¶ 92, 96; Morrissette Dep. at 115), but Defendant offered no evidence to rebut Smithburg's claim that Morrissette put his hands on her thighs between 1998 and 2000. *See supra* n.44. Morrissette further denied allegations that after he became Smithburg's supervisor in 2004, he called her at home to ask for sex or made other statements to her of a sexual nature. (Def. LR 56.1 Stmt. ¶¶ 289; Def. LR 56.1 Resp. ¶¶ 112, 114.) And, Dean Martin denied ever having made a comment to Smithburg about her breasts. (Def. LR 56.1 Resp. ¶ 97; Martin Dep. at 73.) Without resolving these disputes of fact, the court cannot determine exactly what harassing conduct was aimed at Smithburg, or whether a reasonable person would find such harassment severe or pervasive.

The disputed conduct at issue was primarily comprised of offensive utterances. Although mere vulgar banter or suggestive comments that are "tepid or intermittent" are not sufficient to support a discrimination claim, *Yukins*, 481 F.3d at 553, such offensive comments can create an actionable work environment if made with sufficient frequency. *See Boumehdi v. Plastag Holdings, LLC*, No. 06-406, 489 F.3d 781, 789 (7th Cir. 2007) (jury could conclude that eighteen offensive comments in less than a year and similar comments made "very often" was pervasive enough to create a hostile environment); *Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) ("[C]onduct that is not particularly severe but that is an incessant part of the workplace environment may, in the end, be pervasive enough and corrosive enough that it meets the standard for liability."); *see also Hostetler*, 218 F.3d at 808 (no magic number of incidents necessary to establish a hostile environment).

In this case, the court is uncertain of the frequency of the alleged offensive conduct.

Smithburg claims that Morrissette made sexual comments to her and asked her to "fuck" both in person and over the phone during the years 2001 and 2002 and again after he became her supervisor in 2004, but it is not clear how often this conduct occurred. Although Defendant has not rebutted Plaintiff's claim that Morrissette put his hands on Smithburg's thighs between 1998 and 2000, neither party has addressed the frequency of this conduct, either. In Plaintiff's response brief, Plaintiff characterizes the conduct as "repeated," but the portion of Smithburg's deposition addressing this conduct makes no reference to its frequency. (Pl. Response at 18; Hollenback-Smithburg Dep. at 172.) Without a better understanding of the frequency of the harassing conduct, the court declines to assess whether Defendant took reasonable care to prevent or remedy the harassing behavior, beyond observing that the evidence relating to Morrissette's behavior as Smithburg's supervisor suggests that Defendant's earlier steps to curb Morrissette's misconduct were ineffective. Defendant's motion for summary judgment as to Smithburg's sexual harassment claim is denied.

### 6.     Roxanne Tucker

#### a.     Factual Background

Roxanne Tucker was hired by Caterpillar as a supplemental employee on July 30, 2001 and initially worked as a "Drill Specialist 2" on the third shift. (Def. LR 56.1 Stmt. ¶ 316.) She worked in Building K and moved back and forth among different shifts; in this position, she first reported to John Smith and then to Tony Singh. (*Id.* ¶ 317.) On October 22, 2001, Tucker was promoted to a third-shift position and continued to report to Singh. (*Id.* ¶ 318.) During the second half of 2002, Tucker moved to a "class 3" position in Building B; in this position, Tucker reported to Elmar Jurani. (*Id.* ¶ 319.) By June 2003, Tucker had moved to the position of an assembler and worked in Building H, at which point she reported to Dan Spivey. (*Id.* ¶ 320.) In October or November 2003, Tucker moved to the 980 line; at that time, she reported to Al Kitterman when working days and to Jed Brooker when working nights. (*Id.* ¶ 321.) Tucker became a full-time employee, as opposed

to a supplemental one, effective February 7, 2005. (*Id.* ¶ 322.)

When Tucker was first hired, she learned about Caterpillar's prohibited harassment policy at her new hire orientation, and during her employment she saw the policy posted at the plant. (*Id.* ¶¶ 323-24.) On October 17, 2003, Tucker received additional training on the prohibited harassment policy, and she testified that she was comfortable taking complaints to various supervisors. (*Id.* ¶¶ 325-26.)

Tucker first felt harassed at Caterpillar in July 2002 when a contract employee approached her almost every night for a week and a half and asked her for a date. (*Id.* ¶ 346.) Tucker complained to a supervisor, and the contract employee, who had previously been warned about similar behavior, was fired as a result of her complaint. (*Id.*) U.B. Jenkins told Tucker that this was the fifth or sixth time the contract employee had engaged in sexual harassment. (Pl. LR 56.1 Stmt. ¶ 91.)[52]

According to Tucker, in early 2002, an hourly employee, "Little John," said, referring to Tucker, "This is a nice little girl I am training. Doesn't she have a nice ass?" (Def. LR 56.1 Stmt. ¶ 327.) While Tucker did not feel physically threatened by this comment, she did feel demeaned. (*Id.*) Tucker also claims that Little John and two or three other men stood behind her on one occasion and told her they "like the view from the back." (*Id.*) Several months later, Tucker reported Little John's initial comment to her supervisor, Singh, but she did not report the second comment. (*Id.* ¶ 328.) Singh did not immediately report Tucker's complaint but eventually told Bill Miller about it in connection with a complaint about a different incident, described below, in July

---

[52]    Defendant objects to Tucker's testimony of her conversation with U.B. Jenkins on the grounds that it lacks foundation and constitutes hearsay. (Def. LR 56.1 Resp. ¶ 91.) The court finds that Tucker has sufficient personal knowledge to testify to her conversation with Jenkins; further, the statements that U.B. Jenkins made to Tucker are not hearsay as they were made by Jenkins, the building manager, concerning a matter within the scope of his employment during the existence of his employment relationship. *See* FED. R. EVID. 801(d)(2)(D).

2002.  (*Id.* ¶ 329.)

Specifically, Tucker claims that she was subject to harassment in July 2002 when, for three days in a row, three hourly employees pointed and laughed at her every time "she had to bring a load back there." (Def. LR 56.1 Stmt. ¶ 331; Deposition of Roxanne Tucker at 60-61, Ex. EE to Def. LR 56.1 Stmt.) Tucker did not hear what these employees were saying but Jeff Morehead, another employee, told her that they were making sexual statements about wanting to stick their fingers in a hole in Tucker's jeans. (Def. LR 56.1 Stmt. ¶¶ 331-32; Tucker Dep. at 62-63.) Tucker admits, however, that Morehead has lied to her about several things and that he may have been trying to cause trouble—itself harassing conduct, in Tucker's view. (Def. LR 56.1 Stmt. ¶ 333; Tucker Dep. at 136-37.) Tucker testified that although she was bothered by the behavior of these male employees and felt uncomfortable, she did not feel threatened. (Def. LR 56.1 Stmt. ¶ 334; Tucker Dep. at 61-62.) Tucker believes that these employees directed their conduct at her because she was a "supplemental employee," "because she was a woman doing a man's job," and because they thought she was working too hard and raising the production expectations. (Def. LR 56.1 Stmt. ¶ 334.) Tucker complained to Singh about the employees who laughed and pointed at her and, although she did not ask Singh to do anything in response, he immediately called the labor relations department and Bill Miller met with Tucker regarding her complaint. (*Id.* ¶ 335.) Miller told Tucker that Little John's "nice ass" comment was inappropriate but not sexual harassment. (Pl. LR 56.1 Stmt. ¶ 69.) Singh met with the three hourly employees, however, and counseled them "not to engage in any such behavior going forward." (Declaration of Tony Singh ¶ 10, Ex. OO to Def. LR 56.1 Stmt.) Singh and the building manager, U.B. Jenkins, told Tucker to inform them of any further problems with these individuals; these three individuals and "Little John" apologized to Tucker and never engaged in such conduct towards her again. (Def. LR 56.1 Stmt. ¶¶ 330, 338.)

According to Tucker, in May 2003, another hourly employee, Chris McCant, would "stalk" her by following her around the buildings and following her to lunch; McCant also told Tucker that

she was nice looking and has a "cute little body." (Def. LR 56.1 Stmt. ¶ 339; Tucker Dep. at 150, 153.) Tucker told another employee that McCant was following her and he reported it to a supervisor, Dan Spivey. (Def. LR 56.1 Stmt. ¶ 340.) Spivey approached Tucker about the incident and suggested to her that McCant may not have realized what he was doing. (Tucker Dep. at 152.) McCant continued to bother Tucker and, after her union steward reported it to Spivey, McCant and Tucker were moved to different lines. McCant did not bother Tucker again. (Def. LR 56.1 Stmt. ¶ 341; Pl. LR 56.1 Resp. ¶ 341; Tucker Dep. at 153-54.)

Tucker also claims that she was subject to sexual harassment at the hands of her supervisor, Jed Brooker. Over a period of several weeks prior to January 6, 2004, Brooker had told Tucker he was "desperate" and asked her if she could find him a girlfriend. (Pl. LR 56.1 Stmt. ¶ 90.) On January 6, 2004, while Tucker was in Brooker's office, she testified that Brooker put his hands over his pants and moved his penis around in a circular motion. (Def. LR 56.1 Stmt. ¶ 342.) On January 14, 2004, Brooker learned from another employee that Tucker had complained about his behavior. Brooker himself contacted the labor relations department and asked that they conduct an investigation. (*Id.* ¶ 343.) The labor relations department conducted an investigation that included interviews of Tucker and Brooker and concluded that Brooker had inadvertently "adjusted" himself. (*Id.* ¶ 344.) Tucker did not have any further problems with Brooker. (*Id.* ¶ 345.)

Tucker claims to have felt harassed on a variety of other occasions at Caterpillar. These occasions include when Doug Scayman showed Tucker a picture of a deer with a large penis hovering over a man, with a caption that read "How would you like this deer sausage?". (*Id.* ¶ 347.) Jeff Morehead, a co-worker, also informed Tucker that Scayman referred to her as a "dizzy bitch." (*Id.*) Tucker did not complain to her supervisor or to labor relations about this conduct, but U.B. Jenkins learned about the incident and asked Tucker about it; Tucker informed Jenkins that Scayman had apologized to her. (*Id.*) In June 2003, Tucker saw another employee, Oscar Chappa, pull a male employee's pants down; Chappa was immediately fired for this incident. (*Id.*

¶ 349.) A different hourly employee, "Louie," also indicated to Tucker two or three times that he was interested in her; after Tucker told him she was not interested, he backed off. Tucker never complained to anyone about his conduct. (*Id.* ¶ 350.) Similarly, Tucker claims that an hourly employee who was married, Dan Nelson, asked her out for breakfast two or three times in March 2004; Tucker did not complain to anyone about Nelson's conduct. (*Id.* ¶ 351.) Also in March 2004, Tucker alleges that an hourly employee named Keith was sitting in a chair and pulled Tucker down on top of him and said "can't you do this with me?" (*Id.* ¶ 352; Tucker Dep. at 189.) Tucker interpreted Keith to be referring to sex; she told him "no" and Keith later apologized. (Def. LR 56.1 Stmt. ¶ 352.) Tucker did not report this incident to anyone. (*Id.*)

### b. Sexual Harassment Claim

Plaintiff now brings a sexual harassment claim on behalf of Roxanne Tucker. Defendant argues that the harassment Tucker alleges was not sufficiently severe or pervasive to create a hostile work environment and that even if the harassment alleged was actionable, there is no basis for imposing liability on Defendant. (Def. Mem. at 33-34.) Plaintiff argues that Tucker was subject to severe or pervasive harassment and that Defendant's corrective action was inadequate. (Pl. Response at 22-24.) According to Plaintiff, it is the following harassing events that cumulatively amounted to severe or pervasive harassment:

- A co-worker told Tucker that she had a nice "ass" and, when he told her that he "liked the view from the back" when standing behind Tucker with other men (2002);

- Tucker was told that male employees were making statements about wanting to stick their fingers in the holes of her jeans (2002);

- A co-worker told Tucker that she had a "cute little body" (2003);

- Jed Brooker, Tucker's supervisor, put his hand on his pants and moved his penis around in a circular motion after having confided in Tucker that he was desperate and needed a girlfriend (January 2004);

- A co-worker pulled Tucker onto his lap and said "can't you do this with me," which Tucker interpreted as a request for sex. (March 2004); and

- A co-worker showed Tucker a lewd picture of a deer with a large penis hovering over a man that said, "How would you like this deer sausage?" Shortly thereafter the same co-worker called Tucker a "dizzy bitch." (Pl. Response at 23.)

In assessing whether these incidents created a hostile work environment, the court notes, first, that Defendant does not specifically argue that Tucker did not find her work environment to be hostile. In fact, however, Plaintiff has offered no evidence that any of the misconduct interfered with Tucker's work performance. To the contrary, Tucker was performing quite well at work. Tucker herself believes that some of her co-workers' behavior resulted from the fact that "she was a woman doing a man's job" and their belief that she was working too hard and raising production expectations. (Def. LR 56.1 Stmt. ¶ 334.)

Turning to the question of whether the work environment was hostile from an objective perspective, the court concludes that the conduct that Tucker complains about was neither frequent nor severe. Viewing the facts in the light most favorable to Plaintiff, Tucker felt harassed on only eight occasions from 2002 to 2004. Eight incidents over a three-year period cannot be characterized as frequent. *See, e.g.*, *Patt v. Family Health Sys., Inc.*, 280 F.3d 749 (7th Cir. 2002) (eight gender-related comments over several years "too isolated and sporadic to constitute severe or pervasive harassment"); *Baskerville*, 50 F.3d at 430-31 (nine offensive comments over seven months did not amount to actionable harassment). With respect to the severity of the misconduct, the majority of the allegedly harassing incidents involve offensive comments, such as two comments about Tucker's "ass," men talking (notably, not directly to Tucker) about sticking their fingers in holes in her jeans, a comment about her "cute little body," and a reference to Tucker as a "dizzy bitch." These comments, while inappropriate, are not sexual solicitations, nor are they threatening. Rather, they are "petty vulgarities with the potential to annoy but not to objectively transform the workplace," *Hostetler*, 218 F.3d at 808, and they epitomize the vulgar banter of

coarse or boorish workers that Title VII does not reach. *See Patton*, 455 F.3d at 816 (citing *Baskerville*, 50 F.3d at 430).

Even when combined with the harassing events that involved something more than vulgar banter, the court cannot conclude that Tucker was subject to severe or pervasive harassment. First, it is not clear that Tucker's supervisor, Jed Brooker, made an obscene gesture when he moved his penis in a circular motion when in Tucker's presence. Upon hearing of Tucker's allegation, Brooker requested that the labor relations department investigate the complaint; this investigation resulted in a conclusion that Brooker had inadvertently "adjusted" himself in Tucker's presence. (Def. LR 56.1 Stmt. ¶ 344.) That Tucker was shown a picture of a deer with a large penis, however tasteless, is not severe misconduct. Of all of the incidents Tucker alleges, the March 2004 incident during which a co-worker pulled Tucker onto his lap and said "can't you do this with me," is the most serious. (*Id.* ¶ 352; Tucker Dep. at 189.) Construing the episode as an uninvited solicitation for sex, its effect on Tucker's work environment would have been somewhat, if not totally, off-set by the fact that Tucker told her co-worker "no" and he later apologized. (Def. LR 56.1 Stmt. ¶ 352.) Further, Plaintiff does not argue that Tucker felt physically threatened in any way by this isolated incident. The Seventh Circuit has not found harassment to be severe or pervasive where isolated instances of physical contact more intimate than that which occurred here took place in combination with offensive comments and vulgar banter. *See Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (no actionable sexual harassment where plaintiff alleged that her superior "asked her for dates, called her a 'dumb blond,' put his hand on her shoulder several times, placed 'I love you' signs in her work area," attempted to kiss her in a bar, and may have twice attempted to kiss her in the office). Finally, the court notes that in every instance in which Tucker complained—and one in which she did not complain but the perpetrator himself initiated an investigation—Caterpillar's manager took prompt corrective action.

Defendant's motion for summary judgment is granted with respect to Roxanne Tucker's

sexual harassment claim.

## C. Punitive Damages

Defendant contends that Plaintiff should not be able to pursue punitive damages on behalf of Lambert or any individual whose claim survives summary judgment (Early, Gomez, Irvin, and Smithburg) because the undisputed facts show that it has taken "extraordinary measures to comply with the mandate of Title VII." (Def. Mem. at 3.) Defendant argues that its good-faith efforts, in the form of maintaining, publicizing, and frequently providing training on policies prohibiting sexual harassment, demonstrate that it takes its harassment policies seriously and "acts decisively to maintain compliance" with these policies when violations are alleged. (*Id.*) Defendant also contends that when the relevant individuals reported harassment, Caterpillar responded appropriately. (*Id.* at 38-39.) Plaintiff claims that triable issues exist with regard to whether Defendant made a good-faith effort to comply with Title VII after learning of the class members' complaints of sexual harassment. (Pl. Response at 27-28.) According to Plaintiff, evidence that Defendant ignored the class members' complaints of harassment, minimized complaints of harassment, and retaliated against Gomez for her complaint of harassment, supports that Defendant did not make a good-faith effort. as Defendant claims. (*Id.*)

Title VII authorizes an award of punitive damages when a defendant engages in intentional discrimination "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526 (1999) (quoting 42 U.S.C. § 1981a(b)(1)). In *Kolstad*, the Supreme Court set forth a three-part framework for evaluating when this standard is met. *See Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857-58 (7th Cir. 2001) (citing *Kolstad*, 527 U.S. 526). First, punitive damages are only available when the employer acted with the requisite mental state. The plaintiff must show either that the employer acted "with knowledge that its actions may have violated federal law," or with reckless disregard, "by showing that the defendant's employees lied, either to the plaintiff or to the jury, in order to cover up their

discriminatory actions." *Kolstad*, 527 U.S. at 535; *Bruso*, 239 F.3d at 858. Next, the plaintiff must establish a basis for holding the defendant liable; the relevant inquiry is whether the "employees who discriminated against [the plaintiff] are managerial agents acting within the scope of their employment" and is controlled by the principles of federal agency law. *Kolstad*, 527 U.S. at 545; *Bruso*, 239 F.3d at 858. Finally, if the plaintiff's evidence meets these two tests, the employer may avoid vicarious liability "for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." *Kolstad*, 527 U.S. at 545 (internal quotations and citation omitted).

Neither party has explicitly addressed this framework. While Defendant recites the statutory standard for punitive damage liability in its initial memorandum in support of summary judgment, the only argument that Defendant develops in that memorandum is that its good-faith efforts insulate it from awards of punitive damages. (*See* Def. Mem. at 35-40.)[53] As a result, Plaintiff addresses only this point in its response. (Pl. Response at 27-30.) Defendant does argue in its reply brief that there is no evidence to establish that Defendant acted with the requisite "evil intent" for punitive damage liability, (Def. Reply at 3-5), but, because the Defendant raises this specific argument for the first time in its reply, the court declines to consider it. *See United States v. Feinberg*, 89 F.3d 333, 340-41 (7th Cir. 1996).

In any case, the relevant mental state requirement—that the alleged wrongdoer "acted with knowledge that its actions may have violated federal law"—does not require the employer to be

---

[53]     Defendant includes one section in its memorandum titled "Caterpillar Enforces Its Policies And Did Not Act With Malice or Reckless Indifference To Its Employees' Rights." (Def. Mem. at 38.) This section details Defendant's response to the various instances of harassment alleged here—information relevant to the analysis of Defendant's good-faith efforts to comply with Title VII, but not relevant to the analysis of Defendant's mental state. As the Court explained, the mental state analysis "pertain[s] to the employer's knowledge that it may be acting in violation of federal law . . . ." *Kolstad*, 527 U.S. at 535; *see also Bruso*, 239 F.3d at 859 (when evaluating defendant's mental state, discussing whether employees who made the decision to demote plaintiff were familiar with Title VII and whether defendant's anti-discrimination policy intended to implement Title VII).

aware that it is engaging in discrimination. *Bruso*, 239 F.3d at 857-58. The employer need only act "'in the face of a perceived risk that its actions will violate federal law,'" which is satisfied if the relevant individuals were aware or were familiar with anti-discrimination laws and the employer's policies for implementing such laws. *Id.* (quoting *Kolstad*, 527 U.S. at 536). That standard is met here: There is ample evidence that managerial employees were aware of the risk that they might violate federal law, as reflected in Defendant's repeated and substantial efforts to train all employees on and publicize its harassment policies. *See supra* Background Sections 1 & 2. The court is satisfied that the relevant individuals—those individuals alleged to have participated in sex discrimination—in Defendant's organization knew of or were familiar with the antidiscrimination laws and Defendant's policies for implementing them. *See, e.g.*, *Hertzberg v. SRAM Corp.*, 261 F.3d 651, 662-63 (7th Cir. 2001) (evidence was sufficient for a jury to find that two of defendant's employees "knew of . . . the antidiscrimination laws and the employer's policies for implementing those laws," where each of the employees testified to their knowledge of the employer's sexual harassment policy and made statements characterizing certain harassing behaviors as "inappropriate" or "offensive"); *cf. Bruso*, 239 F.3d at 859-60 (based on evidence that "the major players in the decision to demote [plaintiff] were familiar with the antidiscrimination principles of Title VII and [defendant's] zero-tolerance-for-discrimination policy . . . . a reasonable jury could have concluded that [the major players] were familiar with Title VII and must have been aware of the possibility that demoting [plaintiff] after he had come forward with allegations of harassment would violate Title VII").

Nor is there any genuine dispute about whether that liability may be imputed to Defendant based on principles of agency law. That leaves the third prong of the test, the only one Defendant addressed in its opening brief: whether the employment decisions made by Defendant's agents were contrary to Defendant's good-faith efforts to comply with Title VII. Plaintiff is correct that, although the existence of a harassment policy is relevant to evaluating Defendant's good faith, it is not alone sufficient to protect Defendant from an award of punitive damages. *Bruso*, 239 U.S. at 858.

Defendant must not only develop anti-discrimination policies, but must also show the "active enforcement of its mandate." *See Romano v. U-Haul Int'l*, 233 F.3d 655, 670 (1st Cir. 2000) (cited in *Bruso*, 239 F.3d at 859 n.7); *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, 1210 (10th Cir. 2000) (cited in *Bruso*, 239 F.3d at 859 n.7) ("[E]ven if an employer-defendant adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, a plaintiff may still recover punitive damages if she demonstrates the employer failed to adequately address Title VII violations of which it was aware.") Judge Castillo's analysis in *Fuller v. Caterpillar,* 124 F. Supp. 2d 610, 618 (N.D. Ill. 2000), is instructive. In *Fuller*, also a sexual harassment case brought under Title VII, the court concluded that an award of punitive damages was not appropriate in light of Caterpillar's efforts to promote its harassment policy *and* evidence that Caterpillar "promptly took reasonable steps to rectify" the harassment at issue in that case. *Id.* at 618. This court, too, considers whether Defendant enforced its harassment policy effectively in Lambert's case and in the cases of the other women whose claims survive summary judgment—Early, Gomez, Irvin, and Smithburg.

As a preliminary matter, the court denies Defendant's request for summary judgment as to the availability of punitive damages for Lambert. Though Defendant stated in its opening brief that Plaintiff should be precluded from pursuing punitive damages on behalf of Lambert, (Def. Mem. at 3), Defendant offered no evidence about Lambert's complaints of sexual harassment or its response.

The court also denies Defendant's request for summary judgment as to the availability of punitive damages for Early, Gomez, and Irvin. Early's sexual harassment claim arises from the conduct of a security guard. While Defendant focuses on the fact that Early was never harassed after she lodged a complaint, at this state it is undisputed that the individual in Defendant's labor relations department to whom Early complained did nothing in response. Evidence that an employer refused to remedy or ignored complaints of harassment can establish an employer's lack of a good-

faith effort to comply with Title VII.  *See Bruso*, 239 F.3d at 860-61 (reasonable jury could conclude

that defendant did not engage in good-faith effort to comply with Title VII where evidence suggested

that defendant refused to remedy plaintiff's harassment despite knowing about it).  As explained

earlier, questions of fact remain as to how Defendant handled both Gomez and Irvin's complaints

of harassment, as well.  *See supra* Discussion Sections B.2.b. & B.3.b.  Without a complete

understanding of Defendant's actions in response to Gomez and Irvin's complaints, it would be

premature for the court to conclude whether Defendant's responses demonstrated a good-faith

effort.

With respect to Smithburg, however, the record does establish that Defendant made a good-

faith effort to implement its sexual harassment policy in response to Smithburg's complaints.  Plaintiff

emphasizes Defendant's failure to take any disciplinary action from the date of Smithburg's initial

complaint until August 2005.  (Pl. Response at 30.)  The evidence shows, however, that though its

response did not take the form of disciplinary action, Defendant did respond effectively to each of

Smithburg's complaints.  When Smithburg first complained to her supervisor of harassment by

Morrissette in the summer of 2001, he instructed Morrissette to cease the allegedly harassing

behavior, which proved effective for some time.  (Def. LR 56.1 Stmt. ¶ 280; Pl. LR 56.1 Stmt. ¶ 63;

Hollenback-Smithburg Dep. at 96.)  After Smithburg's second complaint in 2002, Defendant initiated

an investigation which, though ultimately inconclusive, was unquestionably thorough. (Def. LR 56.1

Stmt. ¶ 295.)  Finally, when additional inappropriate conduct was again brought to Defendant's

attention in 2005, Defendant initiated an investigation that led to Morrissette's termination.  (*Id.* ¶¶

311-13.)  *Cf. Hertzberg*, 261 F.3d at 663-64 (employer did not act in good faith in responding to

complaints of harassment in part because employee was told that she was being "too emotional" and

complaints were "shrug[ged] off" by those in chain of command).  The undisputed facts do not

support that Defendant turned a blind eye to Smithburg's complaints of harassment; rather, they

show that Defendant took appropriate, effective action in response to each of Smithburg's

complaints.  The court concludes that Smithburg's sexual harassment claim, if successful, will not support an award of punitive damages.

## CONCLUSION

For the reasons explained above, the court grants Defendant's motion for summary judgment (111) as to Plaintiff's retaliation claim on behalf of Diana Gomez, Plaintiff's sexual harassment claims on behalf of Lillie Johnson and Roxanne Tucker, and Plaintiff's claim for punitive damages on behalf of Wendy Hollenback-Smithburg.  In all other respects, Defendant's motion for summary judgment is denied.

ENTER:

Dated:  August 9, 2007

_____
REBECCA R. PALLMEYER
United States District Judge