**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **No. 03 C 5636** |
| ) | |
| **CATERPILLAR, INC.,** ) | **Judge Rebecca R. Pallmeyer** |
| ) | |
| **Defendant.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On February 2, 2002, Karon Lambert[1] filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC" or "Plaintiff") against her employer, Caterpillar Inc. ("Caterpillar" or "Defendant"). This action arises out of the EEOC's subsequent investigation into sexual harassment allegedly occurring at Caterpillar's Aurora, Illinois, facility, where Lambert worked. In addition to Lambert's claims for sexual harassment and retaliation, the EEOC brought sexual harassment claims against Caterpillar on behalf of five other current employees and one former employee. After the court granted Defendant's motion as to some of those claims, the case proceeded to trial on sexual harassment claims brought on behalf of Sandy Irvin and Virginia Early, and on Lambert's claims for sexual harassment and retaliatory discharge. The court conducted a five-day bench trial and states here its findings of fact and conclusions of law.

---

[1] Karon Lambert got married in the course of this litigation and by the time of trial had taken the name Karon Hevelka. Following the parties' lead, the court refers to her as Karon Lambert to avoid confusion.

## BACKGROUND[2]

**Defendant's Aurora Facility and Workforce**

All of the events giving rise to this action took place at Caterpillar's facility in Aurora, Illinois, which is devoted primarily to manufacturing and assembling large earth-moving equipment. *See EEOC v. Caterpillar, Inc.*, 503 F. Supp. 2d 995, 999 (N.D. Ill. 2007) (Pallmeyer, J.)  The Aurora facility is composed of four main buildings, occupies almost 400 acres, and operates 24 hours a day, five days a week, with three shifts per day.  In general, the first shift runs from 7:30 a.m. to 3:30 p.m.; the second shift runs from 3:30 p.m. to 11:30 p.m.; and the third shift runs from 11:30 p.m. to 7:30 a.m.  SF ¶ 10.  The assembly lines normally run on the first and second shift only.  *Id.*  All other departments operate on all three shifts to supply and support the assembly operations.  *Id.*

Approximately one-third of the employees at the Aurora facility are salaried and work in clerical, technical, professional, or managerial positions.  *Id.* ¶ 9.  The remaining employees are hourly workers who are engaged in various aspects of the manufacturing process.  *Caterpillar*, 503 F. Supp. 2d at 999.  These hourly employees are represented by the United Auto Workers, Local 145 (the "union") and, under the terms of the collective bargaining agreement, are classified either as full-time or "supplemental" employees.  *Id.*  Full-time workers are regular, non-temporary employees covered by the agreement, including a progressive discipline policy and assurances that they can only be fired for just cause.  *Id.*  Supplemental employees are hired to work on a temporary, though sometimes indefinite, basis.  *Id.*  Unlike full-time employees, supplemental employees can be fired at any time for any reason, have limited grievance rights under the labor

---

[2]      The following findings of fact are made pursuant to Federal Rule of Civil Procedure 52(a), based upon the stipulated facts and the evidence presented at trial.  The parties' Stipulations, Schedule A to the Final Pretrial Order, are cited here as "SF ¶ __."  The court cites the trial transcript as "Tr.  __" and the parties' exhibits as "Pl.'s Ex.  ___" and "Def.'s Ex.  ___."

agreement, and are not protected by provisions of the labor agreement that require Caterpillar to engage in progressive discipline. *Id.*

**Defendant's Sexual Harassment Policies and Training**

Because it is relevant to Caterpillar's affirmative defense, and to Plaintiff's claims for punitive damages, the parties have devoted considerable attention to Caterpillar's practices and policies concerning workplace harassment. Beginning no later than 1996, Caterpillar maintained and published a policy that prohibited sexual harassment. (SF ¶ 43.) The details of the 1996 policy do not appear in the parties' stipulations; the policy in place between 1998 and 2000, however, provided that an employee who believes that he or she has been sexually harassed should report the conduct to one of four people: (1) his or her supervisor, (2) his or her manager, (3) the labor relations and personnel service manager, or (4) the corporate EEO coordinator. (*Id.* ¶ 44.) Since 2000, Caterpillar has maintained and published a "prohibited harassment" policy that expanded upon its earlier policy to prohibit all forms of harassment, including sexual harassment. (*Id.* ¶ 45.) Similarly to the earlier policies, the policy issued in 2004 instructs workers who believe they have been harassed to notify either the area supervisor, the department manager, the human resources manager, or the corporate EEO manager. (*Id.* ¶ 46.) In addition to those individuals, the 2005 and 2006 policies provide that employees may report harassment to local human resources staff, as well. (*Id.* ¶ 48.) The policies also explain that an employee who believes he or she has been harassed may file a charge with the Illinois Department of Human Rights; the 2005 and 2006 policies note employees' right to file a charge with the EEOC, as well. (*Id.* ¶ 49.) And Caterpillar's policies prohibit retaliation against an employee who reports or participates in an investigation of sexual harassment. (*Id.* ¶ 50.)

Since at least 1996, Caterpillar had established procedures for processing employee complaints regarding equal employment matters. (*Id.* ¶ 51.) Also since 1996, Caterpillar has maintained an equal employment opportunity ("EEO") policy announcing that the Aurora facility is

to be a harassment-free work environment. (*Id.* ¶ 52.) Printed copies of the harassment policies, as well as government-required anti-discrimination posters, have been posted in at least one spot of high visibility in every major building at the Aurora facility since 1996; copies have also been posted in locked glass display cases at major facility entrances, at least one of which all employees pass when they walk into work. (*Id.* ¶¶ 54-56.)

In addition to the posters, Caterpillar communicated with its employees by way of printed publications. In 1996, Caterpillar published a booklet for employees called *What You Should Know About Sexual Harassment in the Workplace*, which sets forth Caterpillar's sexual harassment policy and provides guidance to employees on how to recognize and handle sexual harassment and the consequences of such harassment. (*Id.* ¶ 57.) This booklet, which was distributed to each new employee during his or her orientation from 1996 to 2000, provides that when an employee discloses information concerning an incident of harassment, supervisors are to immediately report the incident to their facility EEO coordinator or local human resources manager. (*Id.* ¶¶ 57-58, 64.) Also in 1996, Caterpillar published another booklet for employees, *Working at Caterpillar*, which recites Caterpillar's EEO policy and warns employees that failure to comply with the company's policies and procedures, including the sexual harassment policy, may lead to disciplinary action. (*Id.* ¶ 59.) A revised booklet, *What You Should Know About Caterpillar's Prohibited Harassment Policy*, was distributed to employees in 2001; this booklet, like the earlier versions, discusses Caterpillar's policies against sexual harassment and retaliation in depth. (*Id.* ¶¶ 60-61.) Since 2001, this booklet has been distributed to each new employee during orientation. (*Id.* ¶ 64.) Caterpillar also distributes its *Code of Worldwide Business Conduct*, which affirms that the company complies with laws prohibiting discrimination, that Caterpillar promotes an environment free of intimidation and harassment, and that its employees have a responsibility to report harassment and will not be subject to retaliation for doing so. (*Id.* ¶62.)

Caterpillar has conducted a number of training sessions for its employees that included training on sexual harassment. Among the training sessions that Caterpillar has conducted at its Aurora facility are the following:

• Since 1996, all new employees at the Aurora facility attend an orientation program on their first day on the job.  (*Id.* ¶ 63.)  Caterpillar's harassment policies are reviewed with the attendees and the new employees are informed that these policies are posted throughout the facility.  (*Id.* ¶ 66.)

• Since 1996, employees have been required to attend another week-long training program three months into their employment. A portion of that training program is devoted to harassment training.  (*Id.* ¶ 67.)

• Since 1996, the facility has conducted an orientation for newly-hired or promoted supervisors, at which Caterpillar reviews its harassment policies and explains to the supervisors their role with respect to complaints of harassment.  (*Id.* ¶¶ 68-70.)

• In March 1996, all salaried and management employees at the Aurora facility were required to attend a diversity training called "Synergy From Others," which included a discussion on behaviors that can give rise to complaints of sexual harassment. (*Id.* ¶ 71.)  This training was repeated for hourly employees in March of 1997. (*Id.* ¶ 74.)

• In November 1996, all of the supervisory and management employees at the Aurora facility were required to attend a two-hour sexual harassment training course titled "Maintaining A Harassment-Free Work Environment" and were provided with the *What You Should Know About Sexual Harassment in the Workplace* booklet. (*Id.* ¶ 72.)

• In January 1998, all salaried and management employees at the Aurora facility were required to attend an eight-hour diversity training, which included a segment on sexual harassment.  (*Id.* ¶ 75.)

• Bill Miller, the labor relations representative, conducted sexual harassment training for managers in certain buildings at the Aurora facility in October 1999. (*Id.* ¶ 76.)

• In early 2000, hourly employees at the Aurora facility were required to attend a training course called "Diversity Diner," concerning the need to be sensitive to diversity, including gender differences, in the workplace.  (*Id.* ¶ 77.)

• In March 2000, supervisors at the Aurora facility were required to attend a training course titled "What the Supervisor Needs to Know About Sexual Harassment," which covered Caterpillar's policies and procedures, what behaviors constitute sexual harassment, and how supervisors should respond to complaints of harassment.  (*Id.* ¶ 77.)

• In 2001, management employees at the Aurora facility took part in a training program called "Valuing People" which reviewed diversity issues, including gender differences, in the workplace. (*Id.* ¶ 79.)

• In 2001, Caterpillar conducted an all-employee meeting at the Aurora facility, at which attendees viewed a video on workplace harassment and discussed Caterpillar's policy prohibiting harassment. (*Id.* ¶ 80.)

• In 2003-2004, Caterpillar conducted mandatory, facility-wide training on its prohibited harassment policy and policy of non-retaliation. (*Id.* ¶ 81.) During the course, Caterpillar reissued its *What You Should Know About Sexual Harassment in the Workplace* booklet. (*Id.*)

## I. Karon Lambert's Claims

### A. Background

Karon Lambert worked as an industrial hygiene and safety supervisor in Building B of Caterpillar's Aurora facility from August 31, 2001 to January 3, 2002, when Caterpillar terminated her employment. (SF ¶¶ 11-12, 16.) Among her duties were ensuring that the plant complied with Occupational Safety and Health Act ("OSHA") standards, ensuring that the plant adhered to its own safety guidelines, and training managers on plant safety requirements. (Tr. 206:5-16.) Lambert alleges that her direct supervisor, Robert Garcia, engaged in repeated acts of sexual harassment throughout her four-month employment and then recommended she be terminated when she rejected his advances. Garcia was employed as Building B's safety and security manager at the time of the alleged harassment until he retired from Caterpillar in 2003.

### B. Evidence of Sexual Harassment

Lambert testified to a pattern of harassment that began, she asserts, on her the very first day of her employment when, Garcia "brush[ed] up" against her breast with his arm and the back of his hand several times while giving her a tour of the facility. (Tr. 35:15-23.) Lambert testified that the second time Garcia did this, he told her that he "liked the way [her breasts] responded to his touch." (Tr. 36:6-7.) Lambert also stated that during this plant tour, Garcia shared what she considered sexually inappropriate information about other employees, such as which coworkers

were rumored to be "sleeping" together. According to Lambert, after introducing her to another male employee, Garcia warned Lambert that he is "a lady's man" who "would sleep with [Lambert] if he had the chance." (Tr. 37:10-15.)

Lambert claims that during her first week at Caterpillar, Garcia said he was interested in dating her, and she responded by telling him that their relationship would only ever be strictly professional. (Tr. 49:1-9.) According to Lambert, Garcia told her that he would be jealous if she dated anyone else, a statement he allegedly made several times in the ensuing weeks. (Tr. 49:10-15, 49:16-50:1.) Lambert testified that shortly after she refused to date Garcia, he told her that he would like to "bend her over the smoking rail," the factory's designated smoking area, and that he wanted to "fuck" her. (Tr. 50:2-10.) Also during her first week at Caterpillar, Garcia allegedly told Lambert that Caterpillar did not permit employees to wear rings in the plant, due to the risk of their getting caught in the machinery; he added, "You are going to like that because no one is going to have to know that you are married." (Tr. 53:14-17.) Around this time, Garcia purportedly told Lambert that he "liked the way that [her breasts] would sometimes stick out when [she] would wear a certain sweater," identifying the sweater he liked. (Tr. 45:19-25.) After introducing Lambert to other women at the plant "that were attracted to him," Garcia also allegedly described their breasts to Lambert and commented on the size of Lambert's breasts. (Tr. 46:6-2.)

Lambert claims Garcia's offensive behavior continued throughout employment at Caterpillar. During the first two to three weeks at the plant, Lambert testified that Garcia would touch her breasts "daily"; she claims he continued to do so, albeit less frequently, thereafter. (Tr. 37:15-38:6.) According to Lambert, Garcia did this in ways that would appear inadvertent or unintentional. (Tr. 39:9-40:1.) For example, Garcia's arm would graze her breast when he pointed things out in the plant, or, when he bent over to get a cigarette from where he stored them in his sock, his shoulder would bump Lambert's breast. (Tr. 40:20-22.) Sometimes, Lambert testified, he blew smoke in the direction of her chest. (Tr. 39: 11-16.) When he and Lambert were at the

7

"smoking rail," Lambert stated that Garcia would lean on the railing in such a way that when he moved or turned to the side he would brush against her breast.  (Tr. 40:14-17.)

Lambert testified that "almost every time he touched [her breasts]," Garcia would comment about how he "liked large breasts," that he "liked the way that they responded," and that he "would be jealous if they responded to anyone else."  (Tr. 43:5-10.)  Lambert stated he would sometimes ask after touching her, "Well, is it as good for you as it was for me?"  (Tr. 45:3-6.)  Lambert recalled an incident when, after seeing another female employee with a lollipop in her mouth, Garcia told Lambert that he would like to suck her breast.  (Tr. 54:22-55:1.)  On another occasion, she claims, Garcia was smoking a cigarette and told Lambert that he "would much rather suck [her] breast than a cigarette" and that he "wanted to fuck [her] breasts." (Tr. 43:25-44:2, 44:6.)  Lambert claims she responded by telling Garcia to leave her alone and that "it would never happen."  (Tr. 44:11-12.)

Lambert testified that Garcia would frequently insist on opening the door for her, leaving just enough room for her to pass, and then brushing her breast with his hand as she walked through the doorway.  (Tr. 39:11-40:2.)  Once, she said, Garcia "grabbed [her] butt" when he opened the door for her.  (Tr. 37:21-23.)  As members of the plant's safety audit committee ("SAC"), Garcia and Lambert would also periodically tour the facility as part of a "safety audit."  (Tr. 52:24-3.)  On these tours, Lambert testified that Garcia told her "a couple of times" that she had a "sexy" walk and that he "got turned on by it."  (Tr. 53:4-9.)

When Lambert first began work, she testified, Garcia and Jenny Logel, another plant employee, instructed her to report each morning to Garcia's office, which was at the opposite end of the facility from her own.  (Tr. 34:21-35:3.)  In mid-September, however, she stopped reporting to Garcia's office after an incident following a birthday celebration at the plant for Garcia.  (Tr. 41:9-14.)  According to Lambert, some plant employees brought a cake to Garcia's office and sang "Happy Birthday" to Garcia, and Garcia's secretary gave him a hug.  (Tr. 41:19.)  After the song and cake, Garcia waited for the other employees to leave and then closed the door after them, leaving

8

himself along with Lambert.  Lambert testified that he told her "he now wanted the hug that he really wanted," embraced her tightly and, as Lambert recounted, began "nuzzling in my neck," "rubbing down my butt," and "pulling me into his groin."  (Tr. 41:23-25.)  Lambert testified that Garcia "told me if I said anything to anyone, that he was here long before me, he would be here long after me, and that there was a zero tolerance.  And I would be the one to lose my job."  (Tr. 42:7-10.)  Lambert claims she "was trying to grab at the door" throughout this encounter and that Garcia finally released her because she "was pulling at the doorknob."  (Tr. 42:11-16.)

To Lambert's knowledge, no one overheard any of Garcia's inappropriate comments or witnessed any of his behavior toward her, with the exception of one occasion when Garcia grabbed her backside as Lambert walked through a doorway.  At trial, Dean Morrissette, the tool room supervisor during Lambert's employment, testified that he once saw Garcia open the door for Lambert and "pat[] her on the rear end as she entered the door ahead of him."  (Tr. 174:7-11.)  Morrissette acknowledged, however, that he was standing somewhere between 30 and 100 feet away at the time and could not say for certain that Garcia actually touched Lambert, though it "appeared that he did."  (Tr. 180:11-25.)  Morrissette explained that he did not report the incident to his own supervisor because he could not tell whether Garcia's behavior was "unwanted or whether it was acceptable to her."  (Tr. 174:25-175:9, 179:9-12.)  Morrissette was fired from Caterpillar in 2005 for sexual harassment.  (Tr. 175:23-25.)

Lambert testified in some detail about Garcia's inappropriate behavior toward certain other women in the Caterpillar plant. Notably, that testimony was contradicted by the women themselves. First, Lambert testified that Garcia frequently referred to women on the facility's safety committee as his "harem."  (Tr. 52:12-21.)  Gene Hevelka, Lambert's husband, also claimed Jenny Logel told him that Garcia referred to certain women on the committee as his "harem."  (Tr. 463:22-464:8.)  Jenny Logel, Vicki Pittenger, and Jessica Hardy, the members of this so-called "harem," however, all denied ever hearing Garcia refer to them as such.  (Tr. 435:12-13, 452:13-14.)  Hardy testified

that she, not Garcia, had once referred herself, Pittenger, and Logel as "Bob's harem" in Garcia's presence, and Garcia afterward reprimanded her for using inappropriate language.  (Tr. 452:15-453:4.)

Lambert also claimed she saw Garcia inappropriately touch other women at the Caterpillar plant.  Specifically, Lambert recalled seeing Garcia rub a Peppermint Pattie across Logel's breasts and afterwards saying, "It's going to taste better now." (Tr. 53:18-54:5.)  In her own earlier statement to the EEOC, however, Lambert stated that she originally heard this story from Logel herself. (Lambert Post-Termination Notes, Def. Ex. 12.)  Gene Hevelka also testified that Logel told him on at least two occasions that Garcia frequently rubbed candy across her chest.  (Tr. 464:9-465:6.)  Garcia and Logel both denied this or any similar event ever took place.  (Tr. 198, 406-407.)

Sometime in late August or early September, Lambert claims she approached Pittenger, Logel, and Hardy about Garcia's behavior.  According to Lambert, she asked them whether he "had ever rubbed and brushed up or grabbed their breasts," and Pittenger responded, "Yes, that that was Bob," and, "He just gets his daily feels." (Tr. 55:22-56:2.)  Hardy reportedly stated that he brushed up against her daily, and Logel added that "[i]f anybody were to complaint about it, they lost their job."  (Tr. 56:3:-9.)  Lambert testified that this conversation made her feel "hopeless" and "threatened" because "it seem[ed] like I was the only one that was complaining and didn't like it." (Tr. 56:10-20.)  At trial, Pittenger, Logel, and Hardy all denied telling Lambert that Garcia had touched them or anyone else inappropriately, and each independently testified that they had never experienced any kind of inappropriate behavior from Garcia.  (Tr. 407-08, 432-33, 434-35, 450-54.)  All three women also denied telling Lambert that retaliation was an expected consequence of reporting harassment by Garcia.  (Tr. 408, 436, 450.)  Pittenger specifically denied making the comment that Garcia "gets his daily feels."  (Tr. 433:20-21.)

During the week of October 15, 2001, Garcia, Hardy, Pittenger, and Lambert attended an overnight safety conference at a hotel in Peoria, Illinois.  (Tr. 56:21-57:2, 116:4.)  At dinner in the

hotel restaurant, Lambert testified, Garcia directed her to the inside of the booth and sat down beside her, across from Hardy and Pittenger. (Tr. 58:11-19.) Throughout dinner, Lambert claims, Garcia rubbed his hand up and down her thigh and buttocks underneath the table. (Tr. 58:24-25, 59:18-29.) At one point, according to Lambert, Garcia whispered to Lambert that he liked the way she held her fork and told her he wanted to "fork" her. (Tr. 59:1-6.) Lambert's initial written account of that evening, in an e-mail to the EEOC dated April 30, 2003, told a milder story: "During dinner, seated in a booth," Lambert wrote, "Bob sat next to me and would often press against or lean into me, which made me feel uncomfortable." (Tr. 116:20-23, Def. Ex. 13.) Lambert also wrote, "Bob made comments that he liked the way that I ate and it was nice to see that I had good table manners."

Later that evening, according to Lambert, she told Hardy that she "didn't like the way Bob was acting." (Tr. 60:5-6.) In response, Hardy allegedly told Lambert that on another work-related trip Garcia had hugged her and tried to unzip her jumper. (Tr. 59:7-10.) According to Lambert, Hardy told her she did not report the incident to anybody at Caterpillar because she did not feel that she could. (Tr. 60:12-14.) At trial, Hardy denied that Garcia ever attempted to unzip her clothing. (Tr. 446:25-3.) Hardy recalls that during Lambert's first week at Caterpillar, Hardy told Lambert over dinner that her supervisor at a different facility had attempted to unzip her pantsuit after walking her back to her hotel room during a conference. (Tr. 446:19-24.) Hardy testified that she reported that incident (not involving Garcia) to another supervisor at Caterpillar, and when she came to work the following day, the supervisor who had engaged in offensive conduct had vacated his office, and she never worked with him again. (Tr. 446:8-15.)

According to Pittenger and Hardy's recollections of the dinner in Peoria, far from voicing any discomfort, Lambert seemed "jovial" and was "laughing and joking around." (Tr. 431:10-11, 445:2-4.) Both women testified that Lambert said she "loved her job" and did not appear upset or complain about Garcia's behavior. (Tr. 444:22- 445:7, 432:1-7.) Pittenger testified that on a trip

11

to the women's restroom, she heard Lambert tell a stranger that she was having a "great time" and that she liked her job. (Tr. 432:2-7.) Neither woman saw Garcia acting inappropriately toward Lambert that evening. (Tr. 444:19-21, 431:3-8.)

Hardy, an ergonomics coordinator who worked under Garcia's supervision during Lambert's employment, did complain on several occasions about inappropriate behavior at the Aurora facility. Once, Hardy testified, she and a prospective female intern were touring the plant and heard "wolf whistling" from the factory floor. (Tr. 447:10-17.) Hardy took the prospective intern to her office and immediately reported the incident to her supervisor, who advised her to speak to Bill Miller, the facility's labor relations manager. (Tr. 447:18-24.) Miller asked her for details about the incident and, according to Hardy, promised to address the entire group on the factory floor about the disciplinary consequences, including discharge, of that kind of behavior.[3] (Tr. 448:9-12, 378:7-11.) Hardy also testified that she complained to both Garcia and Miller about the presence of offensive photographs in the factory on two occasions. (Tr. 449:13-14.) In the first instance, Miller "immediately removed" the offending photograph when he could not identify its owner. (Tr. 449:13-14.) In the second, he deemed the pictures "not inappropriate" and allowed the employee to keep them. (Tr. 377:22-378:6.) Finally, Hardy complained to Garcia when another employee told her "a very offensive joke." Garcia spoke to the employee and instructed him to apologize to Hardy. (Tr. 449:15-24.)

Garcia himself strenuously denied every one of Lambert's allegations. He testified that he never intentionally touched Lambert's breasts or backside, never stated that he was physically attracted to or wished to date Lambert, never threatened Lambert or told her he was jealous, never commented on Lambert's appearance, clothing, or anatomy in a sexual way, never requested a hug from Lambert, never blew smoke in the direction of her chest, and never told Lambert that she

---

[3]     It is unclear from the record, however, whether Miller in fact took action in response to Hardy's complaint about the whistling.

would be pleased by the factory's "no-ring" policy. (Tr. 193-198.) Further, Garcia denied ever discussing the sex lives of other employees, engaging in inappropriate physical contact with female employees, or making comments to Lambert about other female employees in a sexual way. (Tr. 194:6-11.)

### C. Lambert's Response to the Alleged Harassment

Lambert testified that Garcia's behavior during her time as a Caterpillar employee made her feel "violated," "demoralized," "threatened," "afraid," "humiliated," and "worthless." (Tr. 60:19-61:1.) In response to Garcia's conduct, she said, she began wearing minimizer bras and layering her clothing to draw attention away from her breasts. (Tr. 61:2-21.) Lambert testified that she took steps to avoid unwanted contact with Garcia. At first, she made general efforts to avoid physical contact when Garcia "would walk right up beside [her]." (Tr. 41:6-8.) She also told him that she didn't like it when he blew smoke at her breasts, to which Garcia allegedly replied that Lambert "better get used to it." (Tr. 48:11-15.) Following the incident on Garcia's birthday, when he allegedly groped and threatened Lambert, she testified that she stopped reporting to his office in the morning. (Tr. 41:9-14.)

Lambert admitted, however, that she never complained to any supervisor or manager or to anyone in Caterpillar's human resources or labor relations departments regarding Garcia's behavior. (Tr. 96-98.) In December 2001, Lambert did speak to Pete Moore, a union representative, about filing a complaint against Garcia regarding their working relationship, but did not mention sexual harassment as the basis for the complaint. (Tr. 80:13-81:6, 98:12-99:7, 302:17-303:8.) In her testimony, Lambert attributed her reluctance to complain about the harassment to a combination of fear of losing her job and a lack of training in Caterpillar's sexual harassment policies. (Tr. 80-83.) Lambert claims that after she spoke with Moore, Garcia came to her office and threatened her, warning her not to speak to anyone about her job, her position, or "what was going on" because "no one would believe [her]" and that "he would be there long after [her]." (Tr.

82:5-15.)  Lambert did not report this threat to anyone else at Caterpillar because, she testified, she believed she would lose her job.  (Tr. 82:16-83:1.)

Lambert denies Caterpillar ever provided her with sexual harassment training or any handbooks on Caterpillar's sexual harassment policies.  (Tr. 32:22-3, 33:4-18.)  She claims she never attended a scheduled orientation session because Garcia insisted she attend safety meetings instead and assured her "he would give [Lambert] all the training [she] needed."  (Tr. 38:18-29:3.)  She did, however, recognize that Caterpillar had a sexual harassment policy and that human resources staff could have furnished her with a copy of it at her request.  (Tr. 101:12-25.)  Lambert admitted she never sought out a copy of the policy.  (Tr. 102.)  She also admitted she had received sexual harassment training from previous employers and therefore knew from past experience that Garcia's alleged behavior would be considered harassing and illegal.  (Tr. 101:1-10.)

Alan Wolff, the employment supervisor charged with training new employees in the firm's sexual harassment policies at the time, testified that he recalled that Lambert did attend his orientation class on her first day at the Aurora facility, along with four or five other new hires.  (Tr. 277:21-279:22, 281:4-9, 284:7-10.)  Wolff could not recall the names of any of the other attendees and did not keep a written record of persons who attended or received orientation materials.  (Tr. 282:5-22.)  He also conceded that he had trained over 100 employees in his position as employment supervisor and could not recall the names of individual employees or when he had trained them.  (Tr. 282:13-14.)

### D. Events Leading Up to Lambert's Termination

In late September 2001, Lambert attended a retirement party for two Caterpillar employees at a local bar.  The party was not sponsored by Caterpillar.  (Tr. 238:22-24.)  Among those in attendance were Jenny Logel, Vicki Pettinger, Pete Moore, a union committeeman, and Gene Hevelka, a member of the union's safety committee and Lambert's future husband.  (Tr. 70:19-71:14, 208:13-17.)  Garcia was not present.  At this party, Logel, then an ergonomics intern at

14

Caterpillar, witnessed Lambert "kissing a couple guys and dancing provocatively with Gene [Hevelka]." On October 1, 2001, Logel reported Lambert's behavior to Garcia. (Tr. 405:10-17.) Garcia noted the substance of his conversation with Logel in a file titled "Progress Notes Karon Lambert," which contains notes beginning on October 1, 2001, the date he spoke to Logel, and ending on December 14, 2001. (Tr. 214:24-215:25, Def. Ex. 2.) Garcia testified that he started the log because he believed the "situation was serious enough to document just in case my boss would come to me and said (*sic*), 'hey, what's going on?'" (Tr. 215:13-17.) Garcia's October 1 notes state, "Jennifer Logel warned me about hearing rumors in the factory pertaining to Karon Lambert's behavior at a retirement party on Friday. I asked Jennifer, 'What kind of behavior?' And she stated, 'Grabbing, groping, and kissing hourly employees and leaving with one.'" (Tr. 215:19-25, Def. Ex. 2.)

On October 2, 2001, Garcia summoned Lambert to his office to discuss her behavior at the retirement party. (Tr. 216:9-12.) Garcia testified that he told Lambert that her conduct was "inappropriate" and that she should "keep some professionalism about her" when socializing with "Caterpillar people" outside of work. (Tr. 216:21-217:4.) According to Garcia's testimony and his contemporaneous notes of the conversation, Lambert apologized for her behavior, saying she "didn't know what happened" and that "she didn't know whether she drank too much or somebody slipped something into her drink." (Tr. 217:14-19.) His notes of this conversation state, "She finished the conversation by thanking me for trying to help her." (Tr. 217:20-21) According to Lambert's version of events, Garcia explicitly instructed her to stop seeing Hevelka. (Tr. 72:22-24.) She testified that she did not apologize to Garcia and told him she would continue seeing Hevelka if she chose. (Tr. 73:2-4.) She further testified that she had "maybe three, four beers," and denied telling Garcia that she was drunk or believed somebody "slipped something into her drink." (Tr. 73:5-9.) It is undisputed that Caterpillar does not have a policy prohibiting employees from dating within the company. (Tr. 384:12.)

Following Garcia's meeting with Lambert on October 2, Garcia's notes in his progress log reflect that he spoke with Lambert several times about socializing with hourly employees at work. (Tr. 218-28, Def.'s Ex. 2.) On October 5, 2001, Larry Eichelberger, a manager at Caterpillar, spoke with Garcia about issues concerning Lambert's behavior that had been raised by Junior Smith, Eichelberger's subordinate and an operations supervisor at the facility. (Tr. 220:7-14.) Smith, who was fired by Caterpillar in March 2006, testified that he had approached Eichelberger about the amount of time Lambert spent socializing with employees under his supervision. (Tr. 317:1-18, 346:23-25.) Smith told Eichelberger that he had spoken to Lambert repeatedly about wasting employees' time in one of the "zones" he supervised, but to no effect. (Tr. 317:15-18.) After his meeting with Eichelberger, Garcia spoke to Lambert about "wasting time" and "spending too much time with hourly folks." (Tr. 219:15-16.) Garcia also specifically mentioned Lambert's relationship with Hevelka, reminding her of potential conflicts of interest between union employees and management. (Tr. 220:16-22.) Garcia admonished Lambert to "to stay focused on safety" and instructed her that she should contact Smith before entering the area of the plant under his supervision. (Tr. 219:16-24.)

Also on October 5, Garcia requested that Smith document Lambert's troublesome behavior in writing. (Tr. 318:4-12.) When Smith failed to immediately provide such documentation, Garcia's requests became more persistent. (Tr. 231:1-15, 320-321.) Smith testified that Miller and Eichelberger also made similar requests for written documentation of Smith's complaints against Lambert, despite Smith's insistence that Lambert had ceased being a problem following his initial complaint to Eichelberger. (Tr. 320:1-321:25.) According to Smith, all three men told him they needed the documentation because they planned to discharge Lambert. (Tr. 321:22-25, 323:10-17.) Smith testified that the requests became more insistent throughout December. (Tr. 320-321.) Miller denied requesting documentation from Smith prior to Lambert's discharge or telling Smith that

16

Caterpillar intended to discharge Lambert.[4] (Tr. 374:1-3.) Smith also testified that he heard Garcia and Miller refer to Lambert frequently as "the bitch," an allegation Miller denied at trial. (Tr. 324:21-325:25, 327:24-328:3, 380:21-381:5.)

Wilma Ardelean, a supervisor on the facility's "G paint line," also testified at length about Lambert's practice of socializing with coworkers. As a paint line supervisor, Ardelean was responsible for ensuring that individual tractor parts were painted before assembly further down the production line. (Tr. 252:7-15.) According to Ardelean, Lambert repeatedly distracted employees under Ardelean's supervision. First, sometime in mid-November, Ardelean observed Lambert speaking on the factory floor with Owen Stuckey, an employee under her supervision and a member of the plant's safety committee. When Ardelean returned to the floor more than an hour later, according to her testimony, Lambert and Stuckey were still engaged in conversation. (Tr. 258:18-259:10, Ex. 3.) Ardelean testified that she later told Lambert to notify her first if she needed to speak with Stuckey or anyone else on the paint line about a safety issue. (Tr. 259:11-19.) Within a week of the incident involving Stuckey, Ardelean again witnessed Lambert "laughing and talking" with another paint line employee, Pete Moore, who was a union committee member and not a member of the safety committee. (Tr. 262:12-19.) Ardelean once again confronted Lambert and told her to speak with employees "on your own time, not mine." (Tr. 263:12-14.) Ardelean testified that after this she called Garcia, told him about both incidents, and told him that she had instructed Lambert on the proper protocol for contact with assembly line employees. (Tr. 263:18-263:5.)

Nonetheless, about a week later, however, Ardelean saw Lambert back on the paint line, this time talking with four hourly employees: Stuckey, Moore, Jerry Bastion, and a younger employee whose name she could not recall. (Tr. 264:24-265:7.) Afterwards, Ardelean testified that she told Lambert "to get off my line, stay off my line," and Lambert left, visibly upset. (Tr. 265:15-

---

[4]     Eichelberger did not testify at trial.

17

266:14.) Ardelean said that she again called Garcia and complained about Lambert's behavior. (Tr. 265:6-16.) Despite this, Ardelean testified, Lambert returned a fourth time to the paint line, and during this incident the line "backed up" while Lambert was talking to Moore, Stuckey, and Bastion. (Tr. 267:11-268:3.) According to Ardelean, it took three hours for the paint line to be restored to full operation. (Tr. 268:24-25.) On this occasion, Ardelean testified, she told Lambert to leave and warned her that "if she ever came back on my line, since her boss couldn't control her, I would." (Tr. 268:4-7.) The next day, Ardelean documented these four incidents in an e-mail to her supervisor, Dick Hickey, which he in turn forwarded to Garcia on December 7, 2001. (Tr. 256:19-24, 270:16-22, Ardelean E-Mail, Def.'s Ex. 3.) Garcia testified that he spoke to Lambert about Ardelean's complaints after receiving the email. (Tr. 228:3-4, 20-22.) It is undisputed that Lambert was never disciplined for any of these alleged incidents.

Ardelean's testimony is not uncontradicted. Stuckey denied ever having an "hour-and-a-half conversation" with Lambert during work hours. He also denied that the paint line was ever slowed or shut down as a result of a prolonged conversation with Lambert. (Tr. 289:2-11.) Ardelean's own e-mail to Hickey also says nothing about the paint line breaking down. (Tr. 273:21-25, Ardelean E-mail, Def. Ex. 3.) Moore similarly testified that he had never had an hour-long conversation with Lambert on the paint line and that he spoke to Garcia about Ardelean's complaints. (Tr. 303:9-304:6, 306:13-22.) He further testified that any conversations he had with Lambert did not interfere with his job. (Tr. 306:15-18.) Garcia also could not recall ever speaking with Ardelean personally about her issues with Lambert. (238:16-19.) Finally, Lambert herself denied that Ardelean ever spoke to her about socializing with employees under her supervision or ordered her to stay off the paint line. (Tr. 125:25-126:3.)

On November 26, 2001, Garcia recorded a conversation in his notes in which he spoke to Lambert about her attire. (Progress Notes: Karon Lambert, Def. Ex. 2.) Specifically, Garcia testified that he reprimanded Lambert for wearing a "see-through" blouse and a skirt to work and

18

instructed her to put on a blazer and remain in her office for the rest of the day. (Tr. 221:15-18.) Garcia explained that neither skirts nor short pants are permitted on the factory floor due to welding and certain other "chemical operations" that could burn exposed skin. (Tr. 221:22-12.) Both Logel and Pittenger confirmed that Caterpillar policy prohibits wearing skirts in the safety shop, where Lambert worked. (Tr. 403:21-404:4, 421:10-24.) Logel further testified that she saw Lambert wearing a skirt and "see-through" blouse to work and was present when Garcia reprimanded Lambert. (Tr. 404:5-16.) Pittenger also recalled Lambert wearing a "black skirt," and "somewhat see-through" white blouse that revealed a "zebra bra." (Tr. 421:25-422:6.) Lambert denied ever wearing a sheer top to work and testified that Garcia never spoke to her about her attire. (Tr. 74:23-75:4.) She also claimed to have seen Pittenger and Hardy wear skirts to work. (Tr. 75:10-15.)

On December 4, 2001, again according to Garcia's notes, Garcia spoke with Lambert about her desire to become involved in the facility's mentoring program. (Tr. 223:7-14.) On December 5, Garcia learned that Lambert had already spoken to Dick Hickey, a factory superintendent, about the mentoring program and following this conversation, reprimanded Lambert for discussing the program with Hickey without first consulting him. (Tr. 223:22-224:5.) Garcia explained that he did not think Lambert was ready for the mentoring program and disapproved of her approaching another employee who was not her supervisor rather than coming to him. (Tr. 223:25-224:5.)

Garcia twice spoke with Lambert about "keeping her hands to herself." (Tr. 227-28, 294, Ex. 2.) On December 6, 2001, Garcia's notes indicate that he and Owen Stuckey approached Garcia about Lambert's habit of touching Stuckey in a way that made him uncomfortable. (Tr. 227:10-17, Def. Ex. 2.) According to Garcia's testimony and notes, he spoke to Lambert on December 10, instructing her "to stay away from Owen Stuckey . . . unless it was strictly business" and "to keep her hands off Mr. Stuckey, he didn't like it." (Tr. 227:22-228:2.) At trial, Lambert testified that she had only touched Stuckey once, on the leg, to get his attention on the noisy factory

19

floor and that she never touched him again after speaking with Garcia. (Tr. 76:18-77:4.)

On December 14, 2001, Garcia spoke to Lambert about an incident involving Dave Limon, a union safety committeeman. (Tr. 231:13-232:6.) Garcia's and Lambert's testimony conflict as to the details, but Lambert admits that she touched Limon on the shoulder after a safety committee meeting. (Tr. 77:19-78:2, 231:18-25.) When questioned about the incident at trial, Limon simply testified that he "didn't feel comfortable" when Lambert touched him when speaking to him. (Tr. 294:21-23.) Garcia testified that he again gave Lambert specific instructions on December 14 to "keep her hands off of people; they don't like it." (Tr. 232:7-12.) After speaking with Garcia, Lambert testified that she did not touch Limon for the remainder of her employment at Caterpillar. (Tr. 78:8-10, 295:18-21.)

Garcia acknowledged that the Caterpillar plant was not cited for any OSHA violations while Lambert was safety manager. Throughout her tenure at Caterpillar, Lambert never received any written warnings or complaints about her performance as safety manager, nor was she suspended at any time before her termination. (Tr. 84.) In addition, Garcia expressed approval of the manner in which Lambert conducted the two monthly manager meetings that he attended during her tenure at Caterpillar. (Tr. 236-37.)

### E. Lambert's Termination and Aftermath

Garcia did not have the final authority to terminate Lambert, but he did recommend her discharge to Jerry Palmer, a vice-president at Caterpillar, by preparing a written summary of reasons for that recommendation. (Tr. 209:11-13.) On January 3, 2002, Garcia created a summary, based on his progress report file, of reasons he believed Lambert should be terminated. (Tr. 210:14-24, Lambert Termination Documents, Def.'s Ex. 6.) The document Garcia prepared regarding Lambert contained the following paragraph:

> In summary: In 94 working days as of January 3rd, 2002, I have had 14 different conversations that had to be documented and numerous other occasions that were not documented about Ms. Lambert's unprofessional behavior, inappropriate

> behavior with hourly employees, the image that she projects as a Caterpillar manager, wasting time, wasting other people's time, not paying attention to business, and on two occasions held up production in two areas of the factory.

(Lambert Termination Documents, Def.'s Ex. 6 at 2.) This document also refers to a conversation Garcia had with factory manager Timothy Tunt about Lambert's "ineffectiveness in safety meetings." (Tr. 233:17-21.) Garcia's progress notes make no mention of such a conversation, but Tunt confirmed in his trial testimony that he complained to Garcia about Lambert's performance at safety meetings sometime in November or December 2001. (Tr. 355:5-356:6.) Specifically, Tunt complained that Lambert focused on topics, such as Christmas tree safety, that were either only minimally relevant or completely unrelated to the work performed in the factory. (Tr. 355:6-17.) Tunt also told Garcia that he believed Lambert was misrepresenting safety statistics during a period when the plant's safety record was "atrocious." (Tr. 355:20-25.) Garcia never spoke with Lambert about Tunt's complaints. (Tr. 236:8-10.)

Some time prior to January 4, 2002 (the record contains no evidence concerning this process), Garcia's recommendation was adopted. In the early afternoon on that date, Lambert testified that the plant's lieutenant of security, two plant security officers, and Garcia came to Lambert's office. (Tr. 85:2-3, 23.) One of these individuals (Lambert did not say which one) told Lambert her employment had been terminated and instructed her to clean out her desk. (Tr. 85:14-16.) After allowing her to put her personal items in a box, they escorted her across the factory floor to the plant exit. (Tr. 85:15-86:1.)

After arriving home that day, Lambert called Bill Miller, the plant's labor relations manager, to discuss her discharge. (Tr. 86:5-9.) Miller recalled that Lambert complained primarily that her termination for poor performance was unjustified and that no one had discussed her performance with her before she was discharged. She did also mention harassment by Garcia. (Tr. 375:13-376:4.) When Miller pressed her for more details, Lambert said that Garcia had "bumped into her and pressed against her breast once" and that Miller should consult Garcia's "harem," whom she

21

identified as Pittenger, Logel, and Hardy. (Tr. 376:5-18.) Miller testified that he spoke to all three women the next day and, according to Miller, none voiced any complaints about sexual harassment by Garcia. (Tr. 377:1-11.)

Also on January 4, 2002, Tim Anderson, a factory supervisor at Caterpillar, called Lambert after learning she had been discharged. (Tr. 86:16-87:5, Anderson Dep. 19-23.) Anderson, who was stationed at the Marion, Ohio facility at the time, had been working with Lambert remotely on an internal corporate audit of the Marion facility for about two months when Lambert was fired. (Anderson Dep. 14:16-15:6.) According to both Lambert's and Anderson's accounts of this phone call, Lambert described at least some of Garcia's harassing behavior, including that he would "rub up against her chest" and "get a little too close to her body." (Anderson Dep. 21:8-15.)

Lambert filed a charge of sexual harassment with the EEOC on February 5, 2002. (Def. 56.1 ¶ 8.) In preparing the official company response to the charge, Miller reviewed Garcia's recommendation for Lambert's termination. (Tr. 380:1-8.) Specifically, Miller testified that he "requested information" from Logel, Pittenger, and Hardy regarding Lambert's interaction with other employees; their responses are not included in the record. (Tr. 380:9-14.) Miller also interviewed Garcia, who denied committing any of the acts alleged in Lambert's charge. (Tr. 380:15-20.)

### F. Other Alleged Incidents Involving Robert Garcia

The court heard testimony regarding Garcia's alleged sexual harassment of other women at Caterpillar. Judy Sawyer (then Judy Green) worked at Caterpillar's Aurora facility from approximately 1995 through December 1999 as an employee for Vallens Safety Supply, an outside company that Caterpillar contracted to run the safety stores in its plants at that time. (Tr. 135:9-14, 137:16-24.) In 1999, about six months before Sawyer's discharge, Garcia became the safety manager at the Aurora facility. (Tr. 140:15-18.) Sawyer testified that Garcia would come into the safety store to get coffee, and that on two occasions, he put his arm around her waist when she

22

bent to fill the coffee carafe, startling her.  (Tr. 141:2-143.)  As Sawyer attempted to move away, his arm grazed her breasts.  (Tr. 141:2-143.)

The two incidents Sawyer described occurred within a period of a week and a half.  (Tr. 145:3-6.)  After both incidents, Sawyer complained to her immediate supervisor, Melanie Hadley,[5] another Vallens employee, who reportedly told Sawyer that Garcia had behaved similarly around her.  (Tr. 145-147.)  In addition, Sawyer claims she and Hadley spoke with Dina Behrens, a Vallen employee who managed all Caterpillar's on-site safety stores, regarding Garcia's behavior.  According to Sawyer, Behrens instructed them to "bite their tongues" because Vallen was engaged in negotiations to renew its contract with Caterpillar.  (Tr. 472:20-473:8.)  At trial, Behrens denied that Sawyer or Hadley complained to her about Garcia or that she told them not to speak out during the contract negotiations.  (Tr. 391-392; 395-396.)

At some point, Sawyer also complained to Tim Anderson, then the second-shift supervisor at Caterpillar, that Garcia made her uncomfortable because he was "paw-y"; Sawyer was otherwise vague about Garcia's behavior.  (Tr. 152-153.)  When Bill Miller learned of Sawyer's complaint about Garcia from Anderson, he called Anderson to discuss the matter (the substance of the discussion was not presented at trial).  (Tr. 385:12-18.)  Sawyer also testified that Garcia would occasionally pat her backside when no one else was watching.  (Tr. 149:12-16.)  Sawyer said she never experienced inappropriate behavior from other employees while at Caterpillar.  (Tr. 142:18-143:3.)  Several weeks after the incidents in the safety store, Vallen transferred Sawyer out of the Aurora facility.  (Tr. 150:11-24.)

The court also heard testimony regarding Garcia's interactions with Anne Marie Logan, another Vallen employee who worked at Caterpillar.  Logan did not personally testify at trial, but Miller acknowledged that Logan had lodged a complaint about Garcia in February 2002, and that

---

[5]     Hadley did not testify at trial.

he interviewed Logan in a meeting at Vallen with Logan's supervisor. (Tr. 365-367.) Miller recalled that Logan reported that Garcia's hand had grazed her breast while reaching for something in the safety shop, but she was unsure whether the contact was accidental or intentional. (Tr. 368:5-369:1.) Logan stated that there had been no other similar incidents involving Garcia. (Tr. 369:2-6.) Garcia denied touching Logan, but Miller nonetheless instructed him to stay out of the safety store unless escorted. (Tr. 371:8-21.) Behrens testified that Logan never personally complained to her and that Vallen eventually terminated Logan's employment for reasons unrelated to any complaint about Garcia.

## II.    Sandy Irvin's Claim

### A.    Background

On April 18, 2006, the EEOC brought a sexual harassment claim on behalf of Sandy Irvin based on Caterpillar's failure to respond adequately to alleged sexual harassment by Irvin's coworker, John Fay.

Irvin began working for Caterpillar in April 2000 as an assembly-line operator in Caterpillar's Pontiac, Illinois facility. Eight months later, in January 2001, she was promoted to second-shift supervisor. In March 2003, Caterpillar transferred Irvin to its Aurora facility, where she worked from 3:00 p.m. to 11:00 p.m., five days per week, as a second-shift supervisor on the "stick and boom" line in Building G. (Tr. 491:13-25.) "Stick and boom" describes the arm and bucket device on tractors that perform excavations; Irvin supervised 20 employees engaged in both "first operations" (the process of cutting sheet metal to make the "stick and boom") and "second operations" (the process of beveling and welding these parts). (Tr. 492:1-24.) She shared an office with Jon Fay, the first-shift foreman, and Ron Clarner, the third-shift supervisor. (Tr. 493:6-11.) In January 2004, Irvin was promoted again, to the position of lead foreman in a separate building, a position she still held at the time of trial. (Tr. 494:2-17.)

24

Irvin received training in Caterpillar's sexual harassment policy in January 2001, as part of her one-week supervisor orientation, and again in March 2003, when she was transferred to the Aurora facility. (Tr. 530-31.) During both orientations, Irvin received written copies of Caterpillar's policies. (Tr. 531:17-18, 531:25-532:1) Irvin understood that these policies instructed employees experiencing sexual harassment to report it to the human resources department, but conceded that she never complained to human resources. (Tr. 531:1-7.) Irvin also understood that Caterpillar's policy explicitly prohibited retaliation against an employee who reported workplace harassment. (Tr. 531:13-16.)

### B. Evidence of Sexual Harassment

Irvin testified at length about coworker Jon Fay's conduct toward her beginning in the summer of 2003 and continuing through January 9, 2004, the date that Fay's behavior "culminated in unwanted touching and solicitations for sex." (Pl. Post-Trial Br. at 7.) Over a period of approximately six months, Fay made repeated comments to Irvin, both at work and in phone calls to her home, about her underwear, her bra, her smell, and her general appearance. (Tr. 629:22-631:9.) According to Irvin's testimony, Fay told her at various times that she "looked like she needed a spanking," and that he was "horny," and once asked her if she "wanted fries with that shake." (Tr. 504-505.) While Fay could not recall all these incidents, he did not deny making these comments in his trial testimony. (Tr. 629-630.)

Fay told Irvin he was in love with her "several" times during this period. (Tr. 507:19-20.) Once, Irvin accepted Fay's invitation to go out for drinks after work, but Fay called it off at the last minute to be at home with his son. (Tr. 633.)

On one occasion, Fay asked Irvin to show him a new tattoo on her lower back. (Tr. 526:19-22, 629:17-630:1.) According to Fay, Irvin pulled her pants down a couple of inches to allow Fay to see the tattoo, and Fay pulled down her waistband "no more than an inch" further to get a better look. (Tr. 629:25-630:4.) Fay testified that Irvin did not object to his pulling down her waistband.

25

(Tr. 630:2-8.)  Irvin recalled that Fay had "yanked" her pants down to see the tattoo, but did not testify that she objected to this behavior at the time.  (Tr. 526:16-22.)  Nor did she testify at trial that she found this behavior offensive or objectionable.  (Tr. 526:16-22.)

Fay's wife called Irvin at home twice and accused Irvin of having an affair with Fay. (Tr. 505:11-14, 507, 572:3-10.)  Fay told Irvin that his wife had once threatened to shoot both of them. (Tr. 634:8-12.)  Irvin took this threat seriously and feared Fay's wife.  (Tr. 505:9-21.)

Irvin testified that she was "offended" and "upset" by Fay's comments and phone calls, and told him she was not interested in a romantic relationship. (Tr. 507:21-22, 508:5-7, 514:11-13.)  She stated that she told Fay not to call her and hung up on him when his calls were personal rather than work-related.  (Tr. 507:24-508:4.)  Irvin acknowledged that she occasionally called Fay from home, but insisted she did so only to check on the status of production line operations or for other work-related reasons.  (Tr. 508:8-11.)

Although Irvin testified that Fay's behavior offended her, there is evidence that their relationship was for the most part congenial in the months leading up to January 9, 2004.  When Irvin first started working with Fay, she viewed him "as a friend at work."  (Tr. 541:13.)  Irvin admitted that she willingly discussed Fay's marital and personal problems with him and was "sympathetic" to Fay's problems in his home life.  (Tr. 541:21-542:4.)  Irvin said that she discussed her own "issues with her husband" with Fay, and at one point gave Fay a copy of a self-help book that "helped [Irvin] when [she] had had similar problems in [her] own home life."  (Tr. 542:5-2.)  Irvin testified that there were times when Fay would call just to "ask[] what was going on," and that these conversations did not offend her.  (Tr. 544:8-10.)  According to Fay, Irvin never protested that he called too much, hung up on him, or otherwise complained when he discussed personal matters with her.  (Tr. 629-632.)  Further, in a written statement made at Robert Diveley (Irvin's coworker) and Tunt's request shortly after the incident on January 9, 2004, Irvin wrote that Fay began calling

26

her sometime during the summer, but did not start making sexually inappropriate comments until November or December 2003. (Tr. 546:4-21, 547:1-5, Def. Ex. 8.)

Irvin testified that sometime during the summer of 2003, she complained to Diveley about Fay's comments, and ultimately about Fay's behavior. (Tr. 565:16-21.) According to Diveley, Irvin initially complained that "John was talking about his family life and how his wife didn't want him at home and that – basically, that was it." (Tr. 566:10-14.) Diveley testified that Irvin hesitated to complain to Mike Brown, her direct supervisor, because "she really didn't want to get John in trouble." (Tr. 568:3-5.) In addition, Diveley noticed that sometime during that summer, Fay had begun to stay past the end of his shifts "until roughly 8:30, 9:00 o'clock at night," a fact that both Fay and Irvin confirmed. (Tr. 499:14-23, 566:21-567:2.) The first time Irvin confided in Diveley, he advised her to talk to Mike Brown, the general foreman and Irvin's direct supervisor. (Tr. 567:16-21.) At some point, Diveley also spoke to Fay personally about his behavior toward Irvin, cautioning him that other employees were talking about his "hanging round Sandy" and how it "[didn't] look good." (Tr. 568:11-18.) According to Diveley, Fay told him he was "in love" and then just shrugged and walked away. (Tr. 569:1-9.)

Diveley also testified that he himself spoke to Mike Brown at least twice about Irvin's complaints. (Tr. 569:10-13.) According to Diveley, the first time he spoke to Brown, he told Brown that Irvin had complained about Fay "hanging around her, about how unhappy he is and all that kind of stuff," but did not specifically report that any of Fay's comments were sexual or harassing. (Tr. 569:23-570:3.) Diveley recalled that at some point, he did speak with Brown about Fay's "sexually inappropriate comments," but could not recall when. (Tr. 570:6-24.) Diveley believed the second time Irvin complained to him was after January 9, 2004, when he again advised her to talk to Brown. (Tr. 571:3-21.)

About a week after Diveley first advised Irvin to speak to Brown, Irvin testified that she did complain to Brown about Fay's behavior, specifically that Fay was making "comments" to Irvin,

telling her that "he was in love" with her, and calling her at home. (Tr. 515:10-14.) According to Irvin, Brown expressed concern and assured Irvin that he would speak to Fay's supervisor, Doug Holman. (Tr. 514:23-515:18.) Irvin testified that Fay's objectionable behavior stopped for "a little bit" after she spoke with Diveley and Brown, but that over time, Fay resumed making comments and phone calls and staying late into her shift. (Tr. 516:8-18.) Irvin claimed she complained again to Brown about Fay's behavior sometime in the fall of 2003, and again Brown said he would speak to Holman. (Tr. 517:13-518:13.) After this second complaint, Fay's inappropriate comments and phone calls once more stopped for a period, but then started again and continued until January 9, 2004. (Tr. 518:10-519:2.) Contrary to Diveley and Irvin's testimony, Brown testified in his deposition that before January 2004, Irvin "never mentioned anything other than that [Fay] stayed late and he was having some problems at home, and she had talked to him about those." (Tr. 610:25-611:4.)

Under the company's policy, Brown had a duty to report any alleged harassment that came to his attention to Timothy Tunt, Brown's supervisor and the building's general foreman. (Tr. 582:10-24.) Tunt testified that Brown never spoke to him about Irvin's complaints. (Tr. 582.) According to Brown, however, he made no such report because Irvin did not speak to him about any sexually inappropriate conduct until January 10, 2004, and then only in response to his own inquiry after he spoke with Anderson and Diveley. (Tr. 605:25-608:6.)

On January 9, 2004, Fay came into the office he shared with Irvin and Clarner and found Irvin, who had the flu, alone with her head on her desk. (Tr. 509:18-23.) Fay placed his arms on Irvin's shoulders and began rubbing her back. (Tr. 509:22-24, 634:8-14.) Irvin told him to stop, but she claims Fay only rubbed her back harder in response. (Tr. 509:24-510:1.) Irvin pulled away from Fay, who walked back to his desk. (Tr. 510:1-2.) According to Irvin, Fay then said, "Now look what you did to me," a reference, Irvin believed, to the fact that, as she could observe out of the corner of her eye, Fay had an erection. (Tr. 510:1-2, 24-8.) Fay denied making this statement. (Tr. 635:21-22.) Irvin testified that Fay then allegedly proposed that they "go out back and take care of

28

this," which Irvin interpreted as a request for sex. (Tr. 510:9-17.) Fay denied making this or any similar comment. (Tr. 635:23-25.) Irvin testified that she immediately got her things together to leave, but as she began to make her way across the factory floor to the door, a distance of about a quarter mile, Fay pulled up on a scooter and told her to get on. (Tr. 510:16-20, 511:4.) Irvin climbed on behind Fay because, she said, she "was sick and it was quite a ways to the front door." (Tr. 510:21-22.) At trial Fay could not recall giving Irvin a ride on a scooter that day or any other day. (Tr. 636:6-8.) According to Irvin, Fay told her again when they reached the factory door that "it's not too late" and "we can still go out back and take care of this." (Tr. 511:12-15.) Irvin refused and walked out of the building. (Tr. 511:17-18.)

On January 10, the day after her encounter with Fay, Irvin discussed Fay's behavior with Diveley and Tim Anderson, who was then working as a second-shift "robot tech" at the Aurora facility, but was not Irvin's supervisor. (Tr. 501, 512:6-14, 576:11-576:7.) Both Anderson and Diveley spoke to Brown about the incident. (Tr. 571:25-1.) Later that same day, Brown pulled Irvin aside to speak with him in his office. (Tr. 519-520, 607-608.) Brown testified in his deposition that Irvin "explained . . . that Fay had put his hands on her back and made a comment, a verbal comment to her." (Tr. 607:23-24.) In response, Brown testified, "I told her that at that point . . . I had no other choice but to report it to John's supervisor and up through the ladder." (Tr. 606:24-607:1.) Brown did report Irvin's allegations to Doug Holman, who recommended they take the matter to Tim Tunt.

Brown and Holman did report Irvin's allegations to Tunt. Tunt testified that, prior to his discussion with Brown earlier that day, he had never heard about any improper behavior on Fay's part. (Tr. 582:10-24.) Later that day, Tunt and Holman conducted individual interviews with both Fay and Irvin, with Tunt taking notes. (Tr. 613:4-8.) According to Tunt's notes and testimony, Fay was defensive during his interview, claiming he believed he had been "set up" because "he had never gotten any complaints from Sandy . . . until she told him to stop rubbing her shoulders." (Tr.

614:4-9, Tim Tunt Notes of Irvin Investigation, Def. Ex. 22.)  Fay characterized their relationship as friendly and at times flirtatious, with Irvin freely sharing details about her own sex life and occasionally making off-color jokes.  (Tr. 614.)

That afternoon, Holman summoned Irvin to a meeting with him and Tunt in Tunt's office. During her meeting with Holman and Tunt, Irvin testified that she produced, at their request, a written account of Fay's conduct.  (Tr. 523-24.)  In this statement, she recounted Fay's behavior between the summer of 2003 and January 2004.  (Irvin Statement to Tim Tunt, Def. Ex. 8.)  In contrast with her testimony at trial, Irvin wrote that Fay did not begin making sexually inappropriate comments until "two months before" the January 2004 incident.  (*Id.*)

By the time Irvin met with Tunt and Holman, they had already interviewed Fay.  (Tr. 584:13-23.)  Irvin testified that during this meeting Holman, who did not testify at trial, asked her whether she had "led Fay on."  (Tr. 520:17-22.)  Irvin testified that the question "really upset" her, and she denied doing anything to encourage Fay's behavior.  (Tr. 520:25-521:1.)  Irvin further testified that Tunt said Fay's behavior was "wrong," but that as "a good-looking woman," Irvin was expected to have a "thick skin in the shop."  (Tr. 521:19-20.)  Tunt denied making these comments or otherwise suggesting that Irvin was somehow to blame.  (Tr. 616:23-617:3.)

Tunt also testified that he interviewed Diveley about Irvin's complaints, but did not interview Anderson because he had only spoken with Irvin about the incident on January 10, 2004.  Tunt was unable to identify any eyewitnesses to Fay's behavior, despite asking Holman and Brown to investigate whether anyone else in the plant knew about Fay's alleged conduct toward Irvin.  (Tr. 617:16-25.)

After considering Fay's and Irvin's accounts and the lack of eye witnesses to Fay's conduct, Tunt concluded that Fay had not violated Caterpillar's sexual harassment policy.  (Tr. 618:16-23.)

Tunt gave Fay two days leave with pay[6] "to think about his job and the seriousness of violating our prohibited harassment policy," and referred him to the Employee Assistance Program for counseling regarding "the problems that he was having at home." (Tr. 593:5-13, 594:8-18.) After January 9, 2004, Fay made no further inappropriate or sexual comments to Irvin. (Tr. 534:25-535:7.) Approximately two weeks after the incident with Fay, Irvin was promoted to lead foreman and transferred to another building. (Tr. 525:23-526:3.) Irvin testified that in July 2004 her desk was "broken into and ransacked," but she could not establish any connection between the burglary and Fay. (Tr. 558:4-22.)

At trial, Irvin expressed dissatisfaction with the way Caterpillar handled her harassment complaints. (Tr. 560-61.) Specifically, Irvin testified that she was never informed of any disciplinary action taken against Fay. (Tr. 525:14-22.) In the first line of her statement, however, she wrote, "I wanted you [Tunt] to know that the only thing I want from this is for it to stop." (Tr. 538:5-12; Irvin Statement to Tim Tunt, Def. Ex. 8..) In addition, Irvin wrote that she did not intend to take any further action so long as Fay's inappropriate behavior ceased and would "respect any decision you make on handling this issue." (Tr. 539:3-10.) Irvin admitted at trial that she had "great respect" for Tunt despite the comments he allegedly made at the meeting with Holman, and testified that Tunt "had shown good judgment" in dealing with Fay. (Tr. 540:2-4.) In fact, she selected Tunt as her mentor shortly after the incident with Fay. (Tr. 619:21-620:3.) The attorney for Caterpillar questioned Irvin several times at trial about how she would have preferred for Tunt and Caterpillar to handle the situation, to which Irvin replied "it wasn't my decision to make," "it's not for me to decide," and finally, simply, "I don't know." (Tr. 561:24-562:9.) Significantly, Irvin did not file her complaint with the EEOC until April 2006, after learning in March 2006 that she was about to receive a below-average performance rating from her supervisor. (Tr. 556:8-557:9.)

---

[6] According to Tunt, the minimum amount of time an employee can be suspended without pay is one week. (Tr. 618:10-13.)

### III.    Virginia Early's Claim

Virginia Early, the third and final remaining plaintiff in this case, claims that a security guard at the Aurora facility sexually harassed her during July 2001, and that Caterpillar failed to respond adequately to her complaints.  Early filed an initial charge with the EEOC on December 30, 2001, in which she alleged discrimination based on race and disability, but did not add a charge of sexual harassment until several months later, despite testifying that she was experiencing harassment at the time she filed the original charge.  (Tr. 695:13-20.)  At trial, Early gave no explanation for this initial omission save that "she was trying to concentrate on the racial part of [the complaint]" at the time.  (Tr. 695:21-22.)

In 1994, Early received sexual harassment training and a copy of Caterpillar's sexual harassment policy as part of her initial orientation as a welder, a position she still held at the time of trial.  (Tr. 697:11-15, 17-18, 698:15-20.)  She was also aware that the policy was posted on bulletin boards throughout the facility.  (Tr. 698:9-14.)

At the time of the alleged sexually harassing behavior, Early was working as a second-shift welder on the "stick and boom" line in Building G.  According to Early's testimony, in early July she began to notice a certain security guard who would sometimes stare at her from the back of his scooter at a distance of perhaps a hundred feet.  (Tr. 677:7-678:5.)  Over a period of days, Early began to notice the guard moving closer to her, still perched on his bike and staring intently, but otherwise uncommunicative.  (Tr. 678:9-15.)  Then one day Early looked up from her welding to find this security guard sitting on a stool just two to three feet from her.  (Tr. 678:18-679:1.)  Startled, Early "jumped up" and moved closer to her coworker, Bruce Kirk.  (Tr. 679:2-5.)

Soon thereafter, this security guard, who has never been identified by name, began to proposition Early for sex. (Tr. 679:6-13.)  Early testified that from this time on, she told the guard "no" whenever he requested sex, but that he nonetheless continued to harass her.  (Tr. 680:12-15.)  Beginning July 19, Early began to record notes of these encounters on scraps of paper she kept in

32

her toolbox.  (Tr. 680:17-23, Pl. Ex. 16.)  On July 19, Early recorded that the guard "asked for sex," and again on July 21, she wrote, "Security guard came again asking for sex," alongside the number three to indicate the number of times he had asked that day.  (Tr. 681:16-682:20.)  Early testified that while the guard was hovering near her workstation, her supervisor, George Dutton, approached Early and asked her if she would rather work in a part of the facility with more female employees.[7] (Tr. 682:23-683:10.)  Early, however, had not previously mentioned the security guard to Dutton and did not say anything about him during that conversation.  (Tr. 707:21-708:3.)

On July 23, Early wrote, "Asking for sex.  Came over three times before lunch."  Early stated that this note indicated the guard asked her for sex three times in the four-hour period between when she started work at 3:30 pm and broke for lunch at around 6:30 pm or 7:00 pm.  Early's last entry, on July 25, states, "I asked him not to talk to me.  He might get in trouble for sexual harassment." (Tr. 684:20-21.)  According to Early, the guard responded by saying "no one would have to know" and that "it could be between the two of us."  (Tr. 685:17-24.)

In addition to the comments recorded in her notes, Early testified that the guard would sometimes tell her about "what his wife didn't do for him."  On one occasion, he told her that "in his country," which he identified as Romania, he could "rape" her and "nothing would be done."  (Tr. 679:14-18. 685:4-10.)  Early testified that this last comment genuinely frightened her and that the entire experience "messed [her] up emotionally" and that she cried whenever she thought about it. Despite this, she testified that the experience did not affect her work at Caterpillar.  (Tr. 686:1-4, 718:18-719:5.)  After July 25, the security guard never spoke to or otherwise bothered Early.  (Tr. 714:14-17, Ex. 55.)

Early testified that she spoke to her coworker Bruce Kirk approximately three times and to her coworker Jimmy Ray Wilson at least once about the guard's requests for sex.  (Tr. 686-87.)  Kirk

---

[7]     Early's response to Dutton does not appear in the record.

testified that after Early brought the guard to his attention, he noticed him staring at Early "four or five times" over a course of weeks and that there were times when Early did not even seem aware that the guard was staring at her. (Tr. 727-728:12, 731:2-4.) On just one occasion, Kirk saw the guard get off his bike and approach Early; Kirk did not hear the substance of the conversation. (Tr. 728:15-729:11, 732:20-733:1.) Kirk could not recall how many times Early complained to him about the guard, but stated that Early seemed upset and agitated by the guard's behavior and that he recommended she speak to her supervisor. (Tr. 729-720, 732:11-14.)

On July 27, Early called Caterpillar's labor relations department and spoke to Doug Howell, a labor relations assistant who was filling in for the regular labor relations manager, Bill Miller. (Tr. 688:1-4, Howell Report, Def. Ex. 55) Early told Howell that someone had been soliciting sex from her over the past three or four weeks and that, as a result, she longer felt safe on the second shift and wanted to transfer to an environment with other women. (Tr. 688:5-8, 736:2-18, Ex. 55.) Early said she could not remember the name of her alleged harasser during this phone call, but that she did tell Howell that he was a security guard from Romania. (Tr. 689:5-13.) According to Early, Howell asked her whether she had a relationship with the guard, and she confirmed she did not. (Tr. 688:11-13.) Early testified that Howell closed the phone call by telling her someone would come out to meet with her. (Tr. 688:16-18.)

Howell's contemporaneous report of his conversation with Early, however, tells a somewhat different story. First, Howell's report indicates that Early complained about numerous issues during the phone call. In addition to her complaints about the security guard's behavior, she also requested a transfer to a shift with other female employees because she was "tired of working with men." (Tr. 744-746, Def. Ex. 55.) Early claimed that her supervisors had treated her unfairly because she was a woman and forced her to do work she felt was unsafe due to a previous injury. (Def. Ex. 55.) Howell's report states that despite his repeated inquiries, Early refused to supply any identifying details regarding her alleged harasser. (Def. Ex. 55.) Howell testified at trial that Early would not

34

provide a physical description of her harasser, did not identify him as a security guard, and did not mention that he was from Romania. (Tr. 745:20-746:11.) Howell also asked whether Early had reported the alleged harassment to her supervisor or any other employees, and she said no. (Def. Ex. 55.) Further, according to Howell's testimony and his report, Early stated that she had told this person to stop talking to her, that he had in fact stopped as of the time of the phone call, and that "she seemed to think the issue with him was over since it stopped." (Tr. 748:10-20, Def. Ex. 55.) Howell testified that he asked whether Early "knew the individual outside of Caterpillar," but denied asking whether Early was "intimate" with or "dating" the alleged harasser. (Tr. 749:18-750:1.) His report notes, "She also stated that she did not know the employee outside of Cat." (Def. Ex. 55.) Howell's notes do not mention that the security guard threatened to rape Early, and Howell testified that Early did not mention the word "rape" during their conversation. (Tr. 750; Def. Ex. 55.) After Early refused Howell's repeated entreaties for more information, he reminded her that employee assistance programs were available.

Two or three days later, Doug Holman met with Early about her request for a transfer, which she had made earlier that year before any problems arose with the security guard. (Tr. 690:12-14, 690:23, 711:21-712:4.) When asked why she wanted to move, Early replied that she wished to transfer to the third shift so she could spend more time with her children. (Tr. 690:16-18.) Holman never asked Early about her sexual harassment complaint, and Early did not raise the issue because she said she assumed Holman would broach it himself if labor relations personnel had sent him to discuss it. (Tr. 690:25-19.) On July 30, 2001, Early was granted her requested transfer to the third shift, and has not since suffered any kind of harassment or inappropriate behavior while at Caterpillar. (Tr. 714:14-17, Ex. 55.)

According to Howell's notes, on August 2, 2001, Howell called Early's supervisor, Glenn Mendell, to confirm that Early had received her requested transfer to the third shift, and Mendell told Howell that the transfer had been granted "to help out with her attendance problems" and was

35

effective July 30. (Def. Ex. 55.) The following day, Howell called Doug Holman to confirm Early's shift change "as a permanent move to help honor her shift preference as well as an effort to improve her attendance." (Def. Ex. 55.)

Howell testified that he ultimately decided not to follow up on Early's sexual harassment allegations for several reasons. First, he stated that he could not identify the alleged harasser due to Early's refusal to supply identifying information, and he did not feel it was appropriate to "go out and start talking about this issue amongst everyone." (Tr. 753:18-22.) In addition, according to Howell's report, Early told Howell in their conversation on July 27, 2001 that she considered the issue "over" because the harassment had stopped, and, in fact, Howell did not receive any more complaints from Early about sexual harassment after the July 27 phone conversation. (Tr. 748, 753-54; Def. Ex. 55.) Finally, Howell had confirmed that Early's request for a permanent transfer had been granted and thus saw no need for follow-up absent further communication from Early. (Tr. 754.)

## DISCUSSION

Title VII prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). To establish a prima facie case of hostile work environment sexual harassment, an employee must establish that:

> 1) she was subjected to unwelcome harassment; 2) the harassment was based on her sex; 3) the harassment was sufficiently severe or pervasive so as to alter the condition of her employment and create a hostile or abusive atmosphere; and 4) there is a basis for employer liability.

*Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007), citing *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 940 (7th Cir. 2007). The third prong of this test—the severity or pervasiveness of the harassment—has both an objective and a subjective component. *Lapka v. Chertoff*, 517 F.3d 974, 983 (7th Cir. 2008), citing *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002). The

36

plaintiff may satisfy the subjective prong by presenting evidence that she in fact perceived her workplace as hostile or abusive. *Hilt-Dyson* 282 F.3d at 463. In determining whether a workplace is objectively hostile, the court considers the totality of the circumstances, including the frequency and severity of the discriminatory conduct; "'whether it is physically threatening or humiliating, or a mere offensive utterance;" and "whether it unreasonably interferes with an employee's work performance.'" *See Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1145 (7th Cir. 1997) ("Title VII is not directed against unpleasantness per se but only . . . against discrimination in the conditions of employment." (quoting *Carr v. Allison Gas Turbine Div.*, 32 F.3d 1007, 1009 (7th Cir. 1994)).

Under Title VII, different standards of employer liability apply depending on whether the alleged harasser is the victim's supervisor or a coworker. An employer is strictly liable for harassment by a supervisor. *Andonissamy v. Hewlett-Packard Co.,* 547 F.3d 841, 848 (7th Cir. 2008) (citing *Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006)). A "supervisor" for Title VII purposes is "not simply a person who possesses authority to oversee the plaintiff's job performance, but a person with the power to directly affect the terms and conditions of the plaintiff's employment." *Id.* (citation omitted). This power includes generally "the authority to hire, fire, promote, demote, discipline or transfer . . . ." *Id.,* citing *Rhodes v. Illinois Dept. of Transp.,* 359 F.3d 498, 506 (7th Cir. 2004). An employer is liable for harassment by a coworker only if it was negligent in discovering or remedying the harassment, that is, if the employer "knew or should have known about the harassment and failed to take reasonable steps to remedy the harassment once it was on notice." *Wyninger v. New Venture Gear, Inc*, 361 F.3d 965, 976 (7th Cir. 2004); *Williams v. Waste Mgmt. of Ill.*,361 F.3d 1021, 1029 (7th 2004) ("Put differently, the employer can avoid liability for its employees' harassment if it takes prompt and appropriate corrective action reasonably likely to

prevent the harassment from recurring." (quoting *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1048 (7th Cir.2000) (internal quotations omitted)).

If the harassed employee did not suffer a "tangible employment action," such as discharge, demotion, or undesirable reassignment, the employer may raise the *Faragher/Ellerth* affirmative defense to avoid liability. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *see also Phelan v. Cook County*, 463 F.3d 773, 783 (7th Cir. 2006 (citing *Faragher*, 524 U.S. at 807). To prevail on this defense, the employer must show (1) that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) that the "employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807; *Phelan*, 463 F.3d at 783 (citing *Faragher*, 524 U.S. at 807). The *Faragher/Ellerth* defense is not available, however, if the employee suffered a "tangible employment action" as part of the alleged harassment. *Faragher*, 524 U.S. at 808, citing *Ellerth*, 524 U.S. at 762-63; *Phelan*, 463 F.3d at 784-85.

## I.     Karon Lambert's Sexual Harassment Claim

It is undisputed that Robert Garcia was Karon Lambert's direct supervisor throughout her employment at Caterpillar, making Defendant strictly liable for any sexual harassment of Lambert by Garcia. It is further undisputed that Garcia recommended Lambert's termination and that Caterpillar adopted his recommendation. Had Plaintiff met its burden with respect to Karon Lambert's claim, therefore, the *Faragher/Ellerth* defense would be unavailable to Caterpillar. For the reasons discussed below, however, the court finds that Lambert was not subjected to sexual harassment while an employee at Caterpillar and that Caterpillar established a legitimate, non-discriminatory reason for her dismissal. The court therefore enters judgment in favor of Defendant on Lambert's claim of hostile work environment.

38

Lambert's trial testimony paints a vivid picture of unwanted touching, salacious remarks, and disturbing threats that, if true, would describe an environment in which she was almost daily subjected to the kind of behavior that Title VII prohibits. From Lambert's very first day at Caterpillar, Garcia, her immediate supervisor, allegedly ran his hands along her breasts several times and made sexually suggestive comments about both Lambert and other employees at the plant. According to Lambert, this conduct only intensified over the next two weeks, with Garcia sexually propositioning Lambert on several occasions and then threatening her with termination if she reported his conduct to other Caterpillar employees. Lambert conceded that the physical contact lessened toward the end of her employment, in part, she says, because she began to avoid Garcia after he allegedly groped and threatened her in his office. She maintained, nonetheless, that the harassing conduct continued throughout her employment, and further, that her rejection of Garcia's advances was the underlying cause of her termination. Lambert testified that Garcia's behavior made her feel worthless and humiliated and caused her to modify her dress and behavior to avoid attracting Garcia's attention. She also testified that Garcia's jealous comments and threats frightened and intimidated her. She did not, however, claim that Garcia's behavior affected her job performance.

Despite Lambert's extensive and vivid testimony, substantial contravening evidence counsels against swallowing her account whole. Throughout her testimony, Lambert asserted that her coworkers, Vicki Pittenger, Jenny Logel, and Jessica Hardy had all suffered inappropriate and harassing behavior at Garcia's hands. Yet each of these witnesses took the stand and unambiguously denied Lambert's assertions. All three independently testified that Garcia had never touched them inappropriately or made any sexually suggestive remarks to them. Logel denied that Garcia had rubbed candy across her breasts or otherwise touched or commented on her body at any time. Pittenger likewise denied insinuating that other women tolerated Garcia's offensive behavior or saying that Garcia "just gets his daily feels." Logel and Hardy, who according to Lambert were also present, confirmed Pittenger's testimony. Hardy testified that she, not Garcia, referred to

39

Pittenger, Logel, and herself as Garcia's "harem," and that Garcia reprimanded Hardy in response. Notably, at least one of these witnesses was demonstrably willing to speak up in response to harassment: Hardy testified that she had personally made multiple complaints to Miller and Garcia about sexually inappropriate behavior at Caterpillar, all of which were addressed to her satisfaction. While all three women are currently employed by Caterpillar, none were working under Garcia, who retired in 2003, at the time of trial.

Garcia himself also flatly denied all allegations of harassing behavior directed at Lambert or any other woman at Caterpillar. Garcia's denials, while slight on their own, gain significant weight when considered alongside Pittenger, Logel, and Hardy's testimony not only that Garcia never behaved inappropriately toward them, but also that Lambert never complained to any of them about Garcia during her employment.

Pittenger and Hardy's testimony and Lambert's own previous statements also cast significant doubt on Lambert's account at trial of the dinner in Peoria. Whereas at trial Lambert described herself as anxious and uncomfortable that evening, Pittenger and Hardy recalled that she seemed happy and relaxed, going so far as to tell a stranger how much she was enjoying herself and her job. In addition, Lambert's earlier description of Garcia's harassing behavior, recorded in an e-mail to the EEOC after Lambert filed her charge, stated that Garcia pressed up against her in the booth and made mock complimentary remarks on the way she ate. The letter did not mention that Garcia slid his hand under Lambert's thigh or backside or that he said he wanted to "fork" her, as Lambert testified at trial.

Finally, Lambert's own actions suggest that any harassment was both less frequent and less severe than the descriptions in her trial testimony. Not a single witness testified that Lambert complained about sexual harassment while employed at Caterpillar. Lambert did complain to Tim Anderson and Pete Moore about her working relationship with Garcia, but neither man recalled Lambert's complaining that Garcia had sexually harassed her. Not one witness called at trial–not

40

Lambert's coworkers, not her current husband, not members of the union–could recall hearing Lambert complain about Garcia's sexually inappropriate behavior until the date she was fired, when she unburdened herself to Miller and Anderson over the phone.

Lambert explained her failure to report Garcia's behavior as due in part to a lack of training in Caterpillar's sexual harassment policies. The court agrees with Plaintiff that Wolff's testimony that he recalled training Lambert has little weight, given the sheer number of employees he trained over the course of several years, his inability to recall any other attendees on that date, and the lack of documentation of Lambert's attendance at any training sessions. This leaves her testimony that she received no sexual harassment training uncontradicted, despite the parties' stipulation regarding the substantial training program at Caterpillar, described above. Still, Caterpillar's alleged failure to train Lambert in its policies is just one factor this court must consider in assessing her claim. Lambert knew Caterpillar had a sexual harassment policy and recognized Garcia's alleged behavior as "sexual harassment" based on her training under previous employers. While this does not excuse Caterpillar's duty to train all its incoming employees in its sexual harassment policy, it weighs against Lambert's assertions that she was uncertain about how to respond to Garcia's harassing behavior.

The EEOC presented evidence that two Vallen Safety Supply Company employees, independently contracted to operate Caterpillar's safety stores in their plants, complained to Caterpillar of sexual harassment by Garcia and that Caterpillar failed to act on these complaints. One of these employees, Judy Sawyer (now Judy Green), testified that Garcia brushed up against her twice in the safety store and put his arm around her waist. Sawyer complained to Anderson about Garcia, but admitted she was "unspecific," saying only that Garcia sometimes stood too close and that she considered "unprofessional." Caterpillar could perhaps have pursued the complaint more aggressively, but the court cannot agree that Sawyer's vague allegations were sufficient to put Caterpillar notice that Garcia had "engaged in sexual harassment." (Pl. Post-Trial Br. at 5.) Because the EEOC did not present the second Vallen employee, Ann Marie Logan, at trial, the court

heard only Miller's recollection of her complaint about Garcia. Miller recalled that Logan said Garcia had once brushed up against her breast while she was reaching for something on an upper shelf, but she could not say whether his action was intentional or accidental. Miller spoke to Garcia and he denied Logan's allegations. Again, given the uncertainty with which Logan herself described the encounter and Garcia's denial, the court is not persuaded that Miller or Caterpillar failed to address known sexual harassment or that the circumstances involving Sawyer and Logan furnishes support for Lambert's own less credible claim.

Based on the evidence as a whole, the court concludes that any unwelcome sexual conduct Lambert suffered was not severe or pervasive enough to create a hostile work environment during her employment with Caterpillar. *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 505 (7th Cir. 2004). Weighed against Pittenger, Logel, and Hardy's independent and coherent testimony that Garcia did not, as Lambert claimed, act sexually inappropriately toward any one of them, the court simply cannot credit Lambert's testimony that Garcia's sexually harassing behavior was known and widely tolerated by female employees at Caterpillar. Lambert's testimony on other topics, such as her mood the night of the dinner in Peoria or whether she had ever worn clothing unsuitable for the factory floor, was similarly contradicted by multiple witnesses. Finally, there is the fact that Lambert complained to coworkers about her professional relationship with Garcia, but never breathed a word about sexual harassment, even to family and friends, until the day she was fired. In short, the court did not find Lambert's account of her experience at Caterpillar credible in light of such potent contradicting evidence.

But even if the EEOC had met its burden of showing a hostile work environment under the first three prongs of its claim, the court is not persuaded that Garcia's alleged behavior or Lambert's rejection of his advances ultimately led to Lambert's termination. Caterpillar presented substantial and convincing evidence that Lambert was discharged due to poor job performance. Garcia's progress log, prompted by Logel's account of Lambert's behavior at a retirement party, catalogues

42

numerous complaints from third parties about Lambert's disruptive and unprofessional behavior. On at least three occasions, Garcia reprimanded Lambert for excessive socializing with other employees during work hours; on at least two occasions, he spoke with Lambert about touching other employees in a way that made them uncomfortable; and Garcia had to address Lambert about her inappropriate work attire, which kept Lambert confined to her office for an entire day due to the plant's policy prohibiting skirts or short pants on the factory floor.

Significantly, each incident in Garcia's notes was corroborated at trial by the other individuals involved. Junior Smith testified that he complained to his supervisor, Larry Eichelberger, about Lambert's habit of chatting up employees under his supervision. Wilma Ardelean testified at length, albeit with some apparent embellishment, that Lambert repeatedly came onto her assembly line and socialized with workers for substantial periods of time. Both Owen Stuckey and Dave Limon testified that they complained to Garcia about Lambert's habit of touching them with unwelcome intimacy. Logel and Pittenger confirmed that Caterpillar has a policy prohibiting skirts on the factory floor and recalled seeing Lambert in a skirt and sheer top. Lambert insisted that Garcia never confronted her about her attire, but Logel testified credibly that she was present when Garcia reprimanded Lambert and ordered her to remain in her office. Finally, Timothy Tunt complained to Garcia about how Lambert ran the monthly safety meetings for management employees.

In short, the evidence shows that Lambert suffered an adverse employment action due to unprofessional behavior and poor performance, rather than her rejection of Garcia's advances.

## II. Karon Lambert's Retaliation Claim

The EEOC also alleges that Garcia fired Lambert in retaliation for rejecting his sexual advances. Ordinarily, the EEOC could prevail on this claim under either the direct or indirect method of proof. *Andonissamy*, 547 F.3d at 850. Under the direct method, the EEOC must establish (1) that Lambert engaged in a statutorily protected activity; (2) that she suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse

43

action.  *Id.*  Under the indirect method, the EEOC must establish that Lambert (1) engaged in a statutorily protected activity; (2) met her employer's legitimate expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees who did not engage in the protected activity.  *Id.*  The Seventh Circuit has not yet addressed whether the refusal of sexual advances constitutes a protected activity, and district courts are currently divided on this issue.[8]  Because the court did not find Lambert's testimony regarding Garcia's behavior

---

[8]    When confronted with this issue, most courts in this district have held that Title VII does not recognize refusal of an employer's sexual advances as protected activity.  *Farfaras v. Citizens Bank & Trust of Chicago*, No. 01 C 8720, 2004 WL 2034077, at *2 (N.D. Ill. Aug. 30, 2004) (declining to hold that rejecting sexual advances qualifies as protected activity for purposes of making a retaliation claim);  *Jones v. County of Cook*, No. 01 C 9876, 2002 WL 1611606, at *4 (N.D. Ill. July 17, 2002) (Aspen, J.) (anti-retaliation provision of Title VII "is to prevent employee grievances and Title VII claims from being deterred," not to protect an employee who has merely refused an employer's sexual advances); *Bowers v. Radiological Soc'y of North America, Inc.*, 57 F. Supp. 2d 594, 599 (N.D. Ill.1999) (Bucklo, J.) (the rejection of a sexual relationship without submitting a complaint to management or filing a charge is insufficient to state a claim for retaliation); *Speer v. Rand McNally & Co.*, No. 95 C 6269, 1996 WL 667810, at *8 n.4 (N.D. Ill. Nov.15, 1996) (Marovich, J.) (refusal of sexual advances is not a "protected activity" for Title VII retaliation claim); *Finley v. Rodman & Renshaw, Inc.*, No. 93 C 5504, 1993 WL 512608, at *3 (N.D. Ill. Dec. 8, 1993) (Leinenweber, J.) (where plaintiff did not complain to anyone at company about harassment and filed EEOC charge only after leaving company, her allegations of retaliation "for not reciprocating [her supervisor's] advances is a charge that fits more readily under her sexual harassment claim.").

Two judges on this court, however, have arrived at the opposite conclusion: *Estes v. Illinois Dept. of Human Servs.*, No. 05 C 5750,  2007 WL 551554, *4 (N.D. Ill. Feb. 16, 2007) (Guzman, J.) (holding refusal of employer's sexual advances constituted a protected activity, but limited to facts where employer made no effort to apprise plaintiff of its sexual harassment policy; the alleged harasser is plaintiff's immediate supervisor, second-in-command at company and a decades-long friend of head of company; and plaintiff was told not to complain to management because any report would backfire on plaintiff); *Roberts v. County of Cook*, No. 01 C 9373, 2004 WL 1088230, at *5 (N.D. Ill. May 12, 2004) (Kennelly, J.) ("Title VII makes it unlawful 'for an employer to discriminate against any of his employees ... *because he has opposed any practice made an unlawful employment practice by this subchapter*, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" (quoting 42 U.S.C. § 2000e-3(a)) (court's emphasis)).

To the court's knowledge, only one Court of Appeals has addressed this issue and interpreted Title VII as protecting this kind of conduct: *Ogden v. Wax Works, Inc.*  214 F.3d 999, 1007 (8th Cir. 2000) (recognizing refusing an employer's sexual advances as "opposing discriminatory conduct" within the meaning of 42 U.S.C. § 2000e-3(a)).

(continued...)

credible, however, this question can wait for another day. Assuming the question is answered favorably to Plaintiff, the court notes that the evidence of legitimate reasons for Lambert's discharge would defeat any claim that her discharge was retaliatory, as well.

**III.    Sandy Irvin's Sexual Harassment Claim**

Sandy Irvin alleges that her coworker John Fay made sexually explicit comments and behaved inappropriately toward over approximately five months in 2003 and early 2004, and that Caterpillar failed to respond adequately to this conduct. The court is uncertain that Plaintiff has presented evidence of conduct sufficiently severe or pervasive to create a hostile work environment. Assuming this burden is met, however, the court concludes Caterpillar was not negligent in discovering or addressing the alleged harassment. *See Williams*, 361 F.3d at1029 (employer can avoid liability by taking "prompt appropriate corrective action" once a complaint of harassment comes to its attention).

**A.    Evidence of a hostile work environment**

A successful hostile work environment claim requires both subjective and objective proof of harassment so severe or pervasive it alters the employee's work environment. *Lapka v. Chertoff*, 517 F.3d at 983. The court begins by addressing Irvin's subjective response to the circumstances. As Fay himself admitted, he made sexually suggestive and inappropriate comments to Irvin. Among these were comments about Irvin's underwear and the color of her bra. Fay also told Irvin he was in love with her, that she "looked like she needed a spanking," and asked her at least once "whether she wanted fries with that shake." Irvin testified that these comments were unwelcome and continued on and off for several months beginning in summer 2003. There is at least some evidence that is arguably inconsistent with Irvin's claim that Fay's behavior offended and upset her, however: Irvin acknowledged that she openly sympathized with Fay and was receptive to his personal

[8](...continued)

45

problems, having experienced similar issues in her own marriage. She gave Fay a self-help book she had found useful and even agreed to have a beer with Fay after work, though Fay ultimately called it off.

There was conflicting testimony about whether Irvin objected to Fay's phone calls about his personal life. According to Diveley, in her initial complaints, Irvin said only that she was upset because Fay discussed his personal life with her, not because Fay had made sexually inappropriate comments to her. Irvin also expressed fear that Fay would be disciplined if she reported his behavior to her supervisor. Irvin's desire to spare Fay a reprimand is, again, arguably inconsistent with her contention that she was offended or threatened by Fay's conduct. To the extent that Fay's calls and his habit of staying at the plant after hours were brought to their attention, Caterpillar managers might have pushed harder to determine the nature of his interest in Irvin. Irvin's reluctance to push for discipline, however, means that Caterpillar reasonably could conclude Fay's conduct was not severe or pervasive enough to infect her work environment. Nor did Irvin offer proof that Fay's behavior toward her affected her work performance, beyond saying she was "distracted" and "upset" by Fay's phone calls. (Tr. 509:5.)

Significantly, Irvin's written account of Fay's behavior, recorded just one day after the January 2004 incident, describes a milder version of events than her trial testimony. Although the statement mentions phone calls from Fay beginning in the summer of 2003, it also states that Fay did not begin making sexually explicit comments to her until November or December 2003. According to this contemporaneous statement, Fay massaged Irvin's back until she firmly requested twice that he stop, at which point Fay moved across the room to his desk, where he allegedly sexually propositioned Irvin and alluded to having an erection. Yet, after gathering her things to leave, Irvin accepted a ride to the factory door on Fay's scooter, a distance of only a quarter mile. Irvin testified that she did this not out of any sense of fear or intimidation, but because she was suffering from the flu. The court is puzzled that as upset and offended as Irvin claimed to be, she

46

nevertheless agreed to share a scooter with her harasser. That Irvin waited until July 2004 to file a claim with the EEOC, after learning about a pending negative performance evaluation, likewise casts doubt on the alleged severity of Fay's conduct.

Moreover, putting aside Irvin's subjective perceptions, the court is uncertain that the objective prong of the test is met. A reasonable person might well consider at least some of Fay's acts and language vulgar or offensive, particularly his sexually explicit comments about Irvin's body and dress. Title VII does not, however, impose liability on an employer for mere vulgarities or even for uninvited physical contact that is not severe enough to intimidate or unreasonably interfere with an individual's work performance. *See Hildebrandt v. Ill. Dept. of Nat. Res.*, 347 F.3d 1014, 1035 (7th Cir. 2003) ("Harassment, in the context of Title VII, involves conduct that unreasonably interferes with a person's work performance or creates an intimidating, hostile, or offensive work environment." (quoting *Ngeunjuntr v. Metro. Life Ins. Co.*, 146 F.3d 464, 467 (7th Cir.1998)); *Moser v. Indiana Dept. of Corrections*, 406 F.3d 895, 902-03 (7th Cir. 2005) (handful of inappropriate comments amounting to "heedless jokes," as opposed to "serious or threatening comments," insufficient to establish actionable sexual harassment). Fay's conduct, as Irvin admits, at most upset and distracted her, but did not "unreasonably interfere" with her work. *Hildebrandt*, 347 F.3d at 1035. For other reasons, explained below, the court rules in favor of Defendant on Irvin's claim, but simply notes here that it is not clear on this record that Plaintiff has presented evidence sufficient to meet either the subjective or objective prong of the test.

**B.    Notice to Caterpillar**

Despite professing knowledge of and training in Caterpillar's sexual harassment policy, Irvin did not report Fay's behavior to human resources or labor relations, as she knew the policy required. Although Irvin claims she complained to Brown, then her direct supervisor, at least twice in the fall of 2003, Brown recalls no mention of any sexually inappropriate behavior prior to January 10, 2004. Moreover, Irvin's initial complaints to her coworker Bob Diveley concerned, according to Diveley,

Fay's calls and conversations regarding his marital issues. Any discussion of sexually inappropriate comments came later—exactly when Diveley could not recall, but he believed the second time Irvin complained to him was after January 9, 2004. Diveley testified that he reported Irvin's earlier complaint to Brown, an assertion Brown denied at trial. Assuming that Diveley did report Irvin's complaint, the court is not troubled by Brown's failure to recognize that complaint—that Fay made her uncomfortable by sharing intimate details about his personal life—as an allegation of sexually inappropriate behavior. On January 10, Fay spoke with coworkers Anderson and Diveley about Fay's behavior the previous day, and the two men promptly related the incident to her supervisor. Until that time, the evidence shows that with the possible exception of Diveley, no one else at Caterpillar was aware of any sexually inappropriate conduct by Fay

### C. Caterpillar's Response to Fay's January 2004 Complaint

Even if Fay's behavior were sufficient to create a hostile work environment, once Caterpillar managers became aware of Fay's inappropriate behavior (which the weight of the evidence indicates was January 10, 2004), they acted promptly and consistently with the company's sexual harassment policy. On January 10, 2004, Tunt spoke individually with Fay and Irvin and took notes on both interviews. He also obtained a written statement from Irvin, in which she recorded, to the best of her recollection, Fay's conduct between the summer of 2003 and January 9, 2004. Finally, Tunt interviewed Diveley, the only person with whom Irvin raised the matter prior to January 9, 2004. After weighing Fay's and Irvin's conflicting accounts and considering the absence of any third-party witnesses, Tunt concluded that the evidence did not support a finding that Fay had violated Caterpillar's prohibited harassment policy. Tunt nevertheless suspended Fay for two days with pay and referred him to counseling. He also advised Fay and Irvin to avoid interacting with each other to the extent possible until Irvin's promotion and transfer out of Fay's building.

Irvin herself could not articulate what Caterpillar should have done differently in handling her complaint. Both in her complaints to Diveley and in her written statement on January 10, 2004, Irvin

48

stated that she did not want Fay to be punished and only wanted his inappropriate behavior to stop. Following the January 9, 2004 incident, she got her wish. The record is undisputed that Fay never bothered her again after that date. Further, when asked directly what would have been her ideal outcome, Irvin had no answer. Although Irvin testified that Tunt made certain demeaning and sexist comments during the January 10, 2004 meeting, her choice of Tunt as a mentor soon after as well as her testimony that he had "shown good judgment" in handling her issue with Fay undermine Irvin's credibility on this point.

In conclusion, the evidence indicates that prior to January 9, 2004, Caterpillar had no notice Irvin was being subjected to sexually harassing conduct, and the earliest Caterpillar management knew of any inappropriate or harassing behavior on Fay's part was January 10, 2004, the date Irvin complained to Diveley and Anderson about Fay's behavior the previous day. Once the issue was raised, Caterpillar responded swiftly and appropriately in investigating and addressing Irvin's allegations. The court therefore enters judgment for Defendant on the EEOC's claim on Irvin's behalf.

## IV. Virginia Early's Sexual Harassment Claim

Virginia Early claims she suffered sexual harassment by another Caterpillar employee, an unidentified security guard, over approximately one week in July 2001. Early further claims that Caterpillar failed to take prompt and remedial action in response to her complaints about this harassment. At trial, Early presented uncontradicted evidence that she was sexually harassed. The evidence also revealed, however, that she failed to provide information necessary for Caterpillar to pursue the matter and, further, that Caterpillar acted reasonably in attempting to address Early's allegations.

Early, by her own account, first noticed the security guard perched on his scooter in early July 2001, when he began to park near Early's work area and stare at her as she worked. Each day he moved closer to Early, and eventually he began to speak to her. Early testified that from July 19

49

to July 25, this security guard asked her almost daily, and sometimes several times a day, to have sex with him, and would occasionally describe what his wife refused to do for him sexually. Once, the security guard told Early that in his home country of Romania he could rape her without suffering any consequences. Early consistently refused the guard's advances and told him to stop talking to her. When Early told him that he could get in trouble for sexual harassment, he responded that no one had to know, that it could just be between the two of them. The guard did not at any time touch or otherwise try to assault Early.

The security guard was never identified, and the only witness to any of this behavior was Bruce Kirk, Early's coworker, who saw the security guard hovering around Early four or five times over the course of several weeks. Kirk observed the guard staring at Early while she worked, sometimes without her noticing, and at least once saw him get off his scooter and approach Early. Early also recorded some of her encounters with the guard on scraps of paper, dated July 19, 21, 23 and 25.

Plaintiff has carried its burden of proving that Early experienced sexual harassment. Early's uncontradicted testimony regarding the security guard's conduct was credible, particularly in light of her contemporaneous notes. The guard's repeated solicitations for sex, coupled with the threat of rape, were sufficiently severe to alter Early's work environment. *See Quantock v. Shared Mktg. Servs., Inc.*, 312 F.3d 899, 904 (7th Cir. 2002). Further, although Early testified that the harassment did not disrupt her work, she stated that the guard's threat of rape frightened her and that his behavior caused her significant emotional distress.

Under Caterpillar's sexual harassment policy, an employee may contact Caterpillar's labor relations department to notify the company of harassment. On July 27, 2001, Early did just that when she called Doug Howell. Howell took detailed notes of their conversation. In his report, Howell records that Early complained of someone hitting on her and asking for sexual favors. In addition to her complaints of sexual harassment, however, Early also stated that she wished to work around

other women, that her supervisors were treating her unfairly, and that she did not feel safe doing certain kinds of work due to a previous injury. According to Howell's notes, he asked Early repeatedly to identify or describe her harasser, and Early refused to do so. She also told Howell that she considered the matter with the security guard over since she had requested the guard to stop talking to her and he had not spoken to her since. Howell's report states that Howell spoke with Early's supervisor on August 2 to confirm that Early had received her requested transfer to the third shift and that Howell called again the following day to confirm that the transfer was permanent.

Howell's conversation with Early put Caterpillar on notice of the security guard's sexually harassing conduct as of July 27, 2001. The only question remaining, then, is whether Howell responded reasonably to Early's complaint. *See Longstreet v. Illinois Dept. of Corrections*, 276 F.3d 379, 382 (7th Cir. 2002) ("An employer's response to allegations of harassment 'must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made.'" (quoting *Brooms v. Regal Tube Co.*, 881 F.2d 412, 421 (7th Cir.1989)). Howell testified that after learning that Early's transfer request had been granted, he decided not to investigate her sexual harassment allegations because (1) he could not identify the alleged harasser without more information from Early; (2) Early told him she considered the issue over because the harassment had stopped; (3) Howell had confirmed that her request for a transfer had been granted and was permanent; and (4) after their conversation on July 27, 2001, Early did not contact Howell again with any complaints of sexual harassment. (Tr. 752-754.).

This court has noted that the fact that harassing behavior does not recur does not require the conclusion that the employer's response was adequate. *See EEOC v. Caterpillar, Inc.*, 503 F. Supp. 2d at 1010 (N.D. Ill. 2007) (Pallmeyer, J.) (citing *Loughman v. Malnati Org. Inc.*, 395 F.3d 404, 407 (7th Cir. 2005)). Though Early's transfer had the effect of removing her from her harasser, it was not a response to her harassment complaint, and Howell admitted that he did not take any action to follow up on Early's sexual harassment complaint, other than to confirm that she had been

51

transferred. At the same time, Howell's contemporaneous notes show that sexual harassment was not Early's sole or even her primary complaint. Rather, Early spoke mostly of how "she was tired of working with men" and "wanted to move to an area where she was around women." She also felt her supervisors had treated her unfairly and made her do work she considered unsafe. While the harassment Early claims to have suffered likely fueled her desire to work in a less male-dominated environment, it is clear that the security guard's behavior was just one in a series of complaints she voiced to Howell that day.

In addition, Howell's notes reveal that he did not know the full extent of the sexually inappropriate behavior Early testified to at trial. *See Longstreet*, 276 F.3d at 382 ("What is a reasonable response depends on the gravity of the harassment.") Howell's notes state that someone had "hit on" Early and "ask[ed] her for sexual favors," but do not mention rape. Howell likewise testified that Early did not mention any threats of rape or violence when he spoke with her on July 27, 2001. Early claims she could not remember the security guard's name, but told Howell that he was Romanian. Howell's notes record, however, that Early refused to answer any of his inquiries regarding the identity of her harasser and did not supply any identifying information. Further, his report states that she considered the matter "over" since the harassing behavior had stopped. Finally, there is the fact that Early herself failed to recall the incident when she filed her initial complaint with the EEOC alleging race and disability discrimination with no mention sexual harassment.

While Caterpillar may well have done more in response, the court is not convinced it was unreasonable in addressing Early's complaint. Howell's notes, taken at the time of Early's complaint and thus relatively untainted by hindsight or memory loss, indicate that Early told him someone had "hit on her" and sought "sexual favors." While not insignificant, sexually harassing comments and solicitations do not carry the same import as the threat of rape or assault, which Early did not report

52

in the July 27, 2001 phone conversation. In fact, Early focused primarily on her issues with her supervisors during this conversation, whom she perceived as sexist, unfair, and unresponsive.

Moreover, Early refused to aid Howell in discovering and confronting her alleged harasser. When Howell pressed her for specifics, Early told Howell she believed the harassment had ceased and repeatedly refused to help identify her harasser. Confronted with Early's unyielding resistance to his requests for information, Howell reasonably concluded that Early did not want him to act on her complaint and encouraged her to contact him if she changed her mind. But more important, Howell quite simply could not act on Early's complaint given that the only information he had regarding the harassing employee was his gender. As far as Howell knew, only he, Early, and the unidentified harasser were in the know, and he did not think it appropriate to begin questioning random employees about Early's allegations, particularly when Early herself was so reticent. Considering the conversation as a whole, Howell reasonably concluded that Early wanted, above all, to transfer to another shift, as she had previously requested, and he considered the matter at an end once he confirmed that transfer had taken effect. In sum, the court concludes that Howell acted with reasonable care in the face of Early's refusal to take advantage of his attempts to address her complaints of sexual harassment.

## CONCLUSION

For the reasons explained above, the court enters judgment in favor of Defendant on all counts. Accordingly, Plaintiff's request for injunctive and equitable relief is denied.

ENTER:

Dated:       June 18, 2009

_____
                    REBECCA R. PALLMEYER
                    United States District Judge